(Slip Opinion)                OCTOBER TERM, 2013                1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NATIONAL LABOR RELATIONS BOARD *v.* NOEL CANNING ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 12–1281.   Argued January 13, 2014—Decided June 26, 2014

Respondent Noel Canning, a Pepsi-Cola distributor, asked the D. C. Circuit to set aside an order of the National Labor Relations Board, claiming that the Board lacked a quorum because three of the five Board members had been invalidly appointed. The nominations of the three members in question were pending in the Senate when it passed a December 17, 2011, resolution providing for a series of "*pro forma* session[s]," with "no business . . . transacted," every Tuesday and Friday through January 20, 2012. S. J., 112th Cong., 1st Sess., 923. Invoking the Recess Appointments Clause—which gives the President the power "to fill up all Vacancies that may happen during the Recess of the Senate," Art. II, §2, cl. 3—the President appointed the three members in question between the January 3 and January 6 *pro forma* sessions. Noel Canning argued primarily that the appointments were invalid because the 3-day adjournment between those two sessions was not long enough to trigger the Recess Appointments Clause. The D. C. Circuit agreed that the appointments fell outside the scope of the Clause, but on different grounds. It held that the phrase "the recess," as used in the Clause, does not include intra-session recesses, and that the phrase "vacancies that may happen during the recess" applies only to vacancies that first come into existence during a recess.

*Held*:

   1. The Recess Appointments Clause empowers the President to fill any existing vacancy during any recess—intra-session or inter-session—of sufficient length. Pp. 5–33.

      (a) Two background considerations are relevant to the questions here. First, the Recess Appointments Clause is a subsidiary method

for appointing officers of the United States. The Founders intended the norm to be the method of appointment in Article II, §2, cl. 2, which requires Senate approval of Presidential nominations, at least for principal officers. The Recess Appointments Clause reflects the tension between the President's continuous need for "the assistance of subordinates," *Myers* v. *United States*, 272 U. S. 52, 117, and the Senate's early practice of meeting for a single brief session each year. The Clause should be interpreted as granting the President the power to make appointments during a recess but not offering the President the authority routinely to avoid the need for Senate confirmation.

Second, in interpreting the Clause, the Court puts significant weight upon historical practice. The longstanding "practice of the government," *McCulloch* v. *Maryland*, 4 Wheat. 316, 401, can inform this Court's determination of "what the law is" in a separation-of-powers case, *Marbury* v. *Madison*, 1 Cranch 137, 176. See also, *e.g., Mistretta* v. *United States*, 488 U. S. 361, 401; *The Pocket Veto Case*, 279 U. S. 655, 689–690. There is a great deal of history to consider here, for Presidents have made recess appointments since the beginning of the Republic. Their frequency suggests that the Senate and President have recognized that such appointments can be both necessary and appropriate in certain circumstances. The Court, in interpreting the Clause for the first time, must hesitate to upset the compromises and working arrangements that the elected branches of Government themselves have reached. Pp. 5–9.

(b) The phrase "the recess of the Senate" applies to both intersession recess (*i.e.,* breaks between formal sessions of the Senate) and intra-session recesses (*i.e.,* breaks in the midst of a formal session) of substantial length. The constitutional text is ambiguous. Founding-era dictionaries and usages show that the phrase "the recess" can encompass intra-session breaks. And this broader interpretation is demanded by the purpose of the Clause, which is to allow the President to make appointments so as to ensure the continued functioning of the Government while the Senate is away. The Senate is equally away and unavailable to participate in the appointments process during both an inter-session and an intra-session recess. History offers further support for this interpretation. From the founding until the Great Depression, every time the Senate took a substantial, non-holiday intra-session recess, the President made recess appointments. President Andrew Johnson made the first documented intra-session recess appointments in 1867 and 1868, and Presidents made similar appointments in 1921 and 1929. Since 1929, and particularly since the end of World War II, Congress has shortened its inter-session breaks and taken longer and more frequent intra-session

breaks; Presidents accordingly have made more intra-session recess appointments. Meanwhile, the Senate has never taken any formal action to deny the validity of intra-session recess appointments. In 1905, the Senate Judiciary Committee defined "the recess" as "the period of time when the Senate" is absent and cannot "participate as a body in making appointments," S. Rep. No. 4389, 58th Cong., 3d Sess., p. 2, and that functional definition encompasses both intra-session and inter-session recesses. A 1940 law regulating the payment of recess appointees has also been interpreted functionally by the Comptroller General (an officer of the Legislative Branch). In sum, Presidents have made intra-session recess appointments for a century and a half, and the Senate has never taken formal action to oppose them. That practice is long enough to entitle it to "great weight in a proper interpretation" of the constitutional provision. *The Pocket Veto Case*, *supra*, at 689.

The Clause does not say how long a recess must be in order to fall within the Clause, but even the Solicitor General concedes that a 3-day recess would be too short. The Adjournments Clause, Art. I, §5, cl. 4, reflects the fact that a 3-day break is not a significant interruption of legislative business. A Senate recess that is so short that it does not require the consent of the House under that Clause is not long enough to trigger the President's recess-appointment power. Moreover, the Court has not found a single example of a recess appointment made during an intra-session recess that was shorter than 10 days. There are a few examples of inter-session recess appointments made during recesses of less than 10 days, but these are anomalies. In light of historical practice, a recess of more than 3 days but less than 10 days is presumptively too short to fall within the Clause. The word "presumptively" leaves open the possibility that a very unusual circumstance could demand the exercise of the recess-appointment power during a shorter break. Pp. 9–21.

(c) The phrase "vacancies that may happen during the recess of the Senate," Art. II, §2, cl. 3, applies both to vacancies that first come into existence during a recess and to vacancies that initially occur before a recess but continue to exist during the recess. Again, the text is ambiguous. As Thomas Jefferson observed, the Clause is "certainly susceptible of [two] constructions." Letter to Wilson Cary Nicholas (Jan. 26, 1802), in 36 Papers of Thomas Jefferson 433. It "may mean 'vacancies that may happen to be' or 'may happen to fall'" during a recess. *Ibid.* And, as Attorney General Wirt wrote in 1821, the broader reading is more consonant with the "reason and spirit" of the Clause. 1 Op. Atty. Gen. 632. The purpose of the Clause is to permit the President, who is always acting to execute the law, to obtain the assistance of subordinate officers while the Senate, which acts only in

Syllabus

intervals, is unavailable to confirm them. If a vacancy arises too late in the session for the President and Senate to have an opportunity to select a replacement, the narrower reading could paralyze important functions of the Federal Government, particularly at the time of the founding. The broader interpretation ensures that offices needing to be filled can be filled. It does raise a danger that the President may attempt to use the recess-appointment power to circumvent the Senate's advice and consent role. But the narrower interpretation risks undermining constitutionally conferred powers more seriously and more often. It would prevent a President from making any recess appointment to fill a vacancy that arose before a recess, no matter who the official, how dire the need, how uncontroversial the appointment, and how late in the session the office fell vacant.

Historical practice also strongly favors the broader interpretation. The tradition of applying the Clause to pre-recess vacancies dates at least to President Madison. Nearly every Attorney General to consider the question has approved the practice, and every President since James Buchanan has made recess appointments to pre-existing vacancies. It is a fair inference from the historical data that a large proportion of recess appointments over our Nation's history have filled pre-recess vacancies. The Senate Judiciary Committee in 1863 did issue a report disagreeing with the broader interpretation, and Congress passed a law known as the Pay Act prohibiting payment of recess appointments to pre-recess vacancies soon after. However, the Senate subsequently abandoned its hostility. In 1940, the Senate amended the Pay Act to permit payment of recess appointees in circumstances that would be unconstitutional under the narrower interpretation. In short, Presidents have made recess appointments to preexisting vacancies for two centuries, and the Senate as a body has not countered this practice for nearly three-quarters of a century, perhaps longer. The Court is reluctant to upset this traditional practice where doing so would seriously shrink the authority that Presidents have believed existed and have exercised for so long. Pp. 21–33.

2. For purposes of the Recess Appointments Clause, the Senate is in session when it says that it is, provided that, under its own rules, it retains the capacity to transact Senate business.

This standard is consistent with the Constitution's broad delegation of authority to the Senate to determine how and when to conduct its business, as recognized by this Court's precedents. See Art. I, §5, cl. 2; *Marshall Field & Co.* v. *Clark*, 143 U. S. 649, 672; *United States* v. *Ballin*, 144 U. S. 1, 5, 9. Although the Senate's own determination of when it is and is not in session should be given great weight, the Court's deference cannot be absolute. When the Senate is without

the capacity to act, under its own rules, it is not in session even if it so declares.

Under the standard set forth here, the Senate was in session during the *pro forma* sessions at issue. It said it was in session, and Senate rules make clear that the Senate retained the power to conduct business. The Senate could have conducted business simply by passing a unanimous consent agreement. In fact, it did so; it passed a bill by unanimous consent during its *pro forma* session on December 23, 2011. See 2011 S. J. 924; Pub. L. 112–78. The Court will not, as the Solicitor General urges, engage in an in-depth factual appraisal of what the Senate actually did during its *pro forma* sessions in order to determine whether it was in recess or in session for purposes of the Recess Appointments Clause.

Because the Senate was in session during its *pro forma* sessions, the President made the recess appointments at issue during a 3-day recess. Three days is too short a time to bring a recess within the scope of the Clause, so the President lacked the authority to make those appointments. Pp. 33–41.

705 F. 3d 490, affirmed.

BREYER, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which ROBERTS, C. J., and THOMAS and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–1281

_____

## NATIONAL LABOR RELATIONS BOARD, PETITIONER *v.* NOEL CANNING, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 26, 2014]

JUSTICE BREYER delivered the opinion of the Court.

Ordinarily the President must obtain "the Advice and Consent of the Senate" before appointing an "Office[r] of the United States." U. S. Const., Art. II, §2, cl. 2. But the Recess Appointments Clause creates an exception. It gives the President alone the power "to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." Art. II, §2, cl. 3. We here consider three questions about the application of this Clause.

The first concerns the scope of the words "recess of the Senate." Does that phrase refer only to an inter-session recess (*i.e.,* a break between formal sessions of Congress), or does it also include an intra-session recess, such as a summer recess in the midst of a session? We conclude that the Clause applies to both kinds of recess.

The second question concerns the scope of the words "vacancies that may happen." Does that phrase refer only to vacancies that first come into existence during a recess, or does it also include vacancies that arise prior to a recess but continue to exist during the recess? We conclude that

the Clause applies to both kinds of vacancy.

The third question concerns calculation of the length of a "recess." The President made the appointments here at issue on January 4, 2012. At that time the Senate was in recess pursuant to a December 17, 2011, resolution providing for a series of brief recesses punctuated by "*pro forma* session[s]," with "no business . . . transacted," every Tuesday and Friday through January 20, 2012. S. J., 112th Cong., 1st Sess., 923 (2011) (hereinafter 2011 S. J.). In calculating the length of a recess are we to ignore the *pro forma* sessions, thereby treating the series of brief recesses as a single, month-long recess? We conclude that we cannot ignore these *pro forma* sessions.

Our answer to the third question means that, when the appointments before us took place, the Senate was in the midst of a 3-day recess. Three days is too short a time to bring a recess within the scope of the Clause. Thus we conclude that the President lacked the power to make the recess appointments here at issue.

I

The case before us arises out of a labor dispute. The National Labor Relations Board (NLRB) found that a Pepsi-Cola distributor, Noel Canning, had unlawfully refused to reduce to writing and execute a collective-bargaining agreement with a labor union. The Board ordered the distributor to execute the agreement and to make employees whole for any losses. *Noel Canning*, 358 N. L. R. B. No. 4 (2012).

The Pepsi-Cola distributor subsequently asked the Court of Appeals for the District of Columbia Circuit to set the Board's order aside. It claimed that three of the five Board members had been invalidly appointed, leaving the Board without the three lawfully appointed members necessary for it to act. See 29 U. S. C. §160(f) (providing for judicial review); §153(a) (providing for a 5-member

Board); §153(b) (providing for a 3-member quorum); *New Process Steel, L. P.* v. *NLRB*, 560 U. S. 674, 687–688 (2010) (in the absence of a lawfully appointed quorum, the Board cannot exercise its powers).

The three members in question were Sharon Block, Richard Griffin, and Terence Flynn. In 2011 the President had nominated each of them to the Board. As of January 2012, Flynn's nomination had been pending in the Senate awaiting confirmation for approximately a year. The nominations of each of the other two had been pending for a few weeks. On January 4, 2012, the President, invoking the Recess Appointments Clause, appointed all three to the Board.

The distributor argued that the Recess Appointments Clause did not authorize those appointments. It pointed out that on December 17, 2011, the Senate, by unanimous consent, had adopted a resolution providing that it would take a series of brief recesses beginning the following day. See 2011 S. J. 923. Pursuant to that resolution, the Senate held *pro forma* sessions every Tuesday and Friday until it returned for ordinary business on January 23, 2012. *Ibid.*; 158 Cong. Rec. S1–S11 (Jan. 3–20, 2012). The President's January 4 appointments were made between the January 3 and January 6 *pro forma* sessions. In the distributor's view, each *pro forma* session terminated the immediately preceding recess. Accordingly, the appointments were made during a 3-day adjournment, which is not long enough to trigger the Recess Appointments Clause.

The Court of Appeals agreed that the appointments fell outside the scope of the Clause. But the court set forth different reasons. It held that the Clause's words "the recess of the Senate" do not include recesses that occur *within* a formal session of Congress, *i.e.,* intra-session recesses. Rather those words apply only to recesses *between* those formal sessions, *i.e.,* inter-session recesses.

Since the second session of the 112th Congress began on January 3, 2012, the day before the President's appointments, those appointments occurred during an intra-session recess, and the appointments consequently fell outside the scope of the Clause. 705 F. 3d 490, 499–507 (CADC 2013).

The Court of Appeals added that, in any event, the phrase "vacancies that may happen during the recess" applies only to vacancies that come into existence during a recess. *Id.,* at 507–512. The vacancies that Members Block, Griffin, and Flynn were appointed to fill had arisen before the beginning of the recess during which they were appointed. For this reason too the President's appointments were invalid. And, because the Board lacked a quorum of validly appointed members when it issued its order, the order was invalid. 29 U. S. C. §153(b); *New Process Steel*, *supra.*

We granted the Solicitor General's petition for certiorari. We asked the parties to address not only the Court of Appeals' interpretation of the Clause but also the distributor's initial argument, namely, "[w]hether the President's recess-appointment power may be exercised when the Senate is convening every three days in *pro forma* sessions." 570 U. S. ___ (2013).

We shall answer all three questions presented. We recognize that the President has nominated others to fill the positions once occupied by Members Block, Griffin, and Flynn, and that the Senate has confirmed these successors. But, as the parties recognize, the fact that the Board now unquestionably has a quorum does not moot the controversy about the validity of the previously entered Board order. And there are pending before us petitions from decisions in other cases involving challenges to the appointment of Board Member Craig Becker. The President appointed Member Becker during an intra-session recess that was not punctuated by *pro forma* ses-

sions, and the vacancy Becker filled had come into existence prior to the recess. See Congressional Research Service, H. Hogue, M. Carey, M. Greene, & M. Bearden, The *Noel Canning* Decision and Recess Appointments Made from 1981–2013, p. 28 (Feb. 4, 2013) (hereinafter The *Noel Canning* Decision); NLRB, Members of the NLRB since 1935, online at http://www.nlrb.gov/who-we-are/board/members-nlrb-1935 (all Internet materials as visited June 24, 2014, and available in Clerk of Court's case file). Other cases involving similar challenges are also pending in the Courts of Appeals. *E.g., NLRB* v. *New Vista Nursing & Rehabilitation*, No. 11–3440 etc. (CA3). Thus, we believe it is important to answer all three questions that this case presents.

## II

Before turning to the specific questions presented, we shall mention two background considerations that we find relevant to all three. First, *the Recess Appointments Clause sets forth a subsidiary, not a primary, method for appointing officers of the United States*. The immediately preceding Clause—Article II, Section 2, Clause 2—provides the primary method of appointment. It says that the President "shall nominate, *and by and with the Advice and Consent of the Senate*, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States" (emphasis added).

The Federalist Papers make clear that the Founders intended this method of appointment, requiring Senate approval, to be the norm (at least for principal officers). Alexander Hamilton wrote that the Constitution vests the power of *nomination* in the President alone because "one man of discernment is better fitted to analise and estimate the peculiar qualities adapted to particular offices, than a body of men of equal, or perhaps even of superior discern-

ment." The Federalist No. 76, p. 510 (J. Cooke ed. 1961).
At the same time, the need to secure Senate approval
provides "an excellent check upon a spirit of favoritism in
the President, and would tend greatly to preventing the
appointment of unfit characters from State prejudice, from
family connection, from personal attachment, or from a
view to popularity." *Id.,* at 513. Hamilton further ex-
plained that the

> "ordinary power of appointment is confided to the
> President and Senate *jointly*, and can therefore only
> be exercised during the session of the Senate; but as it
> would have been improper to oblige this body to be
> continually in session for the appointment of officers;
> and as vacancies might happen *in their recess*, which
> it might be necessary for the public service to fill
> without delay, the succeeding clause is evidently in-
> tended to authorise the President *singly* to make tem-
> porary appointments." *Id.*, No. 67, at 455.

Thus the Recess Appointments Clause reflects the ten-
sion between, on the one hand, the President's continuous
need for "the assistance of subordinates," *Myers* v. *United
States*, 272 U. S. 52, 117 (1926), and, on the other, the
Senate's practice, particularly during the Republic's early
years, of meeting for a single brief session each year, see
Art. I, §4, cl. 2; Amdt. 20, §2 (requiring the Senate to
"assemble" only "once in every year"); 3 J. Story, Commen-
taries on the Constitution of the United States §1551, p.
410 (1833) (it would be "burthensome to the senate, and
expensive to the public" to require the Senate to be "per-
petually in session"). We seek to interpret the Clause as
granting the President the power to make appointments
during a recess but not offering the President the author-
ity routinely to avoid the need for Senate confirmation.

Second, *in interpreting the Clause, we put significant
weight upon historical practice*. For one thing, the inter-

pretive questions before us concern the allocation of power between two elected branches of Government. Long ago Chief Justice Marshall wrote that

> "a doubtful question, one on which human reason may pause, and the human judgment be suspended, in the decision of which the great principles of liberty are not concerned, but the respective powers of those who are equally the representatives of the people, are to be adjusted; if not put at rest by the practice of the government, ought to receive a considerable impression from that practice." *McCulloch* v. *Maryland*, 4 Wheat. 316, 401 (1819).

And we later confirmed that "[l]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions" regulating the relationship between Congress and the President. *The Pocket Veto Case*, 279 U. S. 655, 689 (1929); see also *id.,* at 690 ("[A] practice of at least twenty years duration 'on the part of the executive department, acquiesced in by the legislative department, . . . is entitled to great regard in determining the true construction of a constitutional provision the phraseology of which is in any respect of doubtful meaning'" (quoting *State* v. *South Norwalk*, 77 Conn. 257, 264, 58 A. 759, 761 (1904))).

We recognize, of course, that the separation of powers can serve to safeguard individual liberty, *Clinton* v. *City of New York*, 524 U. S. 417, 449–450 (1998) (KENNEDY, J., concurring), and that it is the "duty of the judicial department"—in a separation-of-powers case as in any other—"to say what the law is," *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803). But it is equally true that the longstanding "practice of the government," *McCulloch, supra,* at 401, can inform our determination of "what the law is," *Marbury, supra,* at 177.

That principle is neither new nor controversial. As

James Madison wrote, it "was foreseen at the birth of the Constitution, that difficulties and differences of opinion might occasionally arise in expounding terms & phrases necessarily used in such a charter . . . and that it might require a regular course of practice to liquidate & settle the meaning of some of them." Letter to Spencer Roane (Sept. 2, 1819), in 8 Writings of James Madison 450 (G. Hunt ed. 1908). And our cases have continually confirmed Madison's view. *E.g., Mistretta* v. *United States*, 488 U. S. 361, 401 (1989); *Dames & Moore* v. *Regan*, 453 U. S. 654, 686 (1981); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 610–611 (1952) (Frankfurter, J., concurring); *The Pocket Veto Case, supra,* at 689–690; *Ex parte Grossman*, 267 U. S. 87, 118–119 (1925); *United States* v. *Midwest Oil Co.*, 236 U. S. 459, 472–474 (1915); *McPherson* v. *Blacker*, 146 U. S. 1, 27 (1892); *McCulloch, supra; Stuart* v. *Laird*, 1 Cranch 299 (1803).

These precedents show that this Court has treated practice as an important interpretive factor even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era. See *Mistretta, supra,* 400–401 ("While these [practices] spawned spirited discussion and frequent criticism, . . . 'traditional ways of conducting government . . . give meaning' to the Constitution" (quoting *Youngstown, supra,* at 610) (Frankfurter, J., concurring)); *Regan, supra,* at 684 ("[E]ven if the pre-1952 [practice] should be disregarded, congressional acquiescence in [a practice] since that time supports the President's power to act here"); *The Pocket Veto Case, supra,* at 689–690 (postfounding practice is entitled to "great weight"); *Grossman, supra,* at 118–119 (postfounding practice "strongly sustains" a "construction" of the Constitution).

There is a great deal of history to consider here. Presidents have made recess appointments since the beginning of the Republic. Their frequency suggests that the Senate

and President have recognized that recess appointments can be both necessary and appropriate in certain circumstances. We have not previously interpreted the Clause, and, when doing so for the first time in more than 200 years, we must hesitate to upset the compromises and working arrangements that the elected branches of Government themselves have reached.

## III

The first question concerns the scope of the phrase *"the recess* of the Senate." Art. II, §2, cl. 3 (emphasis added). The Constitution provides for congressional elections every two years. And the 2-year life of each elected Congress typically consists of two formal 1-year sessions, each separated from the next by an "inter-session recess." Congressional Research Service, H. Hogue, Recess Appointments: Frequently Asked Questions 2 (2013). The Senate or the House of Representatives announces an inter-session recess by approving a resolution stating that it will "adjourn *sine die*," *i.e.,* without specifying a date to return (in which case Congress will reconvene when the next formal session is scheduled to begin).

The Senate and the House also take breaks in the midst of a session. The Senate or the House announces any such "intra-session recess" by adopting a resolution stating that it will "adjourn" to a fixed date, a few days or weeks or even months later. All agree that the phrase "the recess of the Senate" covers inter-session recesses. The question is whether it includes intra-session recesses as well.

In our view, the phrase "the recess" includes an intra-session recess of substantial length. Its words taken literally can refer to both types of recess. Founding-era dictionaries define the word "recess," much as we do today, simply as "a period of cessation from usual work." 13 The Oxford English Dictionary 322–323 (2d ed. 1989) (hereinafter OED) (citing 18th- and 19th-century sources for that

definition of "recess"); 2 N. Webster, An American Diction-
ary of the English Language (1828) ("[r]emission or sus-
pension of business or procedure"); 2 S. Johnson, A Dic-
tionary of the English Language 1602–1603 (4th ed. 1773)
(hereinafter Johnson) (same). The Founders themselves
used the word to refer to intra-session, as well as to inter-
session, breaks. See, *e.g.,* 3 Records of the Federal Con-
vention of 1787, p. 76 (M. Farrand rev. 1966) (hereinafter
Farrand) (letter from George Washington to John Jay
using "the recess" to refer to an intra-session break of the
Constitutional Convention); *id.,* at 191 (speech of Luther
Martin with a similar usage); 1 T. Jefferson, A Manual
of Parliamentary Practice §LI, p. 165 (2d ed. 1812) (de-
scribing a "recess by adjournment" which did *not* end a
session).

We recognize that the word "the" in "*the* recess" might
suggest that the phrase refers to the single break separat-
ing formal sessions of Congress. That is because the word
"the" frequently (but not always) indicates "a particular
thing." 2 Johnson 2003. But the word can also refer "to a
term used generically or universally." 17 OED 879. The
Constitution, for example, directs the Senate to choose a
President *pro tempore* "in *the* Absence of the Vice-
President." Art. I, §3, cl. 5 (emphasis added). And the
Federalist Papers refer to the chief magistrate of an an-
cient Achaean league who "administered the government
in *the* recess of the Senate." The Federalist No. 18, at 113
(J. Madison) (emphasis added). Reading "the" generically
in this way, there is no linguistic problem applying the
Clause's phrase to both kinds of recess. And, in fact, the
phrase "the recess" was used to refer to intra-session
recesses at the time of the founding. See, *e.g.,* 3 Farrand
76 (letter from Washington to Jay); New Jersey Legislative-
Council Journal, 5th Sess., 1st Sitting 70, 2d Sitting 9
(1781) (twice referring to a 4-month, intra-session break
as "the Recess"); see also Brief for Petitioner 14–16 (listing

examples).

The constitutional text is thus ambiguous. And we believe the Clause's purpose demands the broader interpretation. The Clause gives the President authority to make appointments during "the recess of the Senate" so that the President can ensure the continued functioning of the Federal Government when the Senate is away. The Senate is equally away during both an inter-session and an intra-session recess, and its capacity to participate in the appointments process has nothing to do with the words it uses to signal its departure.

History also offers strong support for the broad interpretation. We concede that pre-Civil War history is not helpful. But it shows only that Congress generally took long breaks between sessions, while taking no significant intrasession breaks at all (five times it took a break of a week or so at Christmas). See Appendix A, *infra*. Obviously, if there are no significant intra-session recesses, there will be no intra-session recess appointments. In 1867 and 1868, Congress for the first time took substantial, nonholiday intra-session breaks, and President Andrew Johnson made dozens of recess appointments. The Federal Court of Claims upheld one of those specific appointments, writing "[w]e have *no doubt* that a vacancy occurring while the Senate was thus temporarily adjourned" during the "first session of the Fortieth Congress" was "legally filled by appointment of the President alone." *Gould* v. *United States*, 19 Ct. Cl. 593, 595–596 (1884) (emphasis added). Attorney General Evarts also issued three opinions concerning the constitutionality of President Johnson's appointments, and it apparently did not occur to him that the distinction between intra-session and inter-session recesses was significant. See 12 Op. Atty. Gen. 449 (1868); 12 Op. Atty. Gen. 455 (1868); 12 Op. Atty. Gen. 469 (1868). Similarly, though the 40th Congress impeached President Johnson on charges relating to his appointment power, he

was not accused of violating the Constitution by mak-
ing intra-session recess appointments.  Hartnett, Recess
Appointments of Article III Judges: Three Constitutional
Questions, 26 Cardozo L. Rev. 377, 409 (2005).

   In all, between the founding and the Great Depression,
Congress took substantial intra-session breaks (other than
holiday breaks) in four years: 1867, 1868, 1921, and 1929.
Appendix A, *infra.*  And in each of those years the Presi-
dent made intra-session recess appointments.  See App. to
Brief for Petitioner 1a–11a.

   Since 1929, and particularly since the end of World War
II, Congress has shortened its inter-session breaks as it
has taken longer and more frequent intra-session breaks;
Presidents have correspondingly made more intra-session
recess appointments. Indeed, if we include military ap-
pointments, Presidents have made thousands of intra-
session recess appointments.  *Id.,* at 11a–64a.  President
Franklin Roosevelt, for example, commissioned Dwight
Eisenhower as a permanent Major General during an
intra-session recess; President Truman made Dean Ache-
son Under Secretary of State; and President George H. W.
Bush reappointed Alan Greenspan as Chairman of the
Federal Reserve Board.  *Id.,* at 11a, 12a, 40a.  JUSTICE
SCALIA does not dispute any of these facts.

   Not surprisingly, the publicly available opinions of
Presidential legal advisers that we have found are nearly
unanimous in determining that the Clause authorizes
these appointments.  In 1921, for example, Attorney Gen-
eral Daugherty advised President Harding that he could
make intra-session recess appointments.  He reasoned:

   "If the President's power of appointment is to be de-
   feated because the Senate takes an adjournment to a
   specified date, the painful and inevitable result will be
   measurably to prevent the exercise of governmental
   functions.  I can not bring myself to believe that the

framers of the Constitution ever intended such a catastrophe to happen."  33 Op. Atty. Gen. 20, 23.

We have found memoranda offering similar advice to President Eisenhower and to every President from Carter to the present.  See 36 Opinion of Office of Legal Counsel (Op. OLC) \_\_\_, \_\_\_ (2012), online at www.justice.gov/ olc/opiniondocslpro-forma-sessions-opinion.pdf;    25  Op. OLC 182 (2001); 20 Op. OLC 124, 161 (1996); 16 Op. OLC 15 (1992); 13 Op. OLC 271 (1989); 6 Op. OLC 585, 586 (1982); 3 Op. OLC 314, 316 (1979); 41 Op. Atty. Gen. 463, 466 (1960).

We must note one contrary opinion authored by President Theodore Roosevelt's Attorney General Philander Knox.  Knox advised the President that the Clause did not cover a 19–day intra-session Christmas recess.  23 Op. Atty. Gen. 599 (1901).  But in doing so he relied heavily upon the use of the word "the," a linguistic point that we do not find determinative.  See *supra,* at 10.  And Knox all but confessed that his interpretation ran contrary to the basic purpose of the Clause.  For it would permit the Senate to adjourn for "several months," to a fixed date, and thereby "seriously curtail the President's power of making recess appointments."  23 Op. Atty. Gen., at 603. Moreover, only three days before Knox gave his opinion, the Solicitor of the Treasury came to the opposite conclusion.  Reply Brief 7, n. 5.  We therefore do not think Knox's isolated opinion can disturb the consensus advice within the Executive Branch taking the opposite position.

What about the Senate?  Since Presidents began making intra-session recess appointments, individual Senators have taken differing views about the proper definition of "the recess."  See, *e.g.,* 130 Cong. Rec. 23234 (1984) (resolution introduced by Senator Byrd urging limits on the *length* of applicable intra-session recesses); Brief for Sen. Mitch McConnell et al. as *Amici Curiae* 26 (an intra-

session adjournment does not count as "the recess"); Brief for Sen. Edward M. Kennedy as *Amicus Curiae* in *Franklin* v. *United States*, O. T. 2004, No. 04–5858, p. 5 (same). But neither the Senate considered as a body nor its committees, despite opportunities to express opposition to the practice of intra-session recess appointments, has done so. Rather, to the extent that the Senate or a Senate committee has expressed a view, that view has favored a functional definition of "recess," and a functional definition encompasses intra-session recesses.

Most notably, in 1905 the Senate Committee on the Judiciary objected strongly to President Theodore Roosevelt's use of the Clause to make more than 160 recess appointments during a "fictitious" inter-session recess. S. Rep. No. 4389, 58th Cong., 3d Sess., p. 2 (hereinafter 1905 Senate Report). At noon on December 7, 1903, the Senate President *pro tempore* had "declare[d]" a formal, "extraordinary session" of the Senate "adjourned without day," and the next formal Senate session began immediately afterwards. 37 Cong. Rec. 544 (1903). President Roosevelt made over 160 recess appointments during the instantaneous inter-session interval. The Judiciary Committee, when stating its strong objection, defined "recess" in functional terms as

> "the period of time when the Senate is not sitting in regular or extraordinary session as a branch of the Congress . . . ; when its members owe no duty of attendance; when its Chamber is empty; when, because of its absence, it can not receive communications from the President or participate as a body in making appointments." 1905 Senate Report, at 2 (emphasis deleted).

That functional definition encompasses intra-session, as well as inter-session, recesses. JUSTICE SCALIA is right that the 1905 Report did not specifically address the dis-

tinction between inter-session and intra-session recesses. But the animating principle of the Report—that "recess" should be practically construed to mean a time when the Senate is unavailable to participate in the appointments process—is inconsistent with the formalistic approach that JUSTICE SCALIA endorses.

Similarly, in 1940 the Senate helped to enact a law regulating the payment of recess appointees, and the Comptroller General of the United States has interpreted that law functionally. An earlier 1863 statute had denied pay to individuals appointed to fill up vacancies first arising prior to the beginning of a recess. The Senate Judiciary Committee then believed that those vacancies fell outside the scope of the Clause. See *infra,* at 30. In 1940, however, the Senate amended the law to permit many of those recess appointees to be paid. Act of July 11, 54 Stat. 751. Interpreting the amendments in 1948, the Comptroller General—who, unlike the Attorney General, is an "officer of the Legislative Branch," *Bowsher* v. *Synar*, 478 U. S. 714, 731 (1986)—wrote:

> "I think it is clear that [the Pay Act amendments'] primary purpose was to relieve 'recess appointees' of the burden of serving without compensation during periods when the Senate is not actually sitting and is not available to give its advice and consent in respect to the appointment, irrespective of whether the recess of the Senate is attributable to a final adjournment *sine die* or to an adjournment to a specified date." 28 Comp. Gen. 30, 37.

We recognize that the Senate cannot easily register opposition as a body to every governmental action that many, perhaps most, Senators oppose. But the Senate has not been silent or passive regarding the meaning of the Clause: A Senate Committee did register opposition to President Theodore Roosevelt's use of the Clause, and the

Senate as a whole has legislated in an effort to discourage certain kinds of recess appointments. And yet we are not aware of any formal action it has taken to call into question the broad and functional definition of "recess" first set out in the 1905 Senate Report and followed by the Executive Branch since at least 1921. Nor has JUSTICE SCALIA identified any. All the while, the President has made countless recess appointments during intra-session recesses.

The upshot is that restricting the Clause to inter-session recesses would frustrate its purpose. It would make the President's recess-appointment power dependent on a formalistic distinction of Senate procedure. Moreover, the President has consistently and frequently interpreted the word "recess" to apply to intra-session recesses, and has acted on that interpretation. The Senate as a body has done nothing to deny the validity of this practice for at least three-quarters of a century. And three-quarters of a century of settled practice is long enough to entitle a practice to "great weight in a proper interpretation" of the constitutional provision. *The Pocket Veto Case*, 279 U. S., at 689.

We are aware of, but we are not persuaded by, three important arguments to the contrary. First, some argue that the Founders would likely have intended the Clause to apply only to inter-session recesses, for they hardly knew any other. See, *e.g.,* Brief for Originalist Scholars as *Amici Curiae* 27–29. Indeed, from the founding until the Civil War inter-session recesses were the only kind of significant recesses that Congress took. The problem with this argument, however, is that it does not fully describe the relevant founding intent. The question is not: Did the Founders at the time think about intra-session recesses? Perhaps they did not. The question is: Did the Founders intend to restrict the scope of the Clause to the form of congressional recess then prevalent, or did they intend a

broader scope permitting the Clause to apply, where appropriate, to somewhat changed circumstances? The Founders knew they were writing a document designed to apply to ever-changing circumstances over centuries. After all, a Constitution is "intended to endure for ages to come," and must adapt itself to a future that can only be "seen dimly," if at all. *McCulloch*, 4 Wheat., at 415. We therefore think the Framers likely did intend the Clause to apply to a new circumstance that so clearly falls within its essential purposes, where doing so is consistent with the Clause's language.

Second, some argue that the intra-session interpretation permits the President to make "illogic[ally]" long recess appointments. Brief for Respondent Noel Canning 13; *post,* at 10 (SCALIA, J., concurring in judgment). A recess appointment made between Congress' annual sessions would permit the appointee to serve for about a year, *i.e.,* until the "end" of the "next" Senate "session." Art. II, §2, cl. 3. But an intra-session appointment made at the beginning or in the middle of a formal session could permit the appointee to serve for 1½ or almost 2 years (until the end of the following formal session).

We agree that the intra-session interpretation permits somewhat longer recess appointments, but we do not agree that this consequence is "illogical." A President who makes a recess appointment will often also seek to make a regular appointment, nominating the appointee and securing ordinary Senate confirmation. And the Clause ensures that the President and Senate always have at least a full session to go through the nomination and confirmation process. That process may take several months. See O'Connell, Vacant Offices: Delays in Staffing Top Agency Positions, 82 S. Cal. L. Rev. 913, 967 (2009) (from 1987 to 2005 the nomination and confirmation process took an average of 236 days for noncabinet agency heads). A recess appointment that lasts somewhat longer than a

year will ensure the President the continued assistance of subordinates that the Clause permits him to obtain while he and the Senate select a regular appointee. An appointment should last until the Senate has "an opportunity to act on the subject," Story, §1551, at 410, and the Clause embodies a determination that a full session is needed to select and vet a replacement.

Third, the Court of Appeals believed that application of the Clause to intra-session recesses would introduce "vagueness" into a Clause that was otherwise clear. 705 F. 3d, at 504. One can find problems of uncertainty, however, either way. In 1867, for example, President Andrew Johnson called a special session of Congress, which took place during a lengthy intra-session recess. Consider the period of time that fell just after the conclusion of that special session. Did that period remain an intra-session recess, or did it become an inter-session recess? Historians disagree about the answer. Compare Hartnett, 26 Cardozo L. Rev., at 408–409, with Brief for Constitutional Law Scholars as *Amici Curiae* 23–24.

Or suppose that Congress adjourns *sine die*, but it does so conditionally, so that the leadership can call the members back into session when "the public interest shall warrant it." *E.g.,* 155 Cong. Rec. 33429 (2009); 152 Cong. Rec. 23731–23732 (2006); 150 Cong. Rec. 25925–25926 (2004). If the Senate Majority Leader were to reconvene the Senate, how would we characterize the preceding recess? Is it still inter-session? On the narrower interpretation the label matters; on the broader it does not.

The greater interpretive problem is determining how long a recess must be in order to fall within the Clause. Is a break of a week, or a day, or an hour too short to count as a "recess"? The Clause itself does not say. And JUSTICE SCALIA claims that this silence itself shows that the Framers intended the Clause to apply only to an inter-session recess. *Post,* at 12–13.

We disagree. For one thing, the most likely reason the Framers did not place a textual floor underneath the word "recess" is that they did not foresee the *need* for one. They might have expected that the Senate would meet for a single session lasting at most half a year. The Federalist No. 84, at 596 (A. Hamilton). And they might not have anticipated that intra-session recesses would become lengthier and more significant than inter-session ones. The Framers' lack of clairvoyance on that point is not dispositive. Unlike JUSTICE SCALIA, we think it most consistent with our constitutional structure to presume that the Framers would have allowed intra-session recess appointments where there was a long history of such practice.

Moreover, the lack of a textual floor raises a problem that plagues *both* interpretations—JUSTICE SCALIA's and ours. Today a brief inter-session recess is just as possible as a brief intra-session recess. And though JUSTICE SCALIA says that the "notion that the Constitution empowers the President to make unilateral appointments every time the Senate takes a half-hour lunch break is *so absurd as to be self-refuting*," he must immediately concede (in a footnote) that the President "can make recess appointments during any break *between* sessions, *no matter how short*." *Post,* at 11, 15, n. 4 (emphasis added).

Even the Solicitor General, arguing for a broader interpretation, acknowledges that there is a lower limit applicable to both kinds of recess. He argues that the lower limit should be three days by analogy to the Adjournments Clause of the Constitution. Tr. of Oral Arg. 11. That Clause says: "Neither House, during the Session of Congress, shall, without the Consent of the other, adjourn for more than three days." Art. I, §5, cl. 4.

We agree with the Solicitor General that a 3-day recess would be too short. (Under Senate practice, "Sunday is generally not considered a day," and so is not counted for

purposes of the Adjournments Clause. S. Doc. No. 101–28, F. Riddick & A. Frumin, Riddick's Senate Procedure: Precedents and Practices 1265 (hereinafter Riddick's).) The Adjournments Clause reflects the fact that a 3-day break is not a significant interruption of legislative business. As the Solicitor General says, it is constitutionally *de minimis.* Brief for Petitioner 18. A Senate recess that is so short that it does not require the consent of the House is not long enough to trigger the President's recess-appointment power.

That is not to say that the President may make recess appointments during any recess that is "more than three days." Art. I, §5, cl. 4. The Recess Appointments Clause seeks to permit the Executive Branch to function smoothly when Congress is unavailable. And though Congress has taken short breaks for almost 200 years, and there have been many thousands of recess appointments in that time, we have not found a single example of a recess appointment made during an intra-session recess that was shorter than 10 days. Nor has the Solicitor General. Reply Brief 23. Indeed, the Office of Legal Counsel once informally advised against making a recess appointment during a 6-day intra-session recess. 3 Op. OLC, at 315–316. The lack of examples suggests that the recess-appointment power is not needed in that context. (The length of a recess is "ordinarily calculated by counting the calendar days running from the day after the recess begins and including the day the recess ends." 36 Op. OLC, at ___, n. 1 (citation omitted).)

There are a few historical examples of recess appointments made during inter-session recesses shorter than 10 days. We have already discussed President Theodore Roosevelt's appointments during the instantaneous, "fictitious" recess. President Truman also made a recess appointment to the Civil Aeronautics Board during a 3-day inter-session recess. Hogue, Recess Appointments: Fre-

quently Asked Questions, at 5–6. President Taft made a few appointments during a 9-day recess following his inauguration, and President Lyndon Johnson made several appointments during an 8-day recess several weeks after assuming office. Hogue, *The Law*: Recess Appointments to Article III Courts, 34 Presidential Studies Q. 656, 671 (2004); 106 S. Exec. J. 2 (1964); 40 S. Exec. J. 12 (1909). There may be others of which we are unaware. But when considered against 200 years of settled practice, we regard these few scattered examples as anomalies. We therefore conclude, in light of historical practice, that a recess of more than 3 days but less than 10 days is presumptively too short to fall within the Clause. We add the word "presumptively" to leave open the possibility that some very unusual circumstance—a national catastrophe, for instance, that renders the Senate unavailable but calls for an urgent response—could demand the exercise of the recess-appointment power during a shorter break. (It should go without saying—except that JUSTICE SCALIA compels us to say it—that political opposition in the Senate would not qualify as an unusual circumstance.)

In sum, we conclude that the phrase "the recess" applies to both intra-session and inter-session recesses. If a Senate recess is so short that it does not require the consent of the House, it is too short to trigger the Recess Appointments Clause. See Art. I, §5, cl. 4. And a recess lasting less than 10 days is presumptively too short as well.

## IV

The second question concerns the scope of the phrase "vacancies *that may happen* during the recess of the Senate." Art. II, §2, cl. 3 (emphasis added). All agree that the phrase applies to vacancies that initially occur during a recess. But does it also apply to vacancies that initially occur before a recess and continue to exist during the recess? In our view the phrase applies to both kinds of

vacancy.

We believe that the Clause's language, read literally, permits, though it does not naturally favor, our broader interpretation. We concede that the most natural meaning of "happens" as applied to a "vacancy" (at least to a modern ear) is that the vacancy "happens" when it initially occurs. See 1 Johnson 913 (defining "happen" in relevant part as meaning "[t]o fall out; to chance; to come to pass"). But that is not the only possible way to use the word.

Thomas Jefferson wrote that the Clause is "certainly susceptible of [two] constructions." Letter to Wilson Cary Nicholas (Jan. 26, 1802), in 36 Papers of Thomas Jefferson 433 (B. Oberg ed., 2009). It "may mean 'vacancies that may happen to be' or 'may happen to fall'" during a recess. *Ibid.* Jefferson used the phrase in the first sense when he wrote to a job seeker that a particular position was unavailable, but that he (Jefferson) was "happy that *another vacancy happens* wherein I can . . . avail the public of your integrity & talents," for "the office of Treasurer of the US. *is vacant* by the resignation of mr Meredith." Letter to Thomas Tudor Tucker (Oct. 31, 1801), in 35 *id.*, at 530 (B. Oberg ed. 2008) (emphasis added). See also Laws Passed by the Legislature of Florida, No. 31, An Act to Organize and Regulate the Militia of the Territory of Florida §13, H. R. Exec. Doc. No. 72, 27th Cong., 3d Sess., 22 (1842) ("[W]hen any vacancy shall take place in the office of any lieutenant colonel, it shall be the duty of the colonel of the regiment in which such vacancy may happen to order an election to be held at the several precincts in the battalion in which such vacancy *may happen*" (emphasis added)).

Similarly, when Attorney General William Wirt advised President Monroe to follow the broader interpretation, he wrote that the "expression seems not perfectly clear. It may mean 'happen to take place:' that is, '*to originate,*'" or it "may mean, also, without violence to the sense, 'happen

to exist.'"  1 Op. Atty. Gen. 631, 631–632 (1823).  The broader interpretation, he added, is "most accordant with" the Constitution's "reason and spirit."  *Id.,* at 632.

We can still understand this earlier use of "happen" if we think of it used together with another word that, like "vacancy," can refer to a continuing state, say, a financial crisis.  A statute that gives the President authority to act in respect to "any financial crisis that may happen during his term" can easily be interpreted to include crises that arise before, and continue during, that term.  Perhaps that is why the Oxford English Dictionary defines "happen" in part as "chance *to be*," rather than "chance to occur."  6 OED 1096 (emphasis added); see also 19 OED 383 (defining "vacancy" as the "condition of an office or post being . . . vacant").

In any event, the linguistic question here is not whether the phrase can be, but whether it must be, read more narrowly.  The question is whether the Clause is ambiguous.  *The Pocket Veto Case*, 279 U. S., at 690.  And the broader reading, we believe, is at least a permissible reading of a "'doubtful'" phrase.  *Ibid.*  We consequently go on to consider the Clause's purpose and historical practice.

The Clause's purpose strongly supports the broader interpretation.  That purpose is to permit the President to obtain the assistance of subordinate officers when the Senate, due to its recess, cannot confirm them.  Attorney General Wirt clearly described how the narrower interpretation would undermine this purpose:

"Put the case of a vacancy occurring in an office, held in a distant part of the country, on the last day of the Senate's session.  Before the vacancy is made known to the President, the Senate rises.  The office may be an important one; the vacancy may paralyze a whole line of action in some essential branch of our internal police; the public interests may imperiously demand

that it shall be immediately filled. But the vacancy happened to occur during the session of the Senate; and if the President's power is to be limited to such vacancies only as happen to occur during the recess of the Senate, the vacancy in the case put must continue, however ruinous the consequences may be to the public." 1 Op. Atty. Gen., at 632.

Examples are not difficult to imagine: An ambassadorial post falls vacant too soon before the recess begins for the President to appoint a replacement; the Senate rejects a President's nominee just before a recess, too late to select another. Wirt explained that the "substantial purpose of the constitution was to keep these offices filled," and "if the President shall not have the power to fill a vacancy thus circumstanced, . . . the substance of the constitution will be sacrificed to a dubious construction of its letter." *Ibid.* Thus the broader construction, encompassing vacancies that initially occur before the beginning of a recess, is the "only construction of the constitution which is compatible with its spirit, reason, and purposes; while, at the same time, it offers no violence to its language." *Id.,* at 633.

We do not agree with JUSTICE SCALIA's suggestion that the Framers would have accepted the catastrophe envisioned by Wirt because Congress can always provide for acting officers, see 5 U. S. C. §3345, and the President can always convene a special session of Congress, see U. S. Const., Art. II, §3. Acting officers may have less authority than Presidential appointments. 6 Op. OLC 119, 121 (1982). Moreover, to rely on acting officers would lessen the President's ability to staff the Executive Branch with people of his own choosing, and thereby limit the President's control and political accountability. Cf. *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 497–498 (2010). Special sessions are

burdensome (and would have been especially so at the time of the founding). The point of the Recess Appointments Clause was to *avoid* reliance on these inadequate expedients.

At the same time, we recognize one important purpose-related consideration that argues in the opposite direction. A broad interpretation might permit a President to avoid Senate confirmations as a matter of course. If the Clause gives the President the power to "fill up all vacancies" that occur before, and continue to exist during, the Senate's recess, a President might not submit any nominations to the Senate. He might simply wait for a recess and then provide all potential nominees with recess appointments. He might thereby routinely avoid the constitutional need to obtain the Senate's "advice and consent."

Wirt thought considerations of character and politics would prevent Presidents from abusing the Clause in this way. 1 Op. Atty. Gen., at 634. He might have added that such temptations should not often arise. It is often less desirable for a President to make a recess appointment. A recess appointee only serves a limited term. That, combined with the lack of Senate approval, may diminish the recess appointee's ability, as a practical matter, to get a controversial job done. And even where the President and Senate are at odds over politically sensitive appointments, compromise is normally possible. Indeed, the 1940 Pay Act amendments represent a general compromise, for they foresee payment of salaries to recess appointees where vacancies occur *before* the recess began but not *too long* before (namely, within 30 days before). 5 U. S. C. §5503(a)(1); see *infra*, at 32. Moreover, the Senate, like the President, has institutional "resources," including political resources, "available to protect and assert its interests." *Goldwater* v. *Carter*, 444 U. S. 996, 1004 (1979) (Rehnquist, J., concurring in judgment). In an unusual instance, where a matter is important enough to the Sen-

ate, that body can remain in session, preventing recess appointments by refusing to take a recess. See Part V, *infra.* In any event, the Executive Branch has adhered to the broader interpretation for two centuries, and Senate confirmation has always remained the norm for officers that require it.

While we concede that both interpretations carry with them some risk of undesirable consequences, we believe the narrower interpretation risks undermining constitutionally conferred powers more seriously and more often. It would prevent the President from making any recess appointment that arose before a recess, no matter who the official, no matter how dire the need, no matter how uncontroversial the appointment, and no matter how late in the session the office fell vacant. Overall, like Attorney General Wirt, we believe the broader interpretation more consistent with the Constitution's "reason and spirit." 1 Op. Atty. Gen., at 632.

Historical practice over the past 200 years strongly favors the broader interpretation. The tradition of applying the Clause to pre-recess vacancies dates at least to President James Madison. There is no undisputed record of Presidents George Washington, John Adams, or Thomas Jefferson making such an appointment, though the Solicitor General believes he has found records showing that Presidents Washington and Jefferson did so. We know that Edmund Randolph, Washington's Attorney General, favored a narrow reading of the Clause. Randolph believed that the "Spirit of the Constitution favors the participation of the Senate in all appointments," though he did not address—let alone answer—the powerful purposive and structural arguments subsequently made by Attorney General Wirt. See Edmund Randolph's Opinion on Recess Appointments (July 7, 1792), in 24 Papers of Thomas Jefferson 166 (J. Catanzariti ed. 1990).

President Adams seemed to endorse the broader view of

the Clause in writing, though we are not aware of any appointments he made in keeping with that view. See Letter to J. McHenry (Apr. 16, 1799), in 8 Works of John Adams 632–633 (C. Adams ed. 1853). His Attorney General, Charles Lee, later informed Jefferson that, in the Adams administration, "whenever an office became vacant so short a time before Congress rose, as not to give an opportunity of enquiring for a proper character, they let it lie always till recess." 36 Papers of Thomas Jefferson 433. We know that President Jefferson thought that the broad interpretation was linguistically supportable, though his actual practice is not clear. But the evidence suggests that James Madison—as familiar as anyone with the workings of the Constitutional Convention—appointed Theodore Gaillard to replace a district judge who had left office before a recess began. Hartnett, 26 Cardozo L. Rev., at 400–401. It also appears that in 1815 Madison signed a bill that created two new offices prior to a recess which he then filled later during the recess. See Act of Mar. 3, ch. 95, 3 Stat. 235; S. J. 13th Cong., 3d Sess., 689–690 (1815); 3 S. Exec. J. 19 (1828) (for Monday, Jan. 8, 1816). He also made recess appointments to "territorial" United States attorney and marshal positions, both of which had been created when the Senate was in session more than two years before. Act of Feb. 27, 1813, ch. 35, 2 Stat. 806; 3 S. Exec. J. 19. JUSTICE SCALIA refers to "written evidence of Madison's own beliefs," *post,* at 36, but in fact we have no direct evidence of what President Madison believed. We only know that he declined to make one appointment to a pre-recess vacancy after his Secretary of War advised him that he lacked the power. On the other hand, he *did* apparently make at least five other appointments to prerecess vacancies, as JUSTICE SCALIA does not dispute.

The next President, James Monroe, received and presumably acted upon Attorney General Wirt's advice, namely that "all vacancies which, from any casualty,

happen to exist at a time when the Senate cannot be consulted as to filling them, may be temporarily filled by the President." 1 Op. Atty. Gen., at 633. Nearly every subsequent Attorney General to consider the question throughout the Nation's history has thought the same. *E.g.,* 2 Op. Atty. Gen. 525, 528 (1832); 7 Op. Atty. Gen. 186, 223 (1855); 10 Op. Atty. Gen. 356, 356–357 (1862); 12 Op. Atty. Gen. 32, 33 (1866); 12 Op. Atty. Gen., at 452; 14 Op. Atty. Gen. 562, 564 (1875); 15 Op. Atty. Gen. 207 (1877); 16 Op. Atty. Gen. 522, 524 (1880); 17 Op. Atty. Gen. 521 (1883); 18 Op. Atty. Gen. 29, 29–30 (1884); 19 Op. Atty. Gen. 261, 262 (1889); 26 Op. Atty. Gen. 234, 234–235 (1907); 30 Op. Atty. Gen. 314, 315 (1914); 41 Op. Atty. Gen. 463, 465 (1960); 3 Op. OLC 314 (1979); 6 Op. OLC 585, 586 (1982); 20 Op. OLC 124, 161 (1996); 36 Op. OLC ___ (2012). Indeed, as early as 1862, Attorney General Bates advised President Lincoln that his power to fill pre-recess vacancies was "settled . . . as far . . . as a constitutional question can be settled," 10 Op. Atty. Gen., at 356, and a century later Acting Attorney General Walsh gave President Eisenhower the same advice "without any doubt," 41 Op. Atty. Gen., at 466.

This power is important. The Congressional Research Service is "unaware of any official source of information tracking the dates of vacancies in federal offices." The *Noel Canning* Decision 3, n. 6. Nonetheless, we have enough information to believe that the Presidents since Madison have made many recess appointments filling vacancies that initially occurred prior to a recess. As we have just said, nearly every 19th- and 20th-century Attorney General expressing a view on the matter has agreed with William Wirt, and Presidents tend to follow the legal advice of their chief legal officers. Moreover, the Solicitor General has compiled a list of 102 (mostly uncontested) recess appointments made by Presidents going back to the founding. App. to Brief for Petitioner 65a–89a. Given the

difficulty of finding accurate information about vacancy dates, that list is undoubtedly far smaller than the actual number. No one disputes that every President since James Buchanan has made recess appointments to pre-existing vacancies.

Common sense also suggests that many recess appointees filled vacancies that arose before the recess began. We have compared the list of *intra*-session recess appointments in the Solicitor General's brief with the chart of congressional recesses. Where a specific date of appointment can be ascertained, more than half of those intra-session appointments were made within two weeks of the beginning of a recess. That short window strongly suggests that many of the vacancies initially arose prior to the recess. See App. to Brief for Petitioner 1a–64a; Appendix A, *infra*. Thus, it is not surprising that the Congressional Research Service, after examining the vacancy dates associated with a random sample of 24 inter-session recess appointments since 1981, concluded that "[i]n most of the 24 cases, the preponderance of evidence indicated that the vacancy arose prior to the recess during which the appointment was made." The *Noel Canning* Decision 3. Further, with research assistance from the Supreme Court Library, we have examined a random sample of the recess appointments made by our two most recent Presidents, and have found that almost all of those appointments filled pre-recess vacancies: Of a sample of 21 recess appointments, 18 filled pre-recess vacancies and only 1 filled a vacancy that arose during the recess in which he was appointed. The precise date on which 2 of the vacancies arose could not be determined. See Appendix B, *infra*. Taken together, we think it is a fair inference that a large proportion of the recess appointments in the history of the Nation have filled pre-existing vacancies.

Did the Senate object? Early on, there was some sporadic disagreement with the broad interpretation. In 1814

Senator Gore said that if "the vacancy happen at another time, it is not the case described by the Constitution." 26 Annals of Cong. 653. In 1822 a Senate committee, while focusing on the President's power to fill a new vacancy created by statute, used language to the same effect. 38 *id.,* at 489, 500. And early Congresses enacted statutes authorizing certain recess appointments, see *post,* at 31, a fact that may or may not suggest they accepted the narrower interpretation of the Clause. Most of those statutes—including the one passed by the First Congress—authorized appointments to newly created offices, and may have been addressed to the separate question of whether new offices are vacancies within the meaning of the Clause. See Letter from Alexander Hamilton to James McHenry (May 3, 1799), in 23 Papers of Alexander Hamilton 94 (H. Syrett ed. 1976) ("*Vacancy* is a relative term, and presupposes that the Office has been once filled"); Reply Brief 17. In any event, by 1862 Attorney General Bates could still refer to "the unbroken acquiescence of the Senate" in support of the broad interpretation. 10 Op. Atty. Gen., at 356.

Then in 1863 the Senate Judiciary Committee disagreed with the broad interpretation. It issued a report concluding that a vacancy "must have its inceptive point after one session has closed and before another session has begun." S. Rep. No. 80, 37th Cong., 3d Sess., p. 3. And the Senate then passed the Pay Act, which provided that "no money shall be paid . . . as a salary, to any person appointed during the recess of the Senate, to fill a vacancy . . . which . . . existed while the Senate was in session." Act of Feb. 9, 1863, §2, 12 Stat. 646. Relying upon the floor statement of a single Senator, JUSTICE SCALIA suggests that the passage of the Pay Act indicates that the Senate as a whole endorsed the position in the 1863 Report. But the circumstances are more equivocal. During the floor debate on the bill, not a single Senator referred to the Report. Cong.

Globe, 37th Cong., 3d Sess. 564–565 (1863). Indeed, Senator Trumbull, who introduced the Pay Act, acknowledged that there was disagreement about the underlying constitutional question. *Id.,* at 565 ("[S]ome other persons think he has that power"). Further, if a majority of the Senate had believed appointments to pre-recess vacancies were unconstitutional, it could have attempted to do far more than temporarily dock the appointees' pay. Cf. Tenure of Office Act of 1867, §5, 14 Stat. 431 (making it a federal crime for "any person" to "accept any appointment" in certain circumstances).

In any event, the Senate subsequently abandoned its hostility. In the debate preceding the 1905 Senate Report regarding President Roosevelt's "constructive" recess appointments, Senator Tillman—who chaired the Committee that authored the 1905 Report—brought up the 1863 Report, and another Senator responded: "Whatever that report may have said in 1863, I do not think that has been the view the Senate has taken" of the issue. 38 Cong. Rec. 1606 (1904). Senator Tillman then agreed that "the Senate has acquiesced" in the President's "power to fill" pre-recess vacancies. *Ibid.* And Senator Tillman's 1905 Report described the Clause's purpose in terms closely echoing Attorney General Wirt. 1905 Senate Report, at 2 ("Its sole purpose was to render it *certain* that at all times there should be, whether the Senate was in session or not, an officer for every office" (emphasis added)).

In 1916 the Senate debated whether to pay a recess appointee who had filled a pre-recess vacancy and had not subsequently been confirmed. Both Senators to address the question—one on each side of the payment debate— agreed that the President had the constitutional power to make the appointment, and the Senate voted to pay the appointee for his service. 53 Cong. Rec. 4291–4299; 39 Stat. 818–819. In 1927 the Comptroller General, a legislative officer, wrote that "there is *no question* but that the

President has authority to make a recess appointment to fill *any* vacancy," including those that "existed while the Senate was in session."  7 Comp. Gen. 10, 11 (emphasis added).  Meanwhile, Presidents continued to make appointments to pre-recess vacancies.  The Solicitor General has identified 40 between 1863 and 1940, but that number is clearly not comprehensive.  See, *e.g.,* 32 Op. Atty. Gen. 271–272 (1920) (listing 5 appointments that are not in the Solicitor General's appendix); Recess Appointments, Washington Post, July 7, 1880, p. 1 (noting that President Hayes had made "quite a number of appointments" to pre-recess vacancies).

Then in 1940 Congress amended the Pay Act to authorize salary payments (with some exceptions) where (1) the "vacancy arose within thirty days prior to the termination of the session," (2) "at the termination of the session" a nomination was "pending," or (3) a nominee was "rejected by the Senate within thirty days prior to the termination of the session."  Act of July 11, 54 Stat. 751 (codified, as amended, at 5 U. S. C. §5503).  All three circumstances concern a vacancy that did not initially occur during a recess but happened to exist during that recess.  By paying salaries to this kind of recess appointee, the 1940 Senate (and later Senates) in effect supported the President's interpretation of the Clause.

The upshot is that the President has consistently and frequently interpreted the Recess Appointments Clause to apply to vacancies that initially occur before, but continue to exist during, a recess of the Senate.  The Senate as a body has not countered this practice for nearly three-quarters of a century, perhaps longer.  See A. Amar, The Unwritten Constitution 576–577, n. 16 (2012) (for nearly 200 years "the overwhelming mass of actual practice" supports the President's interpretation); *Mistretta* v. *United States*, 488 U. S. 361, 401 (1989) (a "200–year tradition" can " 'give meaning' to the Constitution" (quot-

ing *Youngstown*, 343 U. S., at 610 (Frankfurter, J., concurring))). The tradition is long enough to entitle the practice "to great regard in determining the true construction" of the constitutional provision. *The Pocket Veto Case*, 279 U. S., at 690. And we are reluctant to upset this traditional practice where doing so would seriously shrink the authority that Presidents have believed existed and have exercised for so long.

In light of some linguistic ambiguity, the basic purpose of the Clause, and the historical practice we have described, we conclude that the phrase "all vacancies" includes vacancies that come into existence while the Senate is in session.

V

The third question concerns the calculation of the length of the Senate's "recess." On December 17, 2011, the Senate by unanimous consent adopted a resolution to convene "*pro forma* session[s]" only, with "no business . . . transacted," on every Tuesday and Friday from December 20, 2011, through January 20, 2012. 2011 S. J. 923. At the end of each *pro forma* session, the Senate would "adjourn until" the following *pro forma* session. *Ibid.* During that period, the Senate convened and adjourned as agreed. It held *pro forma* sessions on December 20, 23, 27, and 30, and on January 3, 6, 10, 13, 17, and 20; and at the end of each *pro forma* session, it adjourned until the time and date of the next. *Id.,* at 923–924; 158 Cong. Rec. S1–S11.

The President made the recess appointments before us on January 4, 2012, in between the January 3 and the January 6 *pro forma* sessions. We must determine the significance of these sessions—that is, whether, for purposes of the Clause, we should treat them as periods when the Senate was in session or as periods when it was in recess. If the former, the period between January 3 and January 6 was a 3-day recess, which is too short to trigger

the President's recess-appointment power, see *supra,* at 19–21. If the latter, however, then the 3-day period was part of a much longer recess during which the President did have the power to make recess appointments, see *ibid.*

The Solicitor General argues that we must treat the *pro forma* sessions as periods of recess. He says that these "sessions" were sessions in name only because the Senate was in recess as a *functional* matter. The Senate, he contends, remained in a single, unbroken recess from January 3, when the second session of the 112th Congress began by operation of the Twentieth Amendment, until January 23, when the Senate reconvened to do regular business.

In our view, however, the *pro forma* sessions count as sessions, not as periods of recess. We hold that, for purposes of the Recess Appointments Clause, the Senate is in session when it says it is, provided that, under its own rules, it retains the capacity to transact Senate business. The Senate met that standard here.

The standard we apply is consistent with the Constitution's broad delegation of authority to the Senate to determine how and when to conduct its business. The Constitution explicitly empowers the Senate to "determine the Rules of its Proceedings." Art. I, §5, cl. 2. And we have held that "all matters of method are open to the determination" of the Senate, as long as there is "a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained" and the rule does not "ignore constitutional restraints or violate fundamental rights." *United States* v. *Ballin*, 144 U. S. 1, 5 (1892).

In addition, the Constitution provides the Senate with extensive control over its schedule. There are only limited exceptions. See Amdt. 20, §2 (Congress must meet once a year on January 3, unless it specifies another day by law); Art. II, §3 (Senate must meet if the President calls it into

special session); Art. I, §5, cl. 4 (neither House may adjourn for more than three days without consent of the other). See also Art. II, §3 ("[I]n Case of Disagreement between [the Houses], with Respect to the Time of Adjournment, [the President] may adjourn them to such Time as he shall think proper"). The Constitution thus gives the Senate wide latitude to determine whether and when to have a session, as well as how to conduct the session. This suggests that the Senate's determination about what constitutes a session should merit great respect.

Furthermore, this Court's precedents reflect the breadth of the power constitutionally delegated to the Senate. We generally take at face value the Senate's own report of its actions. When, for example, "the presiding officers" of the House and Senate sign an enrolled bill (and the President "approve[s]" it), "its authentication as a bill that has passed Congress should be deemed complete and unimpeachable." *Marshall Field & Co.* v. *Clark*, 143 U. S. 649, 672 (1892). By the same principle, when the Journal of the Senate indicates that a quorum was present, under a valid Senate rule, at the time the Senate passed a bill, we will not consider an argument that a quorum was not, in fact, present. *Ballin, supra,* at 9. The Constitution requires the Senate to keep its Journal, Art. I, §5, cl. 3 ("Each House shall keep a Journal of its proceedings . . ."), and "if reference may be had to" it, "it must be assumed to speak the truth," *Ballin, supra,* at 4.

For these reasons, we conclude that we must give great weight to the Senate's own determination of when it is and when it is not in session. But our deference to the Senate cannot be absolute. When the Senate is without the *capacity* to act, under its own rules, it is not in session even if it so declares. See Tr. of Oral Arg. 69 (acknowledgment by counsel for *amici* Senators that if the Senate had left the Capitol and "effectively given up . . . the business of

legislating" then it might be in recess, even if it said it was not). In that circumstance, the Senate is not simply unlikely or unwilling to act upon nominations of the President. It is *unable* to do so. The purpose of the Clause is to ensure the continued functioning of the Federal Government while the Senate is unavailable. See *supra,* at 5–6. This purpose would count for little were we to treat the Senate as though it were in session even when it lacks the ability to provide its "advice and consent." Art. II, §2, cl. 2. Accordingly, we conclude that when the Senate declares that it is in session and possesses the capacity, under its own rules, to conduct business, it is in session for purposes of the Clause.

Applying this standard, we find that the *pro forma* sessions were sessions for purposes of the Clause. First, the Senate said it was in session. The Journal of the Senate and the Congressional Record indicate that the Senate convened for a series of twice-weekly "sessions" from December 20 through January 20. 2011 S. J. 923–924; 158 Cong. Rec. S1–S11. (The Journal of the Senate for 2012 has not yet been published.) And these reports of the Senate "must be assumed to speak the truth." *Ballin*, *supra,* at 4.

Second, the Senate's rules make clear that during its *pro forma* sessions, despite its resolution that it would conduct no business, the Senate retained the power to conduct business. During any *pro forma* session, the Senate could have conducted business simply by passing a unanimous consent agreement. See Riddick's 1313. The Senate in fact conducts much of its business through unanimous consent. *Id.,* at 1311–1312. Senate rules presume that a quorum is present unless a present Senator questions it. *Id.*, at 1041–1042. And when the Senate has a quorum, an agreement is unanimously passed if, upon its proposal, no present Senator objects. *Id.*, at 1329–1330. It is consequently unsurprising that the

Senate *has* enacted legislation during *pro forma* sessions even when it has said that no business will be transacted. Indeed, the Senate passed a bill by unanimous consent during the second *pro forma* session after its December 17 adjournment. 2011 S. J. 924. And that bill quickly became law. Pub. L. 112–78, 125 Stat. 1280.

By way of contrast, we do not see how the Senate could conduct business during a recess. It could terminate the recess and then, when in session, pass a bill. But in that case, of course, the Senate would no longer be in recess. It would be in session. And that is the crucial point. Senate rules make clear that, once in session, the Senate can act even if it has earlier said that it would not.

The Solicitor General argues that more is required. He contends that what counts is not the Senate's *capacity* to conduct business but what the Senate actually does (or here, *did*) during its *pro forma* sessions. And he looks for support to the functional definition of "recess" set forth in the 1905 Senate Report discussed above. See *supra,* at 14. That Report describes a "recess" of the Senate as

> "the period of time . . . when its members owe no duty of attendance; when its Chamber is empty; when, because of its absence, it can not receive communications from the President or participate as a body in making appointments." 1905 Senate Report, at 2.

Even were we, for argument's sake, to accept all of these criteria as authoritative, they would here be met. Taking the last criterion first, could the Senate, during its *pro forma* sessions, "participate as a body in making appointments"? It could. It could confirm nominees by unanimous consent, just as it passed the bill mentioned above. See Riddick's 1313.

Could the Senate "receive communications from the President"? It could. The Congressional Record indicates that the Senate "received" a message from the President

on January 12, during a 3-day adjournment between two *pro forma* sessions. See 158 Cong. Rec. S37 (Jan. 23, 2012). If the Senate could receive Presidential messages between two *pro forma* sessions, it could receive them during a *pro forma* session.

Was the Senate's Chamber "empty"? It was not. By its official rules, the Senate operates under the presumption that a quorum is present until a present Senator suggests the absence of a quorum, Riddick's 1041–1042, and nothing in the Journal of the Senate or the Congressional Record reflects any such suggestion.

Did Senators "owe [a] duty of attendance"? They did. The Senate's rules dictate that Senators are under a duty to attend every session. See Riddick's 214; Standing Rule of the Senate VI(2), S. Doc. No. 112–1, p. 5 (2011) ("No Senator shall absent himself from the service of the Senate without leave"). Nothing excused the Senators from this duty during the Senate's *pro forma* sessions. If any present Senator had raised a question as to the presence of a quorum, and by roll call it had become clear that a quorum was missing, the Senators in attendance could have directed the Sergeant at Arms to bring in the missing Senators. Rule VI(4).

The Solicitor General asks us to engage in a more realistic appraisal of what the Senate actually did. He argues that, during the relevant *pro forma* sessions, business was not in fact conducted; messages from the President could not be received in any meaningful way because they could not be placed before the Senate; the Senate Chamber was, according to C-SPAN coverage, almost empty; and in practice attendance was not required. See Brief for Petitioner 48–49, 54–55.

We do not believe, however, that engaging in the kind of factual appraisal that the Solicitor General suggests is either legally or practically appropriate. From a legal perspective, this approach would run contrary to prece-

dent instructing us to "respect . . . coequal and independent departments" by, for example, taking the Senate's report of its official action at its word. *Field*, 143 U. S., at 672; see *Ballin*, 144 U. S., at 4. From a practical perspective, judges cannot easily determine such matters as who is, and who is not, in fact present on the floor during a particular Senate session. Judicial efforts to engage in these kinds of inquiries would risk undue judicial interference with the functioning of the Legislative Branch.

Finally, the Solicitor General warns that our holding may "'disrup[t] the proper balance between the coordinate branches by preventing the Executive Branch from accomplishing its constitutionally assigned functions.'" Brief for Petitioner 64 (quoting *Morrison* v. *Olson*, 487 U. S. 654, 695 (1988); alteration in original). We do not see, however, how our holding could significantly alter the constitutional balance. Most appointments are not controversial and do not produce friction between the branches. Where political controversy is serious, the Senate unquestionably has other methods of preventing recess appointments. As the Solicitor General concedes, the Senate could preclude the President from making recess appointments by holding a series of twice-a-week *ordinary* (not *pro forma*) sessions. And the nature of the business conducted at those ordinary sessions—whether, for example, Senators must vote on nominations, or may return to their home States to meet with their constituents—is a matter for the Senate to decide. The Constitution also gives the President (if he has enough allies in Congress) a way to force a recess. Art. II, §3 ("[I]n Case of Disagreement between [the Houses], with Respect to the Time of Adjournment, [the President] may adjourn them to such Time as he shall think proper"). Moreover, the President and Senators engage with each other in many different ways and have a variety of methods of encouraging each other to accept their points of view.

Regardless, the Recess Appointments Clause is not designed to overcome serious institutional friction. It simply provides a subsidiary method for appointing officials when the Senate is away during a recess. Here, as in other contexts, friction between the branches is an inevitable consequence of our constitutional structure. See *Myers*, 272 U. S., at 293 (Brandeis, J., dissenting). That structure foresees resolution not only through judicial interpretation and compromise among the branches but also by the ballot box.

## VI

The Recess Appointments Clause responds to a structural difference between the Executive and Legislative Branches: The Executive Branch is perpetually in operation, while the Legislature only acts in intervals separated by recesses. The purpose of the Clause is to allow the Executive to continue operating while the Senate is unavailable. We believe that the Clause's text, standing alone, is ambiguous. It does not resolve whether the President may make appointments during intra-session recesses, or whether he may fill pre-recess vacancies. But the broader reading better serves the Clause's structural function. Moreover, that broader reading is reinforced by centuries of history, which we are hesitant to disturb. We thus hold that the Constitution empowers the President to fill any existing vacancy during any recess—intra-session or inter-session—of sufficient length.

JUSTICE SCALIA would render illegitimate thousands of recess appointments reaching all the way back to the founding era. More than that: Calling the Clause an "anachronism," he would basically read it out of the Constitution. *Post,* at 12. He performs this act of judicial excision in the name of liberty. We fail to see how excising the Recess Appointments Clause preserves freedom. In fact, Alexander Hamilton observed in the very first Feder-

alist Paper that "the vigour of government is essential to the security of liberty." The Federalist No. 1, at 5. And the Framers included the Recess Appointments Clause to preserve the "vigour of government" at times when an important organ of Government, the United States Senate, is in recess. JUSTICE SCALIA's interpretation of the Clause would defeat the power of the Clause to achieve that objective.

The foregoing discussion should refute JUSTICE SCALIA's claim that we have "embrace[d]" an "adverse-possession theory of executive power." *Post,* at 48. Instead, as in all cases, we interpret the Constitution in light of its text, purposes, and "our whole experience" as a Nation. *Missouri* v. *Holland,* 252 U. S. 416, 433 (1920). And we look to the actual practice of Government to inform our interpretation.

Given our answer to the last question before us, we conclude that the Recess Appointments Clause does not give the President the constitutional authority to make the appointments here at issue. Because the Court of Appeals reached the same ultimate conclusion (though for reasons we reject), its judgment is affirmed.

*It is so ordered.*

Appendix A to opinion of the Court

# APPENDIXES
## A

The following table contains the dates of all the intra-session and inter-session recesses that Congress has taken since the founding. The information (including the footnotes) is taken from 2011–2012 Official Congressional Directory, 112th Cong., 522–539.

SESSIONS OF CONGRESS, 1st–112th CONGRESSES, 1789–2011

| Con-gress | Ses-sion | Convening Date | Adjournment Date | Length in days[1] | Recesses[2] | |
|---|---|---|---|---|---|---|
| | | | | | Senate | House of Representatives |
| 1st | 1 | Mar. 4, 1789 | Sept. 29, 1789 | 210 | | |
| | 2 | Jan. 4, 1790 | Aug. 12, 1790 | 221 | | |
| | 3 | Dec. 6, 1790 | Mar. 3, 1791 | 88 | | |
| 2d | S | Mar. 4, 1791 | Mar. 4, 1791 | 1 | | |
| | 1 | Oct. 24, 1791 | May 8, 1792 | 197 | | |
| | 2 | Nov. 5, 1792 | Mar. 2, 1793 | 119 | | |
| 3d | S | Mar. 4, 1793 | Mar. 4, 1793 | 1 | | |
| | 1 | Dec. 2, 1793 | June 9, 1794 | 190 | | |
| | 2 | Nov. 3, 1794 | Mar. 3, 1795 | 121 | | |
| 4th | S | June 8, 1795 | June 26, 1795 | 19 | | |
| | 1 | Dec. 7, 1795 | June 1, 1796 | 177 | | |
| | 2 | Dec. 5, 1796 | Mar. 3, 1797 | 89 | | |
| 5th | S | Mar. 4, 1797 | Mar. 4, 1797 | 1 | | |
| | 1–E | May 15, 1797 | July 10, 1797 | 57 | | |
| | S | July 17, 1798 | July 19, 1798 | 3 | | |
| | 2 | Nov. 13, 1797 | July 16, 1798 | 246 | | |
| | 3 | Dec. 3, 1798 | Mar. 3, 1799 | 91 | | |
| 6th | 1 | Dec. 2, 1799 | May 14, 1800 | 164 | | |
| | 2 | Nov. 17, 1800 | Mar. 3, 1801 | 107 | Dec. 23–Dec. 30, 1800 | Dec. 23–Dec. 30, 1800 |
| 7th | S | Mar. 4, 1801 | Mar. 5, 1801 | 2 | | |
| | 1 | Dec. 7, 1801 | May 3, 1802 | 148 | | |
| | 2 | Dec. 6, 1802 | Mar. 3, 1803 | 88 | | |
| 8th | 1–E | Oct. 17, 1803 | Mar. 27, 1804 | 163 | | |
| | 2 | Nov. 5, 1804 | Mar. 3, 1805 | 119 | | |
| 9th | 1 | Dec. 2, 1805 | Apr. 21, 1806 | 141 | | |
| | 2 | Dec. 1, 1806 | Mar. 3, 1807 | 93 | | |
| 10th | 1–E | Oct. 26, 1807 | Apr. 25, 1808 | 182 | | |
| | 2 | Nov. 7, 1808 | Mar. 3, 1809 | 117 | | |
| 11th | S | Mar. 4, 1809 | Mar. 7, 1809 | 4 | | |
| | 1 | May 22, 1809 | June 28, 1809 | 38 | | |
| | 2 | Nov. 27, 1809 | May 1, 1810 | 156 | | |
| | 3 | Dec. 3, 1810 | Mar. 3, 1811 | 91 | | |
| 12th | 1–E | Nov. 4, 1811 | July 6, 1812 | 245 | | |
| | 2 | Nov. 2, 1812 | Mar. 3, 1813 | 122 | | |
| 13th | 1 | May 24, 1813 | Aug. 2, 1813 | 71 | | |
| | 2 | Dec. 6, 1813 | Apr. 18, 1814 | 134 | | |
| | 3–E | Sept. 19, 1814 | Mar. 3, 1815 | 166 | | |
| 14th | 1 | Dec. 4, 1815 | Apr. 30, 1816 | 148 | | |
| | 2 | Dec. 2, 1816 | Mar. 3, 1817 | 92 | | |
| 15th | S | Mar. 4, 1817 | Mar. 6, 1817 | 3 | | |
| | 1 | Dec. 1, 1817 | Apr. 20, 1818 | 141 | Dec. 24–Dec. 29, 1817 | Dec. 24–Dec. 29, 1817 |
| | 2 | Nov. 16, 1818 | Mar. 3, 1819 | 108 | | |
| 16th | 1 | Dec. 6, 1819 | May 15, 1820 | 162 | | |
| | 2 | Nov. 13, 1820 | Mar. 3, 1821 | 111 | | |
| 17th | 1 | Dec. 3, 1821 | May 8, 1822 | 157 | | |
| | 2 | Dec. 2, 1822 | Mar. 3, 1823 | 92 | | |
| 18th | 1 | Dec. 1, 1823 | May 27, 1824 | 178 | | |
| | 2 | Dec. 6, 1824 | Mar. 3, 1825 | 88 | | |
| 19th | S | Mar. 4, 1825 | Mar. 9, 1825 | 6 | | |
| | 1 | Dec. 5, 1825 | May 22, 1826 | 169 | | |

Appendix A to opinion of the Court

| Con-gress | Ses-sion | Convening Date | Adjournment Date | Length in days[1] | Recesses [2] Senate | Recesses [2] House of Representatives |
|---|---|---|---|---|---|---|
| | 2 | Dec. 4, 1826 | Mar. 3, 1827 | 90 | | |
| 20th | 1 | Dec. 3, 1827 | May 26, 1828 | 175 | | |
| | 2 | Dec. 1, 1828 | Mar. 3, 1829 | 93 | Dec. 24–Dec. 29, 1828 | Dec. 24–Dec. 29, 1828 |
| 21st | S | Mar. 4, 1829 | Mar. 17, 1829 | 14 | | |
| | 1 | Dec. 7, 1829 | May 31, 1830 | 176 | | |
| | 2 | Dec. 6, 1830 | Mar. 3, 1831 | 88 | | |
| 22d | 1 | Dec. 5, 1831 | July 16, 1832 | 225 | | |
| | 2 | Dec. 3, 1832 | Mar. 2, 1833 | 91 | | |
| 23d | 1 | Dec. 2, 1833 | June 30, 1834 | 211 | | |
| | 2 | Dec. 1, 1834 | Mar. 3, 1835 | 93 | | |
| 24th | 1 | Dec. 7, 1835 | July 4, 1836 | 211 | | |
| | 2 | Dec. 5, 1836 | Mar. 3, 1837 | 89 | | |
| 25th | S | Mar. 4, 1837 | Mar. 10, 1837 | 7 | | |
| | 1–E | Sept. 4, 1837 | Oct. 16, 1837 | 43 | | |
| | 2 | Dec. 4, 1837 | July 9, 1838 | 218 | | |
| | 3 | Dec. 3, 1838 | Mar. 3, 1839 | 91 | | |
| 26th | 1 | Dec. 2, 1839 | July 21, 1840 | 233 | | |
| | 2 | Dec. 7, 1840 | Mar. 3, 1841 | 87 | | |
| 27th | S | Mar. 4, 1841 | Mar. 15, 1841 | 12 | | |
| | 1–E | May 31, 1841 | Sept. 13, 1841 | 106 | | |
| | 2 | Dec. 6, 1841 | Aug. 31, 1842 | 269 | | |
| | 3 | Dec. 5, 1842 | Mar. 3, 1843 | 89 | | |
| 28th | 1 | Dec. 4, 1843 | June 17, 1844 | 196 | | |
| | 2 | Dec. 2, 1844 | Mar. 3, 1845 | 92 | | |
| 29th | S | Mar. 4, 1845 | Mar. 20, 1845 | 17 | | |
| | 1 | Dec. 1, 1845 | Aug. 10, 1846 | 253 | | |
| | 2 | Dec. 7, 1846 | Mar. 3, 1847 | 87 | | |
| 30th | 1 | Dec. 6, 1847 | Aug. 14, 1848 | 254 | | |
| | 2 | Dec. 4, 1848 | Mar. 3, 1849 | 90 | | |
| 31st | S | Mar. 5, 1849 | Mar. 23, 1849 | 19 | | |
| | 1 | Dec. 3, 1849 | Sept. 30, 1850 | 302 | | |
| | 2 | Dec. 2, 1850 | Mar. 3, 1851 | 92 | | |
| 32d | S | Mar. 4, 1851 | Mar. 13, 1851 | 10 | | |
| | 1 | Dec. 1, 1851 | Aug. 31, 1852 | 275 | | |
| | 2 | Dec. 6, 1852 | Mar. 3, 1853 | 88 | | |
| 33d | S | Mar. 4, 1853 | Apr. 11, 1853 | 39 | | |
| | 1 | Dec. 5, 1853 | Aug. 7, 1854 | 246 | | |
| | 2 | Dec. 4, 1854 | Mar. 3, 1855 | 90 | | |
| 34th | 1 | Dec. 3, 1855 | Aug. 18, 1856 | 260 | | |
| | 2–E | Aug. 21, 1856 | Aug. 30, 1856 | 10 | | |
| | 3 | Dec. 1, 1856 | Mar. 3, 1857 | 93 | | |
| 35th | S | Mar. 4, 1857 | Mar. 14, 1857 | 11 | | |
| | 1 | Dec. 7, 1857 | June 14, 1858 | 189 | Dec. 23, 1857–Jan. 4, 1858 | Dec. 23, 1857–Jan. 4, 1858 |
| | S | June 15, 1858 | June 16, 1858 | 2 | | |
| | 2 | Dec. 6, 1858 | Mar. 3, 1859 | 88 | Dec. 23, 1858–Jan. 4, 1859 | Dec. 23, 1858–Jan. 4, 1859 |
| 36th | S | Mar. 4, 1859 | Mar. 10, 1859 | 7 | | |
| | 1 | Dec. 5, 1859 | June 25, 1860 | 202 | | |
| | S | June 26, 1860 | June 28, 1860 | 3 | | |
| | 2 | Dec. 3, 1860 | Mar. 3, 1861 | 93 | | |
| 37th | S | Mar. 4, 1861 | Mar. 28, 1861 | 25 | | |
| | 1–E | July 4, 1861 | Aug. 6, 1861 | 34 | | |
| | 2 | Dec. 2, 1861 | July 17, 1862 | 228 | | |
| | 3 | Dec. 1, 1862 | Mar. 3, 1863 | 93 | Dec. 23, 1862–Jan. 5, 1863 | Dec. 23, 1862–Jan. 5, 1863 |
| 38th | S | Mar. 4, 1863 | Mar. 14, 1863 | 11 | | |
| | 1 | Dec. 7, 1863 | July 4, 1864 | 209 | Dec. 23, 1863–Jan. 5, 1864 | Dec. 23, 1863–Jan. 5, 1864 |
| | 2 | Dec. 5, 1864 | Mar. 3, 1865 | 89 | Dec. 22, 1864–Jan. 5, 1865 | Dec. 22, 1864–Jan. 5, 1865 |
| 39th | S | Mar. 4, 1865 | Mar. 11, 1865 | 8 | | |
| | 1 | Dec. 4, 1865 | July 28, 1866 | 237 | Dec. 6–Dec. 11, 1865 Dec. 21, 1865–Jan. 5, 1866 | Dec. 6–Dec. 11, 1865 Dec. 21, 1865–Jan. 5, 1866 |
| | 2 | Dec. 3, 1866 | Mar. 3, 1867 | 91 | Dec. 20, 1866–Jan. 3, 1867 | Dec. 20, 1866–Jan. 3, 1867 |
| 40th | 1 | Mar. 4, 1867 | Dec. 1, 1867 | 273 | Mar. 30–July 3, 1867 July 20–Nov. 21, 1867 | Mar. 30–July 3, 1867 July 20–Nov. 21, 1867 |
| | S | Apr. 1, 1867 | Apr. 20, 1867 | 20 | | |
| | 2 | Dec. 2, 1867 | Nov. 10, 1868 | 345 | Dec. 20, 1867–Jan. 6, 1868 July 27–Sept. 21, 1868 | Dec. 20, 1867–Jan. 6, 1868 July 27–Sept. 21, 1868 |

## Appendix A to opinion of the Court

| Con-gress | Ses-sion | Convening Date | Adjournment Date | Length in days[1] | Recesses[2] Senate | House of Representa-tives |
|---|---|---|---|---|---|---|
| | | | | | Sept. 21–Oct. 16, 1868 Oct. 16–Nov. 10, 1868 | Sept. 21–Oct. 16, 1868 Oct. 16–Nov. 10, 1868 |
| | 3 | Dec. 7, 1868 | Mar. 3, 1869 | 87 | Dec. 21, 1868–Jan. 5, 1869 | Dec. 21, 1868–Jan. 5, 1869 |
| 41st | 1 | Mar. 4, 1869 | Apr. 10, 1869 | 38 | | |
| | S | Apr. 12, 1869 | Apr. 22, 1869 | 11 | | |
| | 2 | Dec. 6, 1869 | July 15, 1870 | 222 | Dec. 22, 1869–Jan. 10, 1870 | Dec. 22, 1869–Jan. 10, 1870 |
| | 3 | Dec. 5, 1870 | Mar. 3, 1871 | 89 | Dec. 23, 1870–Jan. 4, 1871 | Dec. 22, 1870–Jan. 4, 1871 |
| 42d | 1 | Mar. 4, 1871 | Apr. 20, 1871 | 48 | | |
| | S | May 10, 1871 | May 27, 1871 | 18 | | |
| | 2 | Dec. 4, 1871 | June 10, 1872 | 190 | Dec. 21, 1871–Jan. 8, 1872 | Dec. 21, 1871–Jan. 8, 1872 |
| | 3 | Dec. 2, 1872 | Mar. 3, 1873 | 92 | Dec. 20, 1872–Jan. 6, 1873 | Dec. 20, 1872–Jan. 6, 1873 |
| 43d | S | Mar. 4, 1873 | Mar. 26, 1873 | 23 | | |
| | 1 | Dec. 1, 1873 | June 23, 1874 | 204 | Dec. 19, 1873–Jan. 5, 1874 | Dec. 19, 1873–Jan. 5, 1874 |
| | 2 | Dec. 7, 1874 | Mar. 3, 1875 | 87 | Dec. 23, 1874–Jan. 5, 1875 | Dec. 23, 1874–Jan. 5, 1875 |
| 44th | S | Mar. 5, 1875 | Mar. 24, 1875 | 20 | | |
| | 1 | Dec. 6, 1875 | Aug. 15, 1876 | 254 | Dec. 20, 1875–Jan. 5, 1876 | Dec. 21, 1875–Jan. 5, 1876 |
| | 2 | Dec. 4, 1876 | Mar. 3, 1877 | 90 | | |
| 45th | S | Mar. 5, 1877 | Mar. 17, 1877 | 13 | | |
| | 1–E | Oct. 15, 1877 | Dec. 3, 1877 | 50 | | |
| | 2 | Dec. 3, 1877 | June 20, 1878 | 200 | Dec. 15, 1877–Jan. 10, 1878 | Dec. 15, 1877–Jan. 10, 1878 |
| | 3 | Dec. 2, 1878 | Mar. 3, 1879 | 92 | Dec. 20, 1878–Jan. 7, 1879 | Dec. 20, 1878–Jan. 7, 1879 |
| 46th | 1–E | Mar. 18, 1879 | July 1, 1879 | 106 | | |
| | 2 | Dec. 1, 1879 | June 16, 1880 | 199 | Dec. 19, 1879–Jan. 6, 1880 | Dec. 19, 1879–Jan. 6, 1880 |
| | 3 | Dec. 6, 1880 | Mar. 3, 1881 | 88 | Dec. 23, 1880–Jan. 5, 1881 | Dec. 23, 1880–Jan. 5, 1881 |
| 47th | S | Mar. 4, 1881 | May 20, 1881 | 78 | | |
| | S | Oct. 10, 1881 | Oct. 29, 1881 | 20 | | |
| | 1 | Dec. 5, 1881 | Aug. 8, 1882 | 247 | Dec. 22, 1881–Jan. 5, 1882 | Dec. 22, 1881–Jan. 5, 1882 |
| | 2 | Dec. 4, 1882 | Mar. 3, 1883 | 90 | | |
| 48th | 1 | Dec. 3, 1883 | July 7, 1884 | 218 | Dec. 24, 1883–Jan. 7, 1884 | Dec. 24, 1883–Jan. 7, 1884 |
| | 2 | Dec. 1, 1884 | Mar. 3, 1885 | 93 | Dec. 24, 1884–Jan. 5, 1885 | Dec. 24, 1884–Jan. 5, 1885 |
| 49th | S | Mar. 4, 1885 | Apr. 2, 1885 | 30 | | |
| | 1 | Dec. 7, 1885 | Aug. 5, 1886 | 242 | Dec. 21, 1885–Jan. 5, 1886 | Dec. 21, 1885–Jan. 5, 1886 |
| | 2 | Dec. 6, 1886 | Mar. 3, 1887 | 88 | Dec. 22, 1886–Jan. 4, 1887 | Dec. 22, 1886–Jan. 4, 1887 |
| 50th | 1 | Dec. 5, 1887 | Oct. 20, 1888 | 321 | Dec. 22, 1887–Jan. 4, 1888 | Dec. 22, 1887–Jan. 4, 1888 |
| | 2 | Dec. 3, 1888 | Mar. 3, 1889 | 91 | Dec. 21, 1888–Jan. 2, 1889 | Dec. 21, 1888–Jan. 2, 1889 |
| 51st | S | Mar. 4, 1889 | Apr. 2, 1889 | 30 | | |
| | 1 | Dec. 2, 1889 | Oct. 1, 1890 | 304 | Dec. 21, 1889–Jan. 6, 1890 | Dec. 21, 1889–Jan. 6, 1890 |
| | 2 | Dec. 1, 1890 | Mar. 3, 1891 | 93 | | |
| 52d | 1 | Dec. 7, 1891 | Aug. 5, 1892 | 251 | | |
| | 2 | Dec. 5, 1892 | Mar. 3, 1893 | 89 | Dec. 22, 1892–Jan. 4, 1893 | Dec. 22, 1892–Jan. 4, 1893 |
| 53d | S | Mar. 4, 1893 | Apr. 15, 1893 | 43 | | |
| | 1–E | Aug. 7, 1893 | Nov. 3, 1893 | 89 | | |
| | 2 | Dec. 4, 1893 | Aug. 28, 1894 | 268 | | Dec. 21, 1893–Jan. 3, 1894 |
| | 3 | Dec. 3, 1894 | Mar. 3, 1895 | 97 | | Dec. 23, 1894–Jan. 3, 1895 |
| 54th | 1 | Dec. 2, 1895 | June 11, 1896 | 193 | | |
| | 2 | Dec. 7, 1896 | Mar. 3, 1897 | 87 | Dec. 22, 1896–Jan. 5, 1897 | Dec. 22, 1896–Jan. 5, 1897 |
| 55th | S | Mar. 4, 1897 | Mar. 10, 1897 | 11 | | |

Appendix A to opinion of the Court

| Con-gress | Ses-sion | Convening Date | Adjournment Date | Length in days[1] | Recesses[2] Senate | Recesses[2] House of Representatives |
|---|---|---|---|---|---|---|
| | 1–E | Mar. 15, 1897 | July 24, 1897 | 131 | | |
| | 2 | Dec. 6, 1897 | July 8, 1898 | 215 | Dec. 18, 1897–Jan. 5, 1898 | Dec. 18, 1897–Jan. 5, 1898 |
| | 3 | Dec. 5, 1898 | Mar. 3, 1899 | 89 | Dec. 21, 1898–Jan. 4, 1899 | Dec. 21, 1898–Jan. 4, 1899 |
| 56th | 1 | Dec. 4, 1899 | June 7, 1900 | 186 | Dec. 20, 1899–Jan. 3, 1900 | Dec. 20, 1899–Jan. 3, 1900 |
| | 2 | Dec. 3, 1900 | Mar. 3, 1901 | 91 | Dec. 20, 1900–Jan. 3, 1901 | Dec. 21, 1900–Jan. 3, 1901 |
| 57th | S | Mar. 4, 1901 | Mar. 9, 1901 | 6 | | |
| | 1 | Dec. 2, 1901 | July 1, 1902 | 212 | Dec. 19, 1901–Jan. 6, 1902 | Dec. 19, 1901–Jan. 6, 1902 |
| | 2 | Dec. 1, 1902 | Mar. 3, 1903 | 93 | Dec. 20, 1902–Jan. 5, 1903 | Dec. 20, 1902–Jan. 5, 1903 |
| 58th | S | Mar. 5, 1903 | Mar. 19, 1903 | 15 | | |
| | 1–E | Nov. 9, 1903 | Dec. 7, 1903 | 29 | | |
| | 2 | Dec. 7, 1903 | Apr. 28, 1904 | 144 | Dec. 19, 1903–Jan. 4, 1904 | Dec. 19, 1903–Jan. 4, 1904 |
| | 3 | Dec. 5, 1904 | Mar. 3, 1905 | 89 | Dec. 21, 1904–Jan. 4, 1905 | Dec. 21, 1904–Jan. 4, 1905 |
| 59th | S | Mar. 4, 1905 | Mar. 18, 1905 | 15 | | |
| | 1 | Dec. 4, 1905 | June 30, 1906 | 209 | Dec. 21, 1905–Jan. 4, 1906 | Dec. 21, 1905–Jan. 4, 1906 |
| | 2 | Dec. 3, 1906 | Mar. 3, 1907 | 91 | Dec. 20, 1906–Jan. 3, 1907 | Dec. 20, 1906–Jan. 3, 1907 |
| 60th | 1 | Dec. 2, 1907 | May 30, 1908 | 181 | Dec. 21, 1907–Jan. 6, 1908 | Dec. 21, 1907–Jan. 6, 1908 |
| | 2 | Dec. 7, 1908 | Mar. 3, 1909 | 87 | Dec. 19, 1908–Jan. 4, 1909 | Dec. 19, 1908–Jan. 4, 1909 |
| 61st | S | Mar. 4, 1909 | Mar. 6, 1909 | 3 | | |
| | 1–E | Mar. 15, 1909 | Aug. 5, 1909 | 144 | | |
| | 2 | Dec. 6, 1909 | June 25, 1910 | 202 | Dec. 21, 1909–Jan. 4, 1910 | Dec. 21, 1909–Jan. 4, 1910 |
| | 3 | Dec. 5, 1910 | Mar. 3, 1911 | 89 | Dec. 21, 1910–Jan. 5, 1911 | Dec. 21, 1910–Jan. 5, 1911 |
| 62d | 1–E | Apr. 4, 1911 . | Aug. 22, 1911 | 141 | | |
| | 2 | Dec. 4, 1911 | Aug. 26, 1912 | 267 | Dec. 21, 1911–Jan. 3, 1912 | Dec. 21, 1911–Jan. 3, 1912 |
| | 3 | Dec. 2, 1912 | Mar. 3, 1913 | 92 | Dec. 19, 1912–Jan. 2, 1913 | Dec. 19, 1912–Jan. 2, 1913 |
| 63d | S | Mar. 4, 1913 | Mar. 17, 1913 | 14 | | |
| | 1–E | Apr. 7, 1913 | Dec. 1, 1913 | 239 | | |
| | 2 | Dec. 1, 1913 | Oct. 24, 1914 | 328 | Dec. 23, 1913–Jan. 12, 1914 | Dec. 23, 1913–Jan. 12, 1914 |
| | 3 | Dec. 7, 1914 | Mar. 3, 1915 | 87 | Dec. 23–Dec. 28, 1914 | Dec. 23–Dec. 28, 1914 |
| 64th | 1 | Dec. 6, 1915 | Sept. 8, 1916 | 278 | Dec. 17, 1915–Jan. 4, 1916 | Dec. 17, 1915–Jan. 4, 1916 |
| | 2 | Dec. 4, 1916 | Mar. 3, 1917 | 90 | Dec. 22, 1916–Jan. 2, 1917 | Dec. 22, 1916–Jan. 2, 1917 |
| 65th | S | Mar. 5, 1917 | Mar. 16, 1917 | 12 | | |
| | 1–E | Apr. 2, 1917 | Oct. 6, 1917 | 188 | | |
| | 2 | Dec. 3, 1917 | Nov. 21, 1918 | 354 | Dec. 18, 1917–Jan. 3, 1918 | Dec. 18, 1917–Jan. 3, 1918 |
| | 3 | Dec. 2, 1918 | Mar. 3, 1919 | 92 | | |
| 66th | 1–E | May 19, 1919 | Nov. 19, 1919 | 185 | July 1–July 8, 1919 | July 1–July 8, 1919 |
| | 2 | Dec. 1, 1919 | June 5, 1920 | 188 | Dec. 20, 1919–Jan. 5, 1920 | Dec. 20, 1919–Jan. 5, 1920 |
| | 3 | Dec. 6, 1920 | Mar. 3, 1921 | 88 | | |
| 67th | S | Mar. 4, 1921 | Mar. 15, 1921 | 12 | | |
| | 1–E | Apr. 11, 1921 | Nov. 23, 1921 | 227 | Aug. 24–Sept. 21, 1921 | Aug. 24–Sept. 21, 1921 |
| | 2 | Dec. 5, 1921 | Sept. 22, 1922 | 292 | Dec. 22, 1921–Jan. 3, 1922 | Dec. 22, 1921–Jan. 3, 1922 |
| | 3–E | Nov. 20, 1922 | Dec. 4, 1922 | 15 | | |
| | 4 | Dec. 4, 1922 | Mar. 3, 1923 | 90 | | |
| 68th | 1 | Dec. 3, 1923 | June 7, 1924 | 188 | Dec. 20, 1923–Jan. 3, 1924 | Dec. 20, 1923–Jan. 3, 1924 |
| | 2 | Dec. 1, 1924 | Mar. 3, 1925 | 93 | Dec. 20–Dec. 29, 1924 | Dec. 20–Dec. 29, 1924 |
| 69th | S | Mar. 4, 1925 | Mar. 18, 1925 | 15 | | |
| | 1 | Dec. 7, 1925 | July 3, 1926 | 209 | Dec. 22, 1925–Jan. 4, 1926 | Dec. 22, 1925–Jan. 4, 1926 |
| | 2 | Dec. 6, 1926 | Mar. 4, 1927 | 88 | Dec. 22, 1926–Jan. 3, 1927 | Dec. 22, 1926–Jan. 3, 1927 |
| 70th | 1 | Dec. 5, 1927 | May 29, 1928 | 177 | Dec. 21, 1927–Jan. 4, | Dec. 21, 1927–Jan. 4, |

## Appendix A to opinion of the Court

| Con-gress | Ses-sion | Convening Date | Adjournment Date | Length in days[1] | Recesses[2] | |
|---|---|---|---|---|---|---|
| | | | | | Senate | House of Representa-tives |
| | 2 | Dec. 3, 1928 | Mar. 3, 1929 | 91 | 1928<br>Dec. 22, 1928–Jan. 3, 1929 | 1928<br>Dec. 22, 1928–Jan. 3, 1929 |
| 71st | S | Mar. 4, 1929 | Mar. 5, 1929 | 2 | | |
| | 1–E | Apr. 15, 1929 | Nov. 22, 1929 | 222 | June 19–Aug. 19, 1929 | June 19–Sept. 23, 1929 |
| | 2 | Dec. 2, 1929 | July 3, 1930 | 214 | Dec. 21, 1929–Jan. 6, 1930 | Dec. 21, 1929–Jan. 6, 1930 |
| | S | July 7, 1930 | July 21, 1930 | 15 | | |
| | 3 | Dec. 1, 1930 | Mar. 3, 1931 | 93 | Dec. 20, 1930–Jan. 5, 1931 | Dec. 20, 1930–Jan. 5, 1931 |
| 72d | 1 | Dec. 7, 1931 | July 16, 1932 | 223 | Dec. 22, 1931–Jan. 4, 1932 | Dec. 22, 1931–Jan. 4, 1932 |
| | 2 | Dec. 5, 1932 | Mar. 3, 1933 | 89 | | |
| 73d | S | Mar. 4, 1933 | Mar. 6, 1933 | 3 | | |
| | 1–E | Mar. 9, 1933 | June 15, 1933 | 99 | | |
| | 2 | Jan. 3, 1934 | June 18, 1934 | 167 | | |
| 74th | 1 | Jan. 3, 1935 | Aug. 26, 1935 | 236 | | |
| | 2 | Jan. 3, 1936 | June 20, 1936 | 170 | June 8–June 15, 1936 | June 8–June 15, 1936 |
| 75th | 1 | Jan. 5, 1937 | Aug. 21, 1937 | 229 | | |
| | 2–E | Nov. 15, 1937 | Dec. 21, 1937 | 37 | | |
| | 3 | Jan. 3, 1938 | June 16, 1938 | 165 | | |
| 76th | 1 | Jan. 3, 1939 | Aug. 5, 1939 | 215 | | |
| | 2–E | Sept. 21, 1939 | Nov. 3, 1939 | 44 | | |
| | 3 | Jan. 3, 1940 | Jan. 3, 1941 | 366 | July 11–July 22, 1940 | July 11–July 22, 1940 |
| 77th | 1 | Jan. 3, 1941 | Jan. 2, 1942 | 365 | | |
| | 2 | Jan. 5, 1942 | Dec. 16, 1942 | 346 | | |
| 78th | 1 | Jan. 6, 1943 | Dec. 21, 1943 | 350 | July 8–Sept. 14, 1943 | July 8–Sept. 14, 1943 |
| | 2 | Jan. 10, 1944 | Dec. 19, 1944 | 345 | Apr. 1–Apr. 12, 1944<br>June 23–Aug. 1, 1944<br>Sept. 21–Nov. 14, 1944 | Apr. 1–Apr. 12, 1944<br>June 23–Aug. 1, 1944<br>Sept. 21–Nov. 14, 1944 |
| 79th | 1 | Jan. 3, 1945 | Dec. 21, 1945 | 353 | Aug. 1–Sept. 5, 1945 | July 21–Sept. 5, 1945 |
| | 2 | Jan. 14, 1946 | Aug. 2, 1946 | 201 | | Apr. 18–Apr. 30, 1946 |
| 80th | 1 | Jan. 3, 1947 | Dec. 19, 1947 | 351 | July 27–Nov. 17, 1947 | July 27–Nov. 17, 1947 |
| | 2 | Jan. 6, 1948 | Dec. 31, 1948 | 361 | June 20–July 26, 1948<br>Aug. 7–Dec. 31, 1948 | June 20–July 26, 1948<br>Aug. 7–Dec. 31, 1948 |
| 81st | 1 | Jan. 3, 1949 | Oct. 19, 1949 | 290 | | |
| | 2 | Jan. 3, 1950 | Jan. 2, 1951 | 365 | Sept. 23–Nov. 27, 1950 p | Apr. 6–Apr. 18, 1950<br>Sept. 23–Nov. 27, 1950 |
| 82d | 1 | Jan. 3, 1951 | Oct. 20, 1951 | 291 | | Mar. 22–Apr. 2, 1951<br>Aug. 23–Sept. 12, 1951 |
| | 2 | Jan. 8, 1952 | July 7, 1952 | 182 | | Apr. 10–Apr. 22, 1952 |
| 83d | 1 | Jan. 3, 1953 | Aug. 3, 1953 | 213 | | Apr. 2–Apr. 13, 1953 |
| | 2 | Jan. 6, 1954 | Dec. 2, 1954 | 331 | Aug. 20–Nov. 8, 1954<br>Nov. 18–Nov. 29, 1954 | Apr. 15–Apr. 22, 1954<br>Adjourned sine die<br>Aug. 20, 1954 |
| 84th | 1 | Jan. 5, 1955 | Aug. 2, 1955 | 210 | Apr. 4–Apr. 13, 1955 | Apr. 4–Apr. 13, 1955 |
| | 2 | Jan. 3, 1956 | July 27, 1956 | 207 | Mar. 29–Apr. 9, 1956 | Mar. 29–Apr. 9, 1956 |
| 85th | 1 | Jan. 3, 1957 | Aug. 30, 1957 | 239 | Apr. 18–Apr. 29, 1957 | Apr. 18–Apr. 29, 1957 |
| | 2 | Jan. 7, 1958 | Aug. 24, 1958 | 230 | Apr. 3–Apr. 14, 1958 | Apr. 3–Apr. 14, 1958 |
| 86th | 1 | Jan. 7, 1959 | Sept. 15, 1959 | 252 | Mar. 26–Apr. 7, 1959 | Mar. 26–Apr. 7, 1959 |
| | 2 | Jan. 6, 1960 | Sept. 1, 1960 | 240 | Apr. 14–Apr. 18, 1960<br>May 27–May 31, 1960<br>July 3–Aug. 8, 1960 | Apr. 14–Apr. 18, 1960<br>May 27–May 31, 1960<br>July 3–Aug. 15, 1960 |
| 87th | 1 | Jan. 3, 1961 | Sept. 27, 1961 | 268 | | Mar. 30–Apr. 10, 1961 |
| | 2 | Jan. 10, 1962 | Oct. 13, 1962 | 277 | | Apr. 19–Apr. 30, 1962 |
| 88th | 1 | Jan. 9, 1963 | Dec. 30, 1963 | 356 | | Apr. 11–Apr. 22, 1963 |
| | 2 | Jan. 7, 1964 | Oct. 3, 1964 | 270 | July 10–July 20, 1964<br>Aug. 21–Aug. 31, 1964 | Mar. 26–Apr. 6, 1964<br>July 2–July 20, 1964<br>Aug. 21–Aug. 31, 1964 |
| 89th | 1 | Jan. 4, 1965 | Oct. 23, 1965 | 293 | | |
| | 2 | Jan. 10, 1966 | Oct. 22, 1966 | 286 | Apr. 7–Apr. 13, 1966<br>June 30–July 11, 1966 | Apr. 7–Apr. 18, 1966<br>June 30–July 11, 1966 |
| 90th | 1 | Jan. 10, 1967 | Dec. 15, 1967 | 340 | Mar. 23–Apr. 3, 1967<br>June 29–July 10, 1967<br>Aug. 31–Sept. 11, 1967<br>Nov. 22–Nov. 27, 1967 | Mar. 23–Apr. 3, 1967<br>June 29–July 10, 1967<br>Aug. 31–Sept. 11, 1967<br>Nov. 22–Nov. 27, 1967 |
| | 2 | Jan. 15, 1968 | Oct. 14, 1968 | 274 | Apr. 11–Apr. 17, 1968<br>May 29–June 3, 1968<br>June 3–July 8, 1968<br>Aug. 2–Sept. 4, 1968 | Apr. 11–Apr. 22, 1968<br>May 29–June 3, 1968<br>June 3–July 8, 1968<br>Aug. 2–Sept. 4, 1968 |
| 91st | 1 | Jan. 3, 1969 | Dec. 23, 1969 | 355 | Feb. 7–Feb. 17, 1969<br>Apr. 3–Apr. 14, 1969<br>July 2–July 7, 1969<br>Aug. 13–Sept. 3, 1969 | Feb. 7–Feb. 17, 1969<br>Apr. 3–Apr. 14, 1969<br>May 28–June 2, 1969<br>July 2–July 7, 1969 |

## Appendix A to opinion of the Court

| Con-gress | Ses-sion | Convening Date | Adjournment Date | Length in days[1] | Recesses[2] Senate | House of Representatives |
|---|---|---|---|---|---|---|
| | | | | | | Aug. 13–Sept. 3, 1969<br>Nov. 6–Nov. 12, 1969<br>Nov. 26–Dec. 1, 1969 |
| | 2 | Jan. 19, 1970 | Jan. 2, 1971 | 349 | Nov. 26–Dec. 1, 1969<br>Feb. 10–Feb. 16, 1970<br>Mar. 26–Mar. 31, 1970<br>Sept. 2–Sept. 8, 1970<br>Oct. 14–Nov. 16, 1970<br>Nov. 25–Nov. 30, 1970<br>Dec. 22–Dec. 28, 1970 | Feb. 10–Feb. 16, 1970<br>Mar. 26–Mar. 31, 1970<br>May 27–June 1, 1970<br>July 1–July 6, 1970<br>Aug. 14–Sept. 9, 1970<br>Oct. 14–Nov. 16, 1970<br>Nov. 25–Nov. 30, 1970<br>Dec. 22–Dec. 29, 1970 |
| 92d | 1 | Jan. 21, 1971 | Dec. 17, 1971 | 331 | Feb. 11–Feb. 17, 1971<br>Apr. 7–Apr. 14, 1971<br>May 26–June 1, 1971<br>June 30–July 6, 1971<br>Aug. 6–Sept. 8, 1971<br>Oct. 21–Oct. 26, 1971<br>Nov. 24–Nov. 29, 1971 | Feb. 10–Feb. 17, 1971<br>Apr. 7–Apr. 19, 1971<br>May 27–June 1, 1971<br>July 1–July 6, 1971<br>Aug. 6–Sept. 8, 1971<br>Oct. 7–Oct. 12, 1971<br>Oct. 21–Oct. 26, 1971<br>Nov. 19–Nov. 29, 1971 |
| | 2 | Jan. 18, 1972 | Oct. 18, 1972 | 275 | Feb. 9–Feb. 14, 1972<br>Mar. 30–Apr. 4, 1972<br>May 25–May 30, 1972<br>June 30–July 17, 1972<br>Aug. 18–Sept. 5, 1972 | Feb. 9–Feb. 16, 1972<br>Mar. 29–Apr. 10, 1972<br>May 24–May 30, 1972<br>June 30–July 17, 1972<br>Aug. 18–Sept. 5, 1972 |
| 93d | 1 | Jan. 3, 1973 | Dec. 22, 1973 | 354 | Feb. 8–Feb. 15, 1973<br>Apr. 18–Apr. 30, 1973<br>May 23–May 29, 1973<br>June 30–July 9, 1973<br>Aug. 3–Sept. 5, 1973<br>Oct. 18–Oct. 23, 1973<br>Nov. 21–Nov. 26, 1973 | Feb. 8–Feb. 19, 1973<br>Apr. 19–Apr. 30, 1973<br>May 24–May 29, 1973<br>June 30–July 10, 1973<br>Aug. 3–Sept. 5, 1973<br>Oct. 4–Oct. 9, 1973<br>Oct. 18–Oct. 23, 1973<br>Nov. 15–Nov. 26, 1973 |
| | 2 | Jan. 21, 1974 | Dec. 20, 1974 | 334 | Feb. 8–Feb. 18, 1974<br>Mar. 13–Mar. 19, 1974<br>Apr. 11–Apr. 22, 1974<br>May 23–May 28, 1974<br>Aug. 22–Sept. 4, 1974<br>Oct. 17–Nov. 18, 1974<br>Nov. 26–Dec. 2, 1974 | Feb. 7–Feb. 13, 1974<br>Apr. 11–Apr. 22, 1974<br>May 23–May 28, 1974<br>Aug. 22–Sept. 11, 1974<br>Oct. 17–Nov. 18, 1974<br>Nov. 26–Dec. 3, 1974 |
| 94th | 1 | Jan. 14, 1975 | Dec. 19, 1975 | 340 | Mar. 26–Apr. 7, 1975<br>May 22–June 2, 1975<br>June 27–July 7, 1975<br>Aug. 1–Sept. 3, 1975<br>Oct. 9–Oct. 20, 1975<br>Oct. 23–Oct. 28, 1975<br>Nov. 20–Dec. 1, 1975 | Mar. 26–Apr. 7, 1975<br>May 22–June 2, 1975<br>June 26–July 8, 1975<br>Aug. 1–Sept. 3, 1975<br>Oct. 9–Oct. 20, 1975<br>Oct. 23–Oct. 28, 1975<br>Nov. 20–Dec. 1, 1975 |
| | 2 | Jan. 19, 1976 | Oct. 1, 1976 | 257 | Feb. 6–Feb. 16, 1976<br>Apr. 14–Apr. 26, 1976<br>May 28–June 2, 1976<br>July 2–July 19, 1976<br>Aug. 10–Aug. 23, 1976<br>Sept. 1–Sept. 7, 1976 | Feb. 11–Feb. 16, 1976<br>Apr. 14–Apr. 26, 1976<br>May 27–June 1, 1976<br>July 2–July 19, 1976<br>Aug. 10–Aug. 23, 1976<br>Sept. 2–Sept. 8, 1976 |
| 95th | 1 | Jan. 4, 1977 | Dec. 15, 1977 | 346 | Feb. 11–Feb. 21, 1977<br>Apr. 7–Apr. 18, 1977<br>May 27–June 6, 1977<br>July 1–July 11, 1977<br>Aug. 6–Sept. 7, 1977 | Feb. 9–Feb. 16, 1977<br>Apr. 6–Apr. 18, 1977<br>May 26–June 1, 1977<br>June 30–July 11, 1977<br>Aug. 5–Sept. 7, 1977<br>Oct. 6–Oct. 11, 1977 |
| | 2 | Jan. 19, 1978 | Oct. 15, 1978 | 270 | Feb. 10–Feb. 20, 1978<br>Mar. 23–Apr. 3, 1978<br>May 26–June 5, 1978<br>June 29–July 10, 1978<br>Aug. 25–Sept. 6, 1978 | Feb. 9–Feb. 14, 1978<br>Mar. 22–Apr. 3, 1978<br>May 25–May 31, 1978<br>June 29–July 10, 1978<br>Aug. 17–Sept. 6, 1978 |
| 96th | 1 | Jan. 15, 1979 | Jan. 3, 1980 | 354 | Feb. 9–Feb. 19, 1979<br>Apr. 10–Apr. 23, 1979<br>May 24–June 4, 1979<br>June 27–July 9, 1979<br>Aug. 3–Sept. 5, 1979<br>Nov. 20–Nov. 26, 1979<br>Adjourned sine die, Dec. 20, 1979 | Feb. 8–Feb. 13, 1979<br>Apr. 10–Apr. 23, 1979<br>May 24–May 30, 1979<br>June 29–July 9, 1979<br>Aug. 2–Sept. 5, 1979<br>Nov. 20–Nov. 26, 1979 |
| | 2 | Jan. 3, 1980 | Dec. 16, 1980 | 349 | Apr. 3–Apr. 15, 1980<br>May 22–May 28, 1980<br>July 2–July 21, 1980<br>Aug. 6–Aug. 18, 1980 | Feb. 13–Feb. 19, 1980<br>Apr. 2–Apr. 15, 1980<br>May 22–May 28, 1980<br>July 2–July 21, 1980 |

## Appendix A to opinion of the Court

| Con-gress | Ses-sion | Convening Date | Adjournment Date | Length in days[1] | Recesses[2] Senate | House of Representatives |
|---|---|---|---|---|---|---|
| | | | | | Aug. 27–Sept. 3, 1980 | Aug. 1–Aug. 18, 1980 |
| | | | | | Oct. 1–Nov. 12, 1980 | Aug. 28–Sept. 3, 1980 |
| | | | | | Nov. 25–Dec. 1, 1980 | Oct. 2–Nov. 12, 1980 |
| | | | | | | Nov. 21–Dec. 1, 1980 |
| 97th | 1 | Jan. 5, 1981 | Dec. 16, 1981 | 347 | Feb. 6–Feb. 16, 1981 | Feb. 6–Feb. 17, 1981 |
| | | | | | Apr. 10–Apr. 27, 1981 | Apr. 10–Apr. 27, 1981 |
| | | | | | June 25–July 8, 1981 | June 26–July 8, 1981 |
| | | | | | Aug. 3–Sept. 9, 1981 | Aug. 4–Sept. 9, 1981 |
| | | | | | Oct. 7–Oct. 14, 1981 | Oct. 7–Oct. 13, 1981 |
| | | | | | Nov. 24–Nov. 30, 1981 | Nov. 23–Nov. 30, 1981 |
| | 2 | Jan. 25, 1982 | Dec. 23, 1982 | 333 | Feb. 11–Feb. 22, 1982 | Feb. 10–Feb. 22, 1982 |
| | | | | | Apr. 1–Apr. 13, 1982 | Apr. 6–Apr. 20, 1982 |
| | | | | | May 27–June 8, 1982 | May 27–June 2, 1982 |
| | | | | | July 1–July 12, 1982 | July 1–July 12, 1982 |
| | | | | | Aug. 20–Sept. 8, 1982 | Aug. 20–Sept. 8, 1982 |
| | | | | | Oct. 1–Nov. 29, 1982 | Oct. 1–Nov. 29, 1982 |
| 98th | 1 | Jan. 3, 1983 | Nov. 18, 1983 | 320 | Jan. 3–Jan. 25, 1983 | Jan. 6–Jan. 25, 1983 |
| | | | | | Feb. 3–Feb. 14, 1983 | Feb. 17–Feb. 22, 1983 |
| | | | | | Mar. 24–Apr. 5, 1983 | Mar. 24–Apr. 5, 1983 |
| | | | | | May 26–June 6, 1983 | May 26–June 1, 1983 |
| | | | | | June 29–July 11, 1983 | June 30–July 11, 1983 |
| | | | | | Aug. 4–Sept. 12, 1983 | Aug. 4–Sept. 12, 1983 |
| | | | | | Oct. 7–Oct. 17, 1983 | Oct. 6–Oct. 17, 1983 |
| | 2 | Jan. 23, 1984 | Oct. 12, 1984 | 264 | Feb. 9–Feb. 20, 1984 | Feb. 9–Feb. 21, 1984 |
| | | | | | Apr. 12–Apr. 24, 1984 | Apr. 12–Apr. 24, 1984 |
| | | | | | May 24–May 31, 1984 | May 24–May 30, 1984 |
| | | | | | June 29–July 23, 1984 | June 29–July 23, 1984 |
| | | | | | Aug. 10–Sept. 5, 1984 | Aug. 10–Sept. 5, 1984 |
| 99th | 1 | Jan. 3, 1985 | Dec. 20, 1985 | 352 | Jan. 7–Jan. 21, 1985 | Jan. 3–Jan. 21, 1985 |
| | | | | | Feb. 7–Feb. 18, 1985 | Feb. 7–Feb. 19, 1985 |
| | | | | | Apr. 4–Apr. 15, 1985 | Mar. 7–Mar. 19, 1985 |
| | | | | | May 9–May 14, 1985 | Apr. 4–Apr. 15, 1985 |
| | | | | | May 24–June 3, 1985 | May 23–June 3, 1985 |
| | | | | | June 27–July 8, 1985 | June 27–July 8, 1985 |
| | | | | | Aug. 1–Sept. 9, 1985 | Aug. 1–Sept. 4, 1985 |
| | | | | | Nov. 23–Dec. 2, 1985 | Nov. 21–Dec. 2, 1985 |
| | 2 | Jan. 21, 1986 | Oct. 18, 1986 | 278 | Feb. 7–Feb. 17, 1986 | Feb. 6–Feb. 18, 1986 |
| | | | | | Mar. 27–Apr. 8, 1986 | Mar. 25–Apr. 8, 1986 |
| | | | | | May 21–June 2, 1986 | May 22–June 3, 1986 |
| | | | | | June 26–July 7, 1986 | June 26–July 14, 1986 |
| | | | | | Aug. 15–Sept. 8, 1986 | Aug. 16–Sept. 8, 1986 |
| 100th | 1 | Jan. 6, 1987 | Dec. 22, 1987 | 351 | Jan. 6–Jan. 12, 1987 | Jan. 8–Jan. 20, 1987 |
| | | | | | Feb. 5–Feb. 16, 1987 | Feb. 11–Feb. 18, 1987 |
| | | | | | Apr. 10–Apr. 21, 1987 | Apr. 9–Apr. 21, 1987 |
| | | | | | May 21–May 27, 1987 | May 21–May 27, 1987 |
| | | | | | July 1–July 7, 1987 | July 1–July 7, 1987 |
| | | | | | Aug. 7–Sept. 9, 1987 | July 15–July 20, 1987 |
| | | | | | Nov. 20–Nov. 30, 1987 | Aug. 7–Sept. 9, 1987 |
| | | | | | | Nov. 10–Nov. 16, 1987 |
| | | | | | | Nov. 20–Nov. 30, 1987 |
| | 2 | Jan. 25, 1988 | Oct. 22, 1988 | 272 | Feb. 4–Feb. 15, 1988 | Feb. 9–Feb. 16, 1988 |
| | | | | | Mar. 4–Mar. 14, 1988 | Mar. 31–Apr. 11, 1988 |
| | | | | | Mar. 31–Apr. 11, 1988 | May 26–June 1, 1988 |
| | | | | | Apr. 29–May 9, 1988 | June 30–July 7, 1988 |
| | | | | | May 27–June 6, 1988 | July 14–July 26, 1988 |
| | | | | | June 29–July 6, 1988 | Aug. 11–Sept. 7, 1988 |
| | | | | | July 14–July 25, 1988 | |
| | | | | | Aug. 11–Sept. 7, 1988 | |
| 101st | 1 | Jan. 3, 1989 | Nov. 22, 1989 | 324 | Jan. 4–Jan. 20, 1989 | Jan. 4–Jan. 19, 1989 |
| | | | | | Jan. 20–Jan. 25, 1989 | Feb. 9–Feb. 21, 1989 |
| | | | | | Feb. 9–Feb. 21, 1989 | Mar. 23–Apr. 3, 1989 |
| | | | | | Mar. 17–Apr. 4, 1989 | Apr. 18–Apr. 25, 1989 |
| | | | | | Apr. 19–May 1, 1989 | May 25–May 31, 1989 |
| | | | | | May 18–May 31, 1989 | June 29–July 10, 1989 |
| | | | | | June 23–July 11, 1989 | Aug. 5–Sept. 6, 1989 |
| | | | | | Aug. 4–Sept. 6, 1989 | |
| | 2 | Jan. 23, 1990 | Oct. 28, 1990 | 260 | Feb. 8–Feb. 20, 1990 | Feb. 7–Feb. 20, 1990 |
| | | | | | Mar. 9–Mar. 20, 1990 | Apr. 4–Apr. 18, 1990 |
| | | | | | Apr. 5–Apr. 18, 1990 | May 25–June 5, 1990 |
| | | | | | May 24–June 5, 1990 | June 28–July 10, 1990 |
| | | | | | June 28–July 10, 1990 | Aug. 4–Sept. 5, 1990 |
| | | | | | Aug. 4–Sept. 10, 1990 | |
| 102d | 1 | Jan. 3, 1991 | Jan. 3, 1992 | 366 | Feb. 7–Feb. 19, 1991 | Feb. 6–Feb. 19, 1991 |
| | | | | | Mar. 22–Apr. 9, 1991 | Mar. 22–Apr. 9, 1991 |
| | | | | | Apr. 25–May 6, 1991 | May 23–May 29, 1991 |

## Appendix A to opinion of the Court

| Con-gress | Ses-sion | Convening Date | Adjournment Date | Length in days[1] | Recesses[2] | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | Senate | House of Representatives |
| | | | | | May 24–June 3, 1991<br>June 28–July 8, 1991<br>Aug. 2–Sept. 10, 1991<br>Nov. 27, 1991–Jan. 3, 1992 | June 27–July 9, 1991<br>Aug. 2–Sept. 11, 1991<br>Nov. 27, 1991–Jan. 3, 1992 |
| | 2 | Jan. 3, 1992 | Oct. 9, 1992 | 281 | Jan. 3–Jan. 21, 1992 p<br>Feb. 7–Feb. 18, 1992 p<br>Apr. 10–Apr. 28, 1992<br>May 21–June 1, 1992<br>July 2–July 20, 1992<br>Aug. 12–Sept. 8, 1992 | Jan. 3–Jan. 22, 1992<br>Apr. 10–Apr. 28, 1992<br>May 21–May 26, 1992<br>July 2–July 7, 1992<br>July 9–July 21, 1992<br>Aug. 12–Sept. 9, 1992 |
| 103d | 1 | Jan. 5, 1993 | Nov. 26, 1993 | 326 | Jan. 7–Jan. 20, 1993<br>Feb. 4–Feb. 16, 1993<br>Feb. 18–Feb. 24, 1993 p<br>Apr. 7–Apr. 19, 1993<br>May 28–June 7, 1993<br>July 1–July 13, 1993<br>Aug. 7–Sept. 7, 1993<br>Oct. 7–Oct. 13, 1993<br>Nov. 11–Nov. 16, 1993 | Jan. 6–Jan. 20, 1993<br>Jan. 27–Feb. 2, 1993<br>Feb. 4–Feb. 16, 1993<br>Apr. 7–Apr. 19, 1993<br>May 27–June 8, 1993<br>July 1–July 13, 1993<br>Aug. 6–Sept. 8, 1993<br>Sept. 15–Sept. 21, 1993<br>Oct. 7–Oct. 12, 1993<br>Nov. 10–Nov. 15, 1993 |
| | 2 | Jan. 25, 1994 | Dec. 1, 1994 | 311 | Feb. 11–Feb. 22, 1994<br>Mar. 26–Apr. 11, 1994<br>May 25–June 7, 1994<br>July 1–July 11, 1994<br>Aug. 25–Sept. 12, 1994<br>Oct. 8–Nov. 30, 1994 | Jan. 26–Feb. 1, 1994<br>Feb. 11–Feb. 22, 1994<br>Mar. 24–Apr. 12, 1994<br>May 26–June 8, 1994<br>June 30–July 12, 1994<br>Aug. 26–Sept. 12, 1994<br>Oct. 8–Nov. 29, 1994 |
| 104th | 1 | Jan. 4, 1995 | Jan. 3, 1996 | 365 | Feb. 16–Feb. 22, 1995<br>Apr. 7–Apr. 24, 1995<br>May 26–June 5, 1995<br>June 30–July 10, 1995<br>Aug. 11–Sept. 5, 1995<br>Sept. 29–Oct. 10, 1995<br>Nov. 20–Nov. 27, 1995 | Feb. 16–Feb. 21, 1995<br>Mar. 16–Mar. 21, 1995<br>Apr. 7–May 1, 1995<br>May 3–May 9, 1995<br>May 25–June 6, 1995<br>June 30–July 10, 1995<br>Aug. 4–Sept. 6, 1995<br>Sept. 29–Oct. 6, 1995<br>Nov. 20–Nov. 28, 1995 |
| | 2 | Jan. 3, 1996 | Oct. 4, 1996 | 276 | Jan. 10–Jan. 22, 1996<br>Feb. 1–Feb. 6, 1996 p<br>Feb. 7–Feb. 20, 1996 p<br>Feb. 29–Mar. 5, 1996 p<br>Mar. 29–Apr. 15, 1996<br>May 24–June 3, 1996<br>June 28–July 8, 1996<br>Aug. 2–Sept. 3, 1996 | Jan. 9–Jan. 22, 1996<br>Feb. 1–Feb. 27, 1996 p<br>Mar. 29–Apr. 15, 1996<br>May 23–May 29, 1996<br>June 28–July 8, 1996<br>Aug. 2–Sept. 4, 1996 |
| 105th | 1 | Jan. 7, 1997 | Nov. 13, 1997 | 311 | Jan. 9–Jan. 21, 1997<br>Feb. 13–Feb. 24, 1997<br>Mar. 21–Apr. 7, 1997<br>May 23–June 2, 1997 p<br>June 27–July 7, 1997<br>July 31–Sept. 2, 1997<br>Oct. 9–Oct. 20, 1997 | Jan. 9–Jan. 20, 1997<br>Jan. 21–Feb. 4, 1997<br>Feb. 13–Feb. 25, 1997<br>Mar. 21–Apr. 8, 1997<br>June 26–July 8, 1997<br>Aug. 1–Sept. 3, 1997<br>Oct. 9–Oct. 21, 1997 |
| | 2 | Jan. 27, 1998 | Dec. 19, 1998 | 327 | Feb. 13–Feb. 23, 1998<br>Apr. 3–Apr. 20, 1998<br>May 22–June 1, 1998<br>June 26–July 6, 1998<br>July 31–Aug. 31, 1998<br>Adjourned sine die, Oct. 21, 1998. | Jan. 28–Feb. 3, 1998<br>Feb. 5–Feb. 11, 1998<br>Feb. 12–Feb. 24, 1998<br>Apr. 1–Apr. 21, 1998<br>May 22–June 3, 1998<br>June 25–July 14, 1998<br>Aug. 7–Sept. 9, 1998<br>Oct. 21–Dec. 17, 1998 |
| 106th | 1 | Jan. 6, 1999 | Nov. 22, 1999 | 321 | Feb. 12–Feb. 22, 1999<br>Mar. 25–Apr. 12, 1999<br>May 27–June 7, 1999<br>July 1–July 12, 1999<br>Aug. 5–Sept. 8, 1999 | Jan. 6–Jan. 19, 1999<br>Jan. 19–Feb. 2, 1999<br>Feb. 12–Feb. 23, 1999<br>Mar. 25–Apr. 12, 1999<br>May 27–June 7, 1999<br>July 1–July 12, 1999<br>Aug. 6–Sept. 8, 1999 |
| | 2 | Jan. 24, 2000 | Dec. 15, 2000 | 326 | Feb. 10–Feb. 22, 2000<br>Mar. 9–Mar. 20, 2000<br>Apr. 13–Apr. 25, 2000<br>May 25–June 6, 2000<br>June 30–July 10, 2000<br>July 27–Sept. 5, 2000<br>Nov. 2–Nov. 14, 2000<br>Nov. 14–Dec. 5, 2000 | Feb. 16–Feb. 29, 2000<br>Apr. 13–May 2, 2000<br>May 25–June 6, 2000<br>June 30–July 10, 2000<br>July 27–Sept. 6, 2000<br>Nov. 3–Nov. 13, 2000<br>Nov. 14–Dec. 4, 2000 |

## Appendix A to opinion of the Court

| Con-gress | Ses-sion | Convening Date | Adjournment Date | Length in days[1] | Recesses [2] | |
|---|---|---|---|---|---|---|
| | | | | | Senate | House of Representa-tives |
| 107th | 1 | Jan. 3, 2001 | Dec. 20, 2001 | 352 | Jan. 8–Jan. 20, 2001<br>Feb. 15–Feb. 26, 2001<br>Apr. 6–Apr. 23, 2001<br>May 26–June 5, 2001<br>June 29–July 9, 2001<br>Aug. 3–Sept. 4, 2001<br>Oct. 18–Oct. 23, 2001<br>Nov. 16–Nov. 27, 2001 | Jan. 6–Jan. 20, 2001<br>Jan. 20–Jan. 30, 2001<br>Jan. 31–Feb. 6, 2001<br>Feb. 14–Feb. 26, 2001<br>Apr. 4–Apr. 24, 2001<br>May 26–June 5, 2001<br>June 28–July 10, 2001<br>Aug. 2–Sept. 5, 2001<br>Oct. 17–Oct. 23, 2001<br>Nov. 19–Nov. 27, 2001 |
| | 2 | Jan. 23, 2002 | Nov. 22, 2002 | 304 | Jan. 29–Feb. 4, 2002<br>Feb. 15–Feb. 25, 2002<br>Mar. 22–Apr. 8, 2002<br>May 23–June 3, 2002<br>June 28–July 8, 2002<br>Aug. 1–Sept. 3, 2002<br>Oct. 17–Nov. 12, 2002 p | Jan. 29–Feb. 4, 2002<br>Feb. 14–Feb. 26, 2002<br>Mar. 20–Apr. 9, 2002<br>May 24–June 4, 2002<br>June 28–July 8, 2002<br>July 27–Sept. 4, 2002 |
| 108th | 1 | Jan. 7, 2003 | Dec. 9, 2003 | 337 | Feb. 14–Feb. 24, 2003<br>Apr. 11–Apr. 28, 2003<br>May 23–June 2, 2003<br>June 27–July 7, 2003<br>Aug. 1–Sept. 2, 2003<br>Oct. 3–Oct. 14, 2003<br>Nov. 25–Dec. 9, 2003 | Jan. 8–Jan. 27, 2003<br>Feb. 13–Feb. 25, 2003<br>Apr. 12–Apr. 29, 2003<br>May 23–June 2, 2003<br>June 27–July 7, 2003<br>July 29–Sept. 3, 2003<br>Nov. 25–Dec. 8, 2003 |
| | 2 | Jan. 20, 2004 | Dec. 8, 2004 | 324 | Feb. 12–Feb. 23, 2004<br>Mar. 12–Mar. 22, 2004<br>Apr. 8–Apr. 19, 2004<br>May 21–June 1, 2004<br>June 9–June 14, 2004<br>June 25–July 6, 2004<br>July 22–Sept. 7, 2004<br>Oct. 11–Nov. 16, 2004<br>Nov. 24–Dec. 7, 2004 | Feb. 11–Feb. 24, 2004<br>Apr. 2–Apr. 20, 2004<br>May 20–June 1, 2004<br>June 9–June 14, 2004<br>June 25–July 6, 2004<br>July 22–Sept. 7, 2004<br>Oct. 9–Nov. 16, 2004<br>Nov. 24–Dec. 6, 2004 |
| 109th | 1 | Jan. 4, 2005 | Dec. 22, 2005 | 353 | Jan. 6–Jan. 20, 2005<br>Jan. 26–Jan. 31, 2005<br>Feb. 18–Feb. 28, 2005<br>Mar. 20–Apr. 4, 2005<br>Apr. 29–May 9, 2005<br>May 26–June 6, 2005<br>July 1–July 11, 2005<br>July 29–Sept. 1, 2005<br>Sept. 1–Sept. 6, 2005<br>Oct. 7–Oct. 17, 2005<br>Nov. 18–Dec. 12, 2005 | Jan. 6–Jan. 20, 2005<br>Jan. 20–Jan. 25, 2005<br>Jan. 26–Feb. 1, 2005<br>Feb. 2–Feb. 8, 2005<br>Feb. 17–Mar. 1, 2005<br>Mar. 21–Apr. 5, 2005<br>May 26–June 7, 2005<br>July 1–July 11, 2005<br>July 29–Sept. 2, 2005<br>Oct. 7–Oct. 17, 2005<br>Nov. 18–Dec. 6, 2005 |
| | 2 | Jan. 3, 2006 | Dec. 9, 2006 | 341 | Jan. 3–Jan. 18, 2006<br>Feb. 17–Feb. 27, 2006<br>Mar. 16–Mar. 27, 2006<br>Apr. 7–Apr. 24, 2006<br>May 26–June 5, 2006<br>June 29–July 10, 2006<br>Aug. 4–Sept. 5, 2006<br>Sept. 30–Nov. 9, 2006<br>Nov. 16–Dec. 4, 2006 | Jan. 3–Jan. 31, 2006<br>Feb. 1–Feb. 7, 2006<br>Feb. 8–Feb. 14, 2006<br>Feb. 16–Feb. 28, 2006<br>Mar. 16–Mar. 28, 2006<br>Apr. 6–Apr. 25, 2006<br>May 25–June 6, 2006<br>June 29–July 10, 2006<br>Aug. 2–Sept. 6, 2006<br>Sept. 30–Nov. 9, 2006<br>Nov. 15–Dec. 5, 2006 |
| 110th | 1 | Jan. 4, 2007 | Dec. 31, 2007 | 362 | Feb. 17–Feb. 26, 2007<br>Mar. 29–Apr. 10, 2007<br>May 25–June 4, 2007<br>June 29–July 9, 2007<br>Aug. 3–Sept. 4, 2007<br>Oct. 5–Oct. 15, 2007<br>Nov. 16–Dec. 3, 2007 p<br>Dec. 19–Dec. 31, 2007 p | Jan. 24–Jan. 29, 2007<br>Feb. 16–Feb. 27, 2007<br>Mar. 30–Apr. 16, 2007<br>May 24–June 5, 2007<br>June 28–July 10, 2007<br>Aug. 4–Sept. 4, 2007<br>Nov. 15–Dec. 4, 2007 |
| | 2 | Jan. 3, 2008 | Jan. 3, 2009 | 367 | Jan. 3–Jan. 22, 2008 p<br>Feb. 14–Feb. 26, 2008 p<br>Mar. 13–Mar. 31, 2008 p<br>May 22–June 2, 2008 p<br>June 27–July 7, 2008<br>Aug. 1–Sept. 8, 2008 p<br>Oct. 2–Nov. 17, 2008 p<br>Nov. 20–Dec. 8, 2008 p<br><br>Dec. 11, 2008–Jan. 2, 2009 p | Jan. 3–Jan. 15, 2008<br>Mar. 14–Mar. 31, 2008<br>May 22–June 3, 2008<br>June 26–July 8, 2008<br>Aug. 1–Sept. 8, 2008<br>Oct. 3–Nov. 19, 2008<br>Nov. 20–Dec. 9, 2008<br>Dec. 10, 2008–Jan. 3, 2009 |
| 111th | 1 | Jan. 6, 2009 | Dec. 24, 2009 | 353 | Feb. 13–Feb. 23, 2009 p | Feb. 13–Feb. 23, 2009 |

Appendix A to opinion of the Court

| Con-gress | Ses-sion | Convening Date | Adjournment Date | Length in days[1] | Recesses [2] | |
|---|---|---|---|---|---|---|
| | | | | | Senate | House of Representa-tives |
| | 2 | Jan. 5, 2010 | Dec. 22, 2010 | 352 | Apr. 2–Apr. 20, 2009<br>May 21–June 1, 2009<br>June 25–July 6, 2009<br>Aug. 7–Sept. 8, 2009 p<br>Oct. 8–Oct. 13, 2009 p<br>Nov. 10–Nov. 16, 2009<br>Nov. 21–Nov. 30, 2009<br>Jan. 5–Jan. 20, 2010 p<br>Feb. 11–Feb. 23, 2010<br>Mar. 26–Apr. 12, 2010<br>May 28–June 7, 2010<br>June 30–July 12, 2010<br>Aug. 5–Aug. 12, 2010<br>Aug. 12–Sept. 13, 2010<br>Sept. 29–Nov. 15, 2010 p<br>Nov. 19–Nov. 29, 2010 | Apr. 2–Apr. 21, 2009<br>May 21–June 2, 2009<br>June 26–July 7, 2009<br>July 31–Sept. 8, 2009<br>Nov. 6–Nov. 16, 2009<br>Nov. 19–Dec. 1, 2009<br><br>Jan. 5–Jan. 12, 2010<br>Feb. 9–Feb. 22, 2010<br>Mar. 25–Apr. 13, 2010<br>May 28–June 8, 2010<br>July 1–July 13, 2010<br>July 30–Aug. 9, 2010<br>Aug. 10–Sept. 14, 2010<br>Sept. 29–Nov. 15, 2010<br>Nov. 18–Nov. 29, 2010 |
| 112th | 1 | Jan. 5, 2011 | | | Jan. 5–Jan. 25, 2011<br>Feb. 17–Feb. 28, 2011<br>Mar. 17–Mar. 28, 2011<br>Apr. 14–May 2, 2011<br>May 26–June 6, 2011 p<br>Aug. 2–Sept. 6, 2011 p | Jan. 26–Feb. 8, 2011<br>Feb. 18–Feb. 28, 2011<br>Mar. 17–Mar. 29, 2011<br>Apr. 15–May 2, 2011<br>May 13–May 23, 2011<br>June 24–July 5, 2011 p<br>Aug. 1–Sept. 6, 2011 p |

[1] For the purposes of this table, a session's "length in days" is defined as the total number of calendar days from the convening date to the adjournment date, inclusive. It does not mean the actual number of days that Congress met during that session.

[2] For the purposes of this table, a "recess" is defined as a break in House or Senate proceedings of three or more days, excluding Sundays. According to Article I, section 5 of the U. S. Constitution, neither house may adjourn for more than three days without the consent of the other. On occasion, both chambers have held one or more pro forma sessions because of this constitutional obligation or for other purposes. Treated here as recesses, usually no business is conducted during these time periods. On this table, beginning in the 1990s, such pro forma sessions are indicated with a P.

B

The following table shows the proportion of recent appointments that have filled pre-recess vacancies.  It was compiled with research assistance from the Supreme Court Library.  It contains a random sample of the recess appointments by President George W. Bush and President Barack Obama.  The last column indicates whether the vacancy arose during the recess in which it was filled.  "A" indicates a vacancy that arose during the recess, "P" indicates a vacancy that arose before the recess, and "U" indicates that the vacancy date could not be ascertained.

| Name[1] | Position | Date of Recess Appointment | Date the Position Became Vacant | Status of Vacancy |
|---|---|---|---|---|
| Peter J. Hurtgen | Member (designated Chair), NLRB | 8/31/01 | 8/27/2001[2] | A |
| Dennis L. Schornack | Comm'r on the Part of the US, Int'l Joint Comm'n, US and Can. | 3/29/02 | Unknown[3] | U |
| Tony Hammond | Comm'r, Postal Rate Comm'n | 8/06/02 | 2/2001[4] | P |
| R. Bruce Matthews | Member, Def. Nuclear Facilities Safety Bd. | 4/22/03 | 5/2002[5] | P |
| Ephraim Batambuze | Bd. Member, African Dev. Found. | 8/22/03 | 2/10/2002[6] | P |
| Bradley D. Belt | Member, Soc. Sec. Advisory Bd. (SSAB) | 12/23/03 | 9/2002[7] | P |
| Ronald E. Meisburg | Member, NLRB | 12/23/03 | 8/21/03[8] | P |
| Charles Johnson | Chief Financial Officer, EPA | 5/28/04 | 2003[9] | P |
| Jack E. McGregor | Member, Advisory Bd., St. Lawrence Seaway Dev. Corp. | 7/02/04 | Unknown[10] | U |
| James R. Kunder | Assistant Adm'r, Bureau for Asia and the Near East, USAID | 8/02/04 | 1/2004[11] | P |
| Susan J. Grant | Chief Financial Officer, Dept. of Energy | 8/02/04 | 2003[12] | P |

Appendix B to opinion of the Court

| Name[1] | Position | Date of Recess Appointment | Date the Position Became Vacant | Status of Vacancy |
|---------|----------|---------------------------|--------------------------------|-------------------|
| Anthony J. Principi | Member (designated Chair), Def. Base Closure and Realignment Comm'n | 4/01/05 | 3/2005 (new position)[13] | P |
| John R. Bolton | US Representative to the UN | 8/01/05 | 1/2005[14] | P |
| Ellen R. Sauerbrey | Assistant Sec'y, Population, Refugees, and Migration, Dept. of State | 1/04/06 | by 7/2005[15] | P |
| Ronald E. Meisburg | General Counsel, NLRB | 1/04/06 | 6/03/2005[16] | P |
| John L. Palmer | Member, Bd. of Trustees, Fed. Old-Age and Survivors Ins. Trust Fund and the Fed. Disability Ins. Trust Fund | 4/19/06 | 10/2004[17] | P |
| Richard E. Stickler | Assistant Sec'y, Mine, Safety, and Health Admin. | 10/19/06 | 11/19/2004[18] | P |
| Susan E. Dudley | Adm'r, OIRA, OMB | 4/04/07 | 2/2006[19] | P |
| Mark G. Pearce | Member, NLRB | 3/27/10 | 1/2008[20] | P |
| Mark C. Aponte | Chief of Mission, El Salvador, Dept. of State | 8/19/10 | 1/17/09[21] | P |
| Richard Griffin Jr. | Member, NLRB | 1/04/12 | 8/27/11[22] | P |

———————

[1] The name, position, and date of each recess appointment were taken from The *Noel Canning* Decision 21–29. The sample was generated by selecting every 10th appointment from a chronological list of all recess appointments made during the presidencies of George W. Bush and Barack Obama.

[2] See White House Press Release: President Bush Announces Hurtgen To Stay on as Member and Chairman of the National Labor Relations Board, Aug. 31, 2001, online at http://georgewbush-whitehouse.archives.gov/news/releases/2001/08/20010831-14.html.

[3] Schornack was preceded by Thomas L. Baldini. 147 Cong. Rec. 12592 (2001). We could not find a specific date for Baldini's departure. See Lane, Engler Advisers Tapped for Water Jobs, Crain's Detroit Business, June 18, 2001, p. 6 (Schornack "would replace Marquette's Thomas Baldini, former President Bill Clinton's appointee"); Finley, Senate Often Turns its Role of Advise and Consent into Object and Obstruct, Detroit News, Feb. 10, 2002, p. 13A, col. 1. ("The International Joint Commission post is still held by Clinton appointee Tom Baldini, also of Michigan").

[4] Hammond was preceded by Edward Jay Gleiman, 148 Cong. Rec. 4472 (2002), who retired in February 2001, see Campanelli, PRC Chairman Gleiman Retires, Direct Marketing News, Feb. 6, 2001, online at http://www.dmnews.com/prc-chairman-gleiman-retires/article/70877.

[5] Matthews was preceded by Joseph J. DiNunno, 38 Weekly Comp. of Pres. Doc. 804 (2002), who retired in May 2002, see DNFSB Member Biography, online at http://www.dnfsb.gov/about/board-members/joseph-j-dinunno.

Appendix B to opinion of the Court

————

[6] Batambuze was preceded by Henry McKoy, 149 Cong. Rec. 4875 (2003), whose term expired on February 9, 2002, see 32 Weekly Comp. of Pres. Doc. 363 (1996).

[7] Belt was preceded by Stanford G. Ross, 149 Cong. Rec. 20993 (2003), whose term on the SSAB expired in September 2002, see SSAB Member List, online at http://www.ssab.gov/AbouttheBoard/Members.aspx.

[8] See Division of Information, NLRB, Ronald Meisburg Receives Recess Appointment From President Bush to Be NLRB Member (Dec. 29, 2003), online at http://mynlrb.nlrb.gov/link/document.aspx/09031d45800d5d75.

[9] Johnson was preceded by Linda Morrison Combs, 150 Cong. Rec. 236 (2004), who apparently left in 2003, see Hearings on S. 113 before the Committee on Homeland Security and Governmental Affairs, 109th Cong., 1st Sess., 2 (2005) ("Combs served as [CFO] of the [EPA] from 2001 to 2003"); see also 149 Cong. Rec. 31985 (2003) (nomination of Linda Morrison Combs to be Assistant Secretary of Transportation); 150 Cong. Rec. 10973 (2004) (confirmation of Combs to be Assistant Secretary of Transportation).

[10] McGregor was preceded by Vincent J. Sorrentino. 149 Cong. Rec. 31985 (2003). We have located no further information about Sorrentino's departure date.

[11] Kunder was preceded by Wendy J. Chamberlin, 150 Cong. Rec. 8983 (2004), who accepted a new appointment as of January 2004, see United Nations Refugee Agency Press Release, Wendy Chamberlin Appointed Deputy High Commissioner, Dec. 12, 2003, online at http://www.unhcr.org/news/NEWS/3fda0f584.html.

[12] Grant was preceded by Bruce M. Carnes, 149 Cong. Rec. 24527 (2003), who resigned during 2003, see Bush Nominee to Energy Department CFO Post OK'd by Committee, Environment and Energy Daily, March 11, 2004; see also 39 Weekly Comp. of Pres. Doc. 308 (2003).

[13] Principi was nominated for this newly created position on March 4, 2005. 151 Cong. Rec. 3543 (2005). The position was created by statute in 2001. 115 Stat. 1343–1344.

[14] See Hoge, Diplomats at U. N. Surprised by Danforth's Resignation, N. Y. Times, Dec. 3, 2004, p. A6.

[15] Sauerbrey was preceded by Arthur Dewey. 151 Cong. Rec. 19554 (2005); see also Weekly Review of Developments in Human Rights and Democracy, Dow Jones Factiva, June 30, 2005; Arthur E. Dewey, Dept. of State Biography, online at http://2001-2009.state.gov/outofdate/bios/d/7988.htm.

[16] Meisburg was preceded by Arthur F. Rosenfeld, whose term expired on June 3, 2005, see NLRB General Counsels Since 1935, online at http://www.nlrb.gov/who-we-are/general-counsel/general-counsels-1935.

[17] Palmer was nominated as a reappointment on November 7, 2005. 151 Cong. Rec. 25016 (2005). The Senate confirmed Palmer to his previous 4-year term on October 24, 2000. 146 Cong. Rec 23920 (2000).

[18] Stickler was preceded by David D. Lauriski, 152 Cong. Rec. 17151 (2006), who resigned on November 19, 2004, see Dept. of Labor, News Release, U. S. Assistant Secretary of Labor for Mine Safety and Health Dave D. Lauriski Announces His Plans for Departure, Nov. 12, 2004.

[19] Dudley was preceded by John D. Graham, 152 Cong. Rec. 16707 (2006), who left the office in February 2006, see J. R. Pegg, Bush Bypasses Senate to Appoint Controversial Regulatory Chief, Pesticide & Toxic Chemical News, Apr. 9, 2007, vol. 35, No. 24, pp. 13–14.

[20] Pearce was preceded by Peter N. Kirsanow, whose term had ended by January 2008, see Members of the NLRB since 1935, online at http://www.nlrb.gov/who-we-are/board/members-nlrb-1935.

[21] Aponte was preceded by Charles Glazer, who left his post on January 17, 2009, see Dept. of State, Office of the Historian, Chiefs of Mission for El Salvador, online at http://history.state.gov/departmenthistory/people/glazer-charles-l.

[22] See App. to Brief for Petitioner 89a.

# SUPREME COURT OF THE UNITED STATES

———————

No. 12–1281

———————

## NATIONAL LABOR RELATIONS BOARD, PETITIONER *v.* NOEL CANNING, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 26, 2014]

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE ALITO join, concurring in the judgment.

Except where the Constitution or a valid federal law provides otherwise, all "Officers of the United States" must be appointed by the President "by and with the Advice and Consent of the Senate." U. S. Const., Art. II, §2, cl. 2. That general rule is subject to an exception: "The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." *Id.,* §2, cl. 3. This case requires us to decide whether the Recess Appointments Clause authorized three appointments made by President Obama to the National Labor Relations Board in January 2012 without the Senate's consent.

To prevent the President's recess-appointment power from nullifying the Senate's role in the appointment process, the Constitution cabins that power in two significant ways. First, it may be exercised only in "the Recess of the Senate," that is, the intermission between two formal legislative sessions. Second, it may be used to fill only those vacancies that "happen during the Recess," that is, offices that become vacant during that intermission. Both conditions are clear from the Constitution's text and struc-

ture, and both were well understood at the founding.  The Court of Appeals correctly held that the appointments here at issue are invalid because they did not meet either condition.

Today's Court agrees that the appointments were invalid, but for the far narrower reason that they were made during a 3-day break in the Senate's session.  On its way to that result, the majority sweeps away the key textual limitations on the recess-appointment power.  It holds, first, that the President can make appointments without the Senate's participation even during short breaks in the middle of the Senate's session, and second, that those appointments can fill offices that became vacant long before the break in which they were filled.  The majority justifies those atextual results on an adverse-possession theory of executive authority: Presidents have long claimed the powers in question, and the Senate has not disputed those claims with sufficient vigor, so the Court should not "upset the compromises and working arrangements that the elected branches of Government themselves have reached." *Ante,* at 9.

The Court's decision transforms the recess-appointment power from a tool carefully designed to fill a narrow and specific need into a weapon to be wielded by future Presidents against future Senates.  To reach that result, the majority casts aside the plain, original meaning of the constitutional text in deference to late-arising historical practices that are ambiguous at best.  The majority's insistence on deferring to the Executive's untenably broad interpretation of the power is in clear conflict with our precedent and forebodes a diminution of this Court's role in controversies involving the separation of powers and the structure of government.  I concur in the judgment only.

### I. Our Responsibility

Today's majority disregards two overarching principles that ought to guide our consideration of the questions presented here.

First, the Constitution's core, government-structuring provisions are no less critical to preserving liberty than are the later adopted provisions of the Bill of Rights. Indeed, "[s]o convinced were the Framers that liberty of the person inheres in structure that at first they did not consider a Bill of Rights necessary." *Clinton* v. *City of New York*, 524 U. S. 417, 450 (1998) (KENNEDY, J., concurring). Those structural provisions reflect the founding generation's deep conviction that "checks and balances were the foundation of a structure of government that would protect liberty." *Bowsher* v. *Synar*, 478 U. S. 714, 722 (1986). It is for that reason that "the claims of individuals—not of Government departments—have been the principal source of judicial decisions concerning separation of powers and checks and balances." *Bond* v. *United States*, 564 U. S. ___, ___ (2011) (slip op., at 10); see, *e.g., Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477 (2010); *Clinton, supra*; *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211 (1995); *Bowsher*, *supra*; *INS* v. *Chadha*, 462 U. S. 919 (1983); *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50 (1982). Those decisions all rest on the bedrock principle that "the constitutional structure of our Government" is designed first and foremost not to look after the interests of the respective branches, but to "protec[t] individual liberty." *Bond, supra,* at ___ (slip op., at 11).

Second and relatedly, when questions involving the Constitution's government-structuring provisions are presented in a justiciable case, it is the solemn responsibility of the Judicial Branch "'to say what the law is.'" *Zivotofsky* v. *Clinton*, 566 U. S. ___, ___ (2012) (slip op., at 7) (quoting *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803)).

This Court does not defer to the other branches' resolution of such controversies; as JUSTICE KENNEDY has previously written, our role is in no way "lessened" because it might be said that "the two political branches are adjusting their own powers between themselves." *Clinton, supra,* at 449 (concurring opinion). Since the separation of powers exists for the protection of individual liberty, its vitality "does not depend" on "whether 'the encroached-upon branch approves the encroachment.'" *Free Enterprise Fund, supra,* at 497 (quoting *New York* v. *United States*, 505 U. S. 144, 182 (1992)); see also *Freytag* v. *Commissioner*, 501 U. S. 868, 879–880 (1991); *Metropolitan Washington Airports Authority* v. *Citizens for Abatement of Aircraft Noise, Inc.*, 501 U. S. 252, 276–277 (1991). Rather, policing the "enduring structure" of constitutional government when the political branches fail to do so is "one of the most vital functions of this Court." *Public Citizen* v. *Department of Justice*, 491 U. S. 440, 468 (1989) (KENNEDY, J., concurring in judgment).

Our decision in *Chadha* illustrates that principle. There, we held that a statutory provision authorizing one House of Congress to cancel an executive action taken pursuant to statutory authority—a so-called "legislative veto"—exceeded the bounds of Congress's authority under the Constitution. 462 U. S., at 957–959. We did not hesitate to hold the legislative veto unconstitutional even though Congress had enacted, and the President had signed, nearly 300 similar provisions over the course of 50 years. *Id.,* at 944–945. Just the opposite: We said the other branches' enthusiasm for the legislative veto "sharpened rather than blunted" our review. *Id.,* at 944. Likewise, when the charge is made that a practice "enhances the President's powers beyond" what the Constitution permits, "[i]t is no answer . . . to say that Congress surrendered its authority by its own hand." *Clinton*, 524 U. S., at 451 (KENNEDY, J., concurring). "[O]ne Congress

cannot yield up its own powers, much less those of other Congresses to follow. Abdication of responsibility is not part of the constitutional design." *Id.,* at 452 (citations omitted).

Of course, where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision. See, *e.g., Alden* v. *Maine*, 527 U. S. 706, 743–744 (1999); *Bowsher*, *supra,* at 723–724; *Myers* v. *United States*, 272 U. S. 52, 174–175 (1926); see also *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 610 (1952) (Frankfurter, J., concurring) (arguing that "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned" should inform interpretation of the "Executive Power" vested in the President); *Rutan* v. *Republican Party of Ill.*, 497 U. S. 62, 95, and n. 1 (1990) (SCALIA, J., dissenting). But "'[p]ast practice does not, by itself, create power.'" *Medellín* v. *Texas*, 552 U. S. 491, 532 (2008) (quoting *Dames & Moore* v. *Regan*, 453 U. S. 654, 686 (1981)). That is a necessary corollary of the principle that the political branches cannot by agreement alter the constitutional structure. Plainly, then, a self-aggrandizing practice adopted by one branch well after the founding, often challenged, and never before blessed by this Court—in other words, the sort of practice on which the majority relies in this case—does not relieve us of our duty to interpret the Constitution in light of its text, structure, and original understanding.

Ignoring our more recent precedent in this area, which is extensive, the majority relies on *The Pocket Veto Case*, 279 U. S. 655, 689 (1929), for the proposition that when interpreting a constitutional provision "regulating the relationship between Congress and the President," we must defer to the settled practice of the political branches if the provision is "'"in any respect of doubtful meaning."'"

*Ante,* at 7; see *ante,* at 8, 16, 23, 33. The language the majority quotes from that case was pure dictum. The *Pocket Veto* Court had to decide whether a bill passed by the House and Senate and presented to the President less than 10 days before the adjournment of the first session of a particular Congress, but neither signed nor vetoed by the President, became a law. Most of the opinion analyzed that issue like any other legal question and concluded that treating the bill as a law would have been inconsistent with the text and structure of the Constitution. Only near the end of the opinion did the Court add that its conclusion was "confirmed" by longstanding Presidential practice in which Congress appeared to have acquiesced. 279 U. S., at 688–689. We did not suggest that the case would have come out differently had the longstanding practice been otherwise.[1]

—————

[1] The other cases cited by the majority in which we have afforded significant weight to historical practice, *ante,* at 8, are consistent with the principles described above. Nearly all involved venerable and unchallenged practices, and constitutional provisions that were either deeply ambiguous or plainly supportive of the practice. See *Dames & Moore* v. *Regan*, 453 U. S. 654, 679–681, and n. 8, 686 (1981) (citing Presidential practice dating from 1799 and never questioned by Congress to inform meaning of "Executive Power"); *Ex parte Grossman*, 267 U. S. 87, 118–119 (1925) (citing unchallenged Presidential practice dating from 1841 as support for a construction of the pardon power based on the "common law," the "history of the clause in the Convention," and "the ordinary meaning of its words"); *United States* v. *Midwest Oil Co.*, 236 U. S. 459, 469–471, 474 (1915) (citing Presidential practice dating from "an early period in the history of the government," "uniformly and repeatedly acquiesced in" by Congress and previously upheld by this Court, to establish "a recognized administrative power of the Executive in the management of the public lands"); *McPherson* v. *Blacker*, 146 U. S. 1, 25–35 (1892) (citing method of choosing Presidential electors prevalent among the States "from the formation of the government until now," as to the constitutionality of which "'no question ha[d] ever arisen,'" in support of construction consistent with the constitutional text and its drafting history); *McCulloch* v. *Maryland*, 4 Wheat. 316, 401–402 (1819) (citing power "exercised by the first Con-

## II. Intra-Session Breaks

The first question presented is whether "the Recess of the Senate," during which the President's recess-appointment power is active, is (a) the period between two of the Senate's formal sessions, or (b) any break in the Senate's proceedings. I would hold that "the Recess" is the gap between sessions and that the appointments at issue here are invalid because they undisputedly were made *during* the Senate's session. The Court's contrary conclusion—that "the Recess" includes "breaks in the midst of a session," *ante,* at 9—is inconsistent with the Constitution's text and structure, and it requires judicial fabrication of vague, unadministrable limits on the recess-appointment power (thus defined) that overstep the judicial role. And although the majority relies heavily on "historical practice," no practice worthy of our deference supports the majority's conclusion on this issue.

### A. Plain Meaning

A sensible interpretation of the Recess Appointments Clause should start by recognizing that the Clause uses the term "Recess" in contradistinction to the term "Session." As Alexander Hamilton wrote: "The time within which the power is to operate 'during the recess of the

_____

gress elected under the present constitution," "recognized by many successive legislatures, and . . . acted upon by the judicial department," in support of the conclusion that the Necessary and Proper Clause allowed Congress to incorporate a bank); *Stuart* v. *Laird*, 1 Cranch 299, 309 (1803) (citing practice that "commence[d] with the organization of the judicial system" in rejecting challenge to Supreme Court Justices' riding circuit). Even *Mistretta* v. *United States*, 488 U. S. 361 (1989), which concluded that the constitutional text did not prohibit judges from undertaking extrajudicial duties and found "additional evidence" for that conclusion in a longstanding practice that it acknowledged had been "controversial," emphasized that it was relying on "contemporaneous practice by the Founders themselves" that had been "frequent and continuing" since ratification. *Id.,* at 397–400.

Senate' and the duration of the appointments 'to the end of the next session' of that body, conspire to elucidate the sense of the provision." The Federalist No. 67, p. 455 (J. Cooke ed. 1961).

In the founding era, the terms "recess" and "session" had well-understood meanings in the marking-out of legislative time. The life of each elected Congress typically consisted (as it still does) of two or more formal sessions separated by adjournments "*sine die,*" that is, without a specified return date. See GPO, Congressional Directory, 113th Cong., pp. 524–542 (2013–2014) (hereinafter Congressional Directory) (listing sessions of Congress from 1789 through 2013); 705 F. 3d 490, 512, and nn. 1–2 (CADC 2013) (case below); *ante,* at 9. The period *between* two sessions was known as "the recess." See 26 Annals of Cong. 748 (1814) (Sen. Gore) ("The time of the Senate consists of two periods, viz: their session and their recess"). As one scholar has thoroughly demonstrated, "in government practice the phrase 'the Recess' *always* referred to the gap between sessions." Natelson, The Origins and Meaning of "Vacancies that May Happen During the Recess" in the Constitution's Recess Appointments Clause, 37 Harv. J. L. & Pub. Pol'y 199, 213 (2014) (hereinafter Natelson); see *id.,* at 214–227 (providing dozens of examples). By contrast, other provisions of the Constitution use the verb "adjourn" rather than "recess" to refer to the commencement of breaks *during* a formal legislative session. See, *e.g.,* Art. I, §5, cl. 1; *id.,* §5, cl. 4.[2]

―――――――――

[2] The majority claims that "the phrase 'the recess' was used to refer to intra-session recesses at the time of the founding," *ante,* at 10, but it offers strikingly little support for that assertion. It first cites a letter from George Washington that is quite obviously an example of imprecise, colloquial usage. See 3 Records of the Federal Convention of 1787, p. 76 (M. Farrand rev. 1966) ("I had put my carriage in the hands of a workman to be repaired and had not the means of mooving [sic] during the recess"). It next cites an example from the New Jersey Legislature

To be sure, in colloquial usage both words, "recess" and "session," could take on alternative, less precise meanings. A session could include any short period when a legislature's members were "assembled for business," and a recess could refer to any brief "suspension" of legislative "business." 2 N. Webster, American Dictionary of the English Language (1828). So the Continental Congress could complain of the noise from passing carriages disrupting its "daily Session," 29 Journals of the Continental Congress 1774–1789, p. 561 (1785) (J. Fitzpatrick ed. 1933), and the House could "take a recess" from 4 o'clock to 6 o'clock, Journal of the House of Representatives, 17th Cong., 2d Sess., p. 259 (1823). But as even the majority acknowledges, the Constitution's use of "the word 'the' in '*the* [R]ecess'" tends to suggest "that the phrase refers to the single break separating formal sessions." *Ante,* at 10.

More importantly, neither the Solicitor General nor the majority argues that the Clause uses "session" in its loose, colloquial sense. And if "the next Session" denotes a *formal* session, then "the Recess" must mean the break *between* formal sessions. As every commentator on the Clause until the 20th century seems to have understood, the "Recess" and the "Session" to which the Clause refers are mutually exclusive, alternating states. See, *e.g.,* The Federalist No. 67, at 455 (explaining that appointments would require Senatorial consent "during the session of the Senate" and would be made by the President alone "*in their recess*"); 1 Op. Atty. Gen. 631 (1823) (contrasting

_____

that simply reflects that body's practice of dividing its time not only into "sessions" but also into distinct, formal "sittings" within each session, with "the recess" denoting the period between sittings. See Brief for Respondent Noel Canning 23; see also Natelson 207. Finally, the majority cites three pages from the Solicitor General's brief without acknowledging the arguments offered in response to the Solicitor General's few supposed counterexamples. See, *e.g.,* Brief for Respondent Noel Canning 21–24; Natelson 222, n. 120.

vacancies occurring "during the recess of the Senate" with those occurring "during the session of the Senate"); 2 Op. Atty Gen. 525, 527 (1832) (discussing a vacancy that "took place while the Senate was in session, and not during the recess"). It is linguistically implausible to suppose—as the majority does—that the Clause uses one of those terms ("Recess") informally and the other ("Session") formally in a single sentence, with the result that an event can occur during *both* the "Recess" *and* the "Session."

Besides being linguistically unsound, the majority's reading yields the strange result that an appointment made during a short break near the beginning of one official session will not terminate until the end of the *following* official session, enabling the appointment to last for up to two years. The majority justifies that result by observing that the process of confirming a nominee "may take several months." *Ante,* at 17. But the average duration of the confirmation process is irrelevant. The Clause's self-evident design is to have the President's unilateral appointment last only until the Senate has "had an *opportunity* to act on the subject." 3 J. Story, Commentaries on the Constitution of the United States §1551, p. 410 (1833) (emphasis added).

One way to avoid the linguistic incongruity of the majority's reading would be to read both "the Recess" and "the next Session" colloquially, so that the recess-appointment power would be activated during any temporary suspension of Senate proceedings, but appointments made pursuant to that power would last only until the beginning of the next suspension (which would end the next colloquial session). See, *e.g.,* Rappaport, The Original Meaning of the Recess Appointments Clause, 52 UCLA L. Rev. 1487, 1569 (2005) (hereinafter Rappaport, Original Meaning). That approach would be more linguistically defensible than the majority's. But it would not cure the most fundamental problem with giving "Recess" its colloquial,

rather than its formal, meaning: Doing so leaves the recess-appointment power without a textually grounded principle limiting the time of its exercise.

The dictionary definitions of "recess" on which the majority relies provide no such principle. On the contrary, they make clear that in colloquial usage, a recess could include *any* suspension of legislative business, no matter how short. See 2 S. Johnson, A Dictionary of the English Language 1602 (4th ed. 1773). Webster even provides a stark illustration: "[T]he house of representatives had a *recess* of half an hour." 2 Webster, *supra.* The notion that the Constitution empowers the President to make unilateral appointments every time the Senate takes a half-hour lunch break is so absurd as to be self-refuting. But that, in the majority's view, is what the text authorizes.

The boundlessness of the colloquial reading of "the Recess" thus refutes the majority's assertion that the Clause's "purpose" of "ensur[ing] the continued functioning of the Federal Government" demands that it apply to intra-session breaks as well as inter-session recesses. *Ante,* at 11. The majority disregards another self-evident purpose of the Clause: to preserve the Senate's role in the appointment process—which the founding generation regarded as a critical protection against "'despotism,'" *Freytag*, 501 U. S., at 883—by clearly delineating the times when the President can appoint officers without the Senate's consent. Today's decision seriously undercuts *that* purpose. In doing so, it demonstrates the folly of interpreting constitutional provisions designed to establish "a structure of government that would protect liberty," *Bowsher*, 478 U. S., at 722, on the narrow-minded assumption that their only purpose is to make the government run as efficiently as possible. "Convenience and efficiency," we have repeatedly recognized, "are not the primary objectives" of our constitutional framework. *Free*

*Enterprise Fund*, 561 U. S., at 499 (internal quotation marks omitted).

Relatedly, the majority contends that the Clause's supposed purpose of keeping the wheels of government turning demands that we interpret the Clause to maintain its relevance in light of the "new circumstance" of the Senate's taking an increasing number of intra-session breaks that exceed three days. *Ante,* at 17. Even if I accepted the canard that courts can alter the Constitution's meaning to accommodate changed circumstances, I would be hard pressed to see the relevance of that notion here. The rise of intra-session adjournments has occurred in tandem with the development of modern forms of communication and transportation that mean the Senate "is always available" to consider nominations, even when its Members are temporarily dispersed for an intra-session break. Tr. of Oral Arg. 21 (GINSBURG, J.). The Recess Appointments Clause therefore is, or rather, should be, an anachronism—"essentially an historic relic, something whose original purpose has disappeared." *Id.,* at 19 (KAGAN, J.). The need it was designed to fill no longer exists, and its only remaining use is the ignoble one of enabling the President to circumvent the Senate's role in the appointment process. That does not justify "read[ing] it out of the Constitution" and, contra the majority, *ante,* at 40, I would not do so; but neither would I distort the Clause's original meaning, as the majority does, to ensure a prominent role for the recess-appointment power in an era when its influence is far more pernicious than beneficial.

To avoid the absurd results that follow from its colloquial reading of "the Recess," the majority is forced to declare that some intra-session breaks—though undisputedly within the phrase's colloquial meaning—are simply "too short to trigger the Recess Appointments Clause." *Ante,* at 21. But it identifies no textual basis whatsoever for limiting the length of "the Recess," nor does it point to any

clear standard for determining how short is too short. It is inconceivable that the Framers would have left the circumstances in which the President could exercise such a significant and potentially dangerous power so utterly indeterminate. Other structural provisions of the Constitution that turn on duration are quite specific: Neither House can adjourn "for more than three days" without the other's consent. Art. I, §5, cl. 4. The President must return a passed bill to Congress "within ten Days (Sundays excepted)," lest it become a law. *Id.,* §7, cl. 2. Yet on the majority's view, when the first Senate considered taking a 1-month break, a 3-day weekend, or a half-hour siesta, it had no way of knowing whether the President would be constitutionally authorized to appoint officers in its absence. And any officers appointed in those circumstances would have served under a cloud, unable to determine with any degree of confidence whether their appointments were valid.[3]

Fumbling for some textually grounded standard, the majority seizes on the Adjournments Clause, which bars either House from adjourning for more than three days without the other's consent. *Id.,* §5, cl. 4. According to the majority, that clause establishes that a 3-day break is *always* "too short" to trigger the Recess Appointments Clause. *Ante,* at 19. It goes without saying that nothing

---

[3] The majority insists that "the most likely reason the Framers did not place a textual floor underneath the word 'recess' is that they did not foresee the *need* for one" because they did not anticipate that intra-session breaks "would become lengthier and more significant than inter-session ones." *Ante,* at 19. The majority's logic escapes me. The Framers' supposed failure to anticipate "length[y]" intra-session breaks might explain why (as I maintain) they did not bother to authorize recess appointments during intra-session breaks at all; but it cannot explain why (as the majority holds) they would have enacted a text that authorizes appointments during *all* intra-session breaks—even the short ones the majority says they *did* anticipate—without placing a temporal limitation on that power.

in the constitutional text supports that disposition.  If (as
the majority concludes) "the Recess" means a recess in the
colloquial sense, then it necessarily includes breaks shorter
than three days.  And the fact that the Constitution in-
cludes a 3-day limit in one clause but omits it from the
other weighs strongly against finding such a limit to be
implicit in the clause in which it does not appear.  In all
events, the dramatically different contexts in which the
two clauses operate make importing the 3-day limit from
the Adjournments Clause into the Recess Appointments
Clause "both arbitrary and mistaken."  Rappaport, Origi-
nal Meaning 1556.

    And what about breaks longer than three days?  The
majority says that a break of four to nine days is "pre-
sumptively too short" but that the presumption may be
rebutted in an "unusual circumstance," such as a "national
catastrophe . . . that renders the Senate unavailable but
calls for an urgent response."  *Ante,* at 21.  The majority
must hope that the *in terrorem* effect of its "presumptively
too short" pronouncement will deter future Presidents
from making any recess appointments during 4-to-9-day
breaks and thus save us from the absurd spectacle of
unelected judges evaluating (after an evidentiary hear-
ing?) whether an alleged "catastrophe" was sufficiently
"urgent" to trigger the recess-appointment power.  The
majority also says that "political opposition in the Senate
would not qualify as an unusual circumstance."  *Ibid.*  So
if the Senate should refuse to confirm a nominee whom the
President considers highly qualified; or even if it should
refuse to confirm any nominee for an office, thinking the
office better left vacant for the time being; the President's
power would not be triggered during a 4-to-9-day break, no
matter how "urgent" the President's perceived need for the
officer's assistance.  (The majority protests that this
"should go without saying—except that JUSTICE SCALIA
compels us to say it," *ibid.,* seemingly forgetting that the

appointments at issue in this very case were justified on those grounds and that the Solicitor General has asked us to view the recess-appointment power as a "safety valve" against Senatorial "intransigence." Tr. of Oral Arg. 21.)

As for breaks of 10 or more days: We are presumably to infer that such breaks do not trigger any "presumpt[ion]" against recess appointments, but does that mean the President has an utterly free hand? Or can litigants seek invalidation of an appointment made during a 10-day break by pointing to an absence of "unusual" or "urgent" circumstances necessitating an immediate appointment, albeit without the aid of a "presumpt[ion]" in their favor? Or, to put the question as it will present itself to lawyers in the Executive Branch: Can the President make an appointment during a 10-day break simply to overcome "political opposition in the Senate" despite the absence of any "national catastrophe," even though it "go[es] without saying" that he cannot do so during a 9-day break? Who knows? The majority does not say, and neither does the Constitution.[4]

—————

[4] The majority erroneously suggests that the "lack of a textual floor raises a problem that plagues" both interpretations of "the Recess." *Ante,* at 19. Not so. If the Clause is given its plain meaning, the President cannot make recess appointments during the session but can make recess appointments during any break *between* sessions, no matter how short. Contra the majority, that is not a "problem." True, the recess-appointment power applies even during very short inter-session breaks. But inter-session breaks typically occur at most a few times a year, and the recess-appointment power is of limited utility during very short inter-session breaks since, as explained below, the President can fill only those vacancies that arise during the break. See Part III, *infra.* Of course, as the Senate Judiciary Committee has argued, the break must be actual and not "constructive"; the Senate must adjourn for some measurable period of time between the two sessions. See *infra,* at 20–22. But the requirement that there actually *be* a recess does not involve anywhere near the level of indeterminacy entailed by the majority's requirement that the recess be *long enough* (or the circumstances unusual enough), as determined by a court, to

Even if the many questions raised by the majority's failure to articulate a standard could be answered, a larger question would remain: If the Constitution's text empowers the President to make appointments during any break in the Senate's proceedings, by what right does the majority subject the President's exercise of that power to vague, court-crafted limitations with no textual basis? The majority claims its temporal guideposts are informed by executive practice, but a President's self-restraint cannot "bind his successors by diminishing their powers." *Free Enterprise Fund*, 561 U. S., at 497; cf. *Clinton* v. *Jones*, 520 U. S. 681, 718 (1997) (BREYER, J., concurring in judgment) ("voluntary actions" by past Presidents "tel[l] us little about what the Constitution commands").

An interpretation that calls for this kind of judicial adventurism cannot be correct. Indeed, if the Clause really did use "Recess" in its colloquial sense, then there would be no "judicially discoverable and manageable standard for resolving" whether a particular break was long enough to trigger the recess-appointment power, making that a nonjusticiable political question. *Zivotofsky*, 566 U. S., at ___ (slip op., at 5) (internal quotation marks omitted).

## B. Historical Practice

For the foregoing reasons, the Constitution's text and structure unambiguously refute the majority's freewheeling interpretation of "the Recess." It is not plausible that the Constitution uses that term in a sense that authorizes the President to make unilateral appointments during *any* break in Senate proceedings, subject only to hazy, atextual limits crafted by this Court centuries after ratification. The majority, however, insists that history "offers strong support" for its interpretation. *Ante,* at 11. The historical

---

trigger the recess-appointment power.

practice of the political branches is, of course, irrelevant when the Constitution is clear. But even if the Constitution were thought ambiguous on this point, history does not support the majority's interpretation.

### 1. 1789 to 1866

To begin, the majority dismisses the 78 years of history from the founding through 1866 as "not helpful" because during that time Congress took hardly any "significant" intra-session breaks, by which the majority evidently means breaks longer than three days. *Ibid.* (citing table in Appendix A, which does not include breaks of three or fewer days). In fact, Congress took 11 intra-session breaks of more than three days during that time, see Congressional Directory 524–527, and it appears Presidents made recess appointments during none of them.

More importantly, during those eight decades, Congress must have taken thousands of breaks that were three days or shorter. On the majority's reading, every one of those breaks would have been within the Clause's text—the majority's newly minted limitation not yet having been announced. Yet there is no record of anyone, ever, having so much as *mentioned the possibility* that the recess-appointment power was activated during those breaks. That would be surprising indeed if the text meant what the majority thinks it means. Cf. *Printz* v. *United States,* 521 U. S. 898, 907–908 (1997).

### 2. 1867 and 1868

The first intra-session recess appointments in our history almost certainly were made by President Andrew Johnson in 1867 and 1868.[5] That was, of course, a period of

---

[5] The majority does not contend otherwise. The Solicitor General claims that President Lincoln appointed a handful of brigadier generals during intra-session breaks in 1862 and 1863, but he does not include those appointments in his list of known intra-session recess appoint-

dramatic conflict between the Executive and Congress that saw the first-ever impeachment of a sitting President. The Solicitor General counts 57 intra-session recess appointments during those two years. App. to Brief for Petitioner 1a–9a. But the precise nature and historical understanding of many of those appointments is subject to debate. See, *e.g.,* Brief for Constitutional Law Scholars as *Amici Curiae* 23–24; Rappaport, Nonoriginalism 27–33. It seems likely that at least 36 of the 57 appointments were made with the understanding that they took place during a recess *between sessions.* See *id.,* at 27–31.

As for the remainder, the historical record reveals nothing about how they were justified, if at all. There is no indication that Johnson's Attorney General or anyone else considered at the time whether those appointments were made between or during formal legislative sessions or, if the latter, how they could be squared with the constitutional text. The majority drives that point home by citing a judicial opinion that upheld one of the appointments nearly two decades later with no analysis of the question presented here. See *ante,* at 11 (citing *Gould* v. *United States,* 19 Ct. Cl. 593 (1884)). Johnson's intra-session appointments were disavowed by the first Attorney General to address that question, see *infra,* at 20, and were not followed as precedent by the Executive Branch for more than 50 years, see *infra,* at 22. Thus, the relevance of those appointments to our constitutional inquiry is

———————

ments. Compare Brief for Petitioner 22 with App. to Brief for Petitioner 1a. Noel Canning convincingly argues that the generals were not given recess appointments but only unofficial "acting appointments" for which they received no commissions. Brief for Respondent Noel Canning 25; see Rappaport, Why Nonoriginalism Does Not Justify Departing from the Original Meaning of the Recess Appointments Clause (manuscript, at 27, n. 79) (hereinafter Rappaport, Nonoriginalism), online at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2374563 (all Internet materials as visited June 24, 2014, and available in the Clerk of Court's case file).

severely limited. Cf. Brief for Political Scientists and Historians as *Amici Curiae* 21 (Johnson's appointments "should be viewed as anomalies" that were "*sui generis* in the first 130 years of the Republic").

### 3. 1869 to 1920

More than half a century went by before any other President made an intra-session recess appointment, and there is strong reason to think that during that period neither the Executive nor the Senate believed such a power existed. For one thing, the Senate adjourned for more than 3 days 45 times during that period, and 43 of those adjournments exceeded 10 days (and thus would not even be subject to the majority's "presumption" against the availability of recess appointments). See Congressional Directory 527–529. Yet there is no evidence that a single appointment was made during any of those adjournments or that any President before the 20th century even considered making such appointments.

In 1901 Philander Knox, the first Attorney General known to have opined on the question, explicitly stated that the recess-appointment power was limited to the period between formal sessions. 23 Op. Atty. Gen. 599. Knox advised President Theodore Roosevelt that he could not appoint an appraiser of merchandise during an intra-session adjournment. He explained:

> "[T]he Constitution and laws make it clear that in our legislative practice an adjournment during a session of Congress means a merely temporary suspension of business from day to day . . . whereas *the recess* means the period after the final adjournment of Congress for the session, and before the next session begins. . . . It is this period following the final adjournment for the session which is *the recess* during which the President has power to fill vacancies . . . . Any intermediate temporary adjournment is not such recess, although it

may be *a* recess in the general and ordinary use of that term." *Id.,* at 601.[6]

Knox went on to observe that none of the "many elaborate opinions" of previous Attorneys General concerning the recess-appointment power had asserted that the power could be exercised "during a temporary adjournment of the Senate," rather than "during the recess of the Senate between two sessions of Congress." *Id.,* at 602. He acknowledged the contrary example furnished by Johnson's appointments in 1867 and 1868, but noted (with perhaps too much tact) that "[t]he public circumstances producing this state of affairs were unusual and involved results which should not be viewed as precedents." *Id.,* at 603.

That was where things stood when, in 1903, Roosevelt made a number of controversial recess appointments. At noon on December 7, the Senate moved seamlessly from a special session into a regular one scheduled to begin at that hour. See 37 Cong. Rec. 544; 38 Cong. Rec. 1. Roosevelt claimed to have made the appointments in a "constructive" recess between the two sessions. See Special Session Is Merged Into Regular, N. Y. Times, Dec. 8, 1903, p. 1. He and his allies in the Senate justified the appointments on the theory that "at the moment the gavel falls to summon the regular session into being there is an infinitesimal fraction of a second, which is the recess between the two sessions." Extra Session Muddle, N. Y. Times, Dec. 7, 1903, p. 3. In 1905, the Senate Judiciary Committee published a report criticizing the appointments on the ground that "the Constitution means a real recess,

---

[6] The majority dismisses Knox's opinion as overly formalistic because it "relied heavily upon the use of the word 'the'" in the phrase "the Recess." *Ante,* at 13. It did not. As the passage quoted above makes clear, Knox was relying on the common understanding of what "the Recess" meant in the context of marking out legislative time.

not a constructive one." S. Rep. No. 4389, 58th Cong., 3d Sess., p. 4. The report explained that the recess is "the period of time when the Senate is not sitting in regular or extraordinary session . . . when its members owe no duty of attendance; when its Chamber is empty; when, because of its absence, it can not receive communications from the President or participate as a body in making appointments." *Id.,* at 2 (emphasis deleted).

The majority seeks support in this episode, claiming that the Judiciary Committee embraced a "broad and functional definition of 'recess'" consistent with the one the majority adopts. *Ante,* at 16. On the contrary, the episode powerfully *refutes* the majority's theory. Roosevelt's legal justification for his appointments was extremely aggressive, but even he recognized that "the Recess of the Senate" could take place only between formal sessions. If the majority's view of the Clause had been considered plausible, Roosevelt could have strengthened his position considerably by making the appointments during an intra-session break of a few days, or at least a few hours. (Just 10 minutes after the new session began on December 7, the Senate took "a recess for one hour." 38 Cong. Rec. 2.) That he instead strained to declare a dubious *inter-session* recess of an "infinitesimal fraction of a second" is powerful evidence that the majority's view of "the Recess" was not taken seriously even as late as the beginning of the 20th century.

Yet the majority contends that "to the extent that the Senate or a Senate committee has expressed a view, that view has favored a functional definition of 'recess' [that] encompasses intra-session recesses." *Ante,* at 14. It rests that contention entirely on the 1905 Judiciary Committee Report. This distorts what the committee said when it denied Roosevelt's claim that there had been a recess. If someone avers that a catfish is a cat, and I respond by pointing out that a catfish lives in water and does not have

four legs, I have not endorsed the proposition that every land-dwelling quadruped is a cat. Likewise, when the Judiciary Committee explained that an instantaneous transition from one session to another is not a recess because the Senate is never absent, it did not suggest that the Senate's absence is enough to create a recess. To assume otherwise, as the majority does, is to commit the fallacy of the inverse (otherwise known as denying the antecedent): the incorrect assumption that if P implies Q, then not-P implies not-Q. Contrary to that fallacious assumption, the Judiciary Committee surely believed, consistent with the Executive's clear position at the time, that "the Recess" was limited to (actual, not constructive) breaks *between sessions*.

### 4. 1921 to the Present

It is necessary to skip over the first 13 decades of our Nation's history in order to find a Presidential legal adviser arguably embracing the majority's interpretation of "the Recess." In 1921 President Harding's Attorney General, Harry Daugherty, advised Harding that he could make recess appointments while the Senate stood adjourned for 28 days during the session because "the term 'recess' must be given a practical construction." 33 Op. Atty. Gen. 20, 25. Daugherty acknowledged Knox's 1901 opinion to the contrary, *id.,* at 21, but he (committing the same fallacy as today's majority) thought the 1905 Judiciary Committee report had come to the opposite conclusion, *id.,* at 23–24. He also recognized the fundamental flaw in this interpretation: that it would be impossible to "accurately dra[w]" a line between intra-session breaks that constitute "the Recess" and those that do not. *Id.,* at 25. But he thought the absence of a standard gave the President "discretion to determine when there is a real and genuine recess." *Ibid.* While a "palpable abuse of discretion might subject his appointment to review," Daugherty thought that "[e]very

presumption [should] be indulged in favor of the validity of whatever action he may take." *Ibid.*[7]

Only after Daugherty's opinion did the flow of intra-session recess appointments start, and for several years it was little more than a trickle. The Solicitor General has identified 22 such appointments made by Presidents Harding, Coolidge, Hoover, and Franklin Roosevelt between 1921 and 1944. App. to Brief for Petitioner 9a–12a. Intra-session recess appointments experienced a brief heyday after World War II, with President Truman making about 150 such appointments to civilian positions and several thousand to military posts from 1945 through 1950. *Id.,* at 12a–27a. (The majority's impressive-sounding claim that "Presidents have made thousands of intra-session recess appointments," *ante,* at 12, depends entirely on post-war military appointments that Truman made in just two years, 1947 and 1948.) President Eisenhower made only 43 intra-session recess appointments, *id.,* at 27a–30a, after which the practice sank back into relative obscurity. Presidents Kennedy, Lyndon Johnson, and Ford made none, while Nixon made just 7. *Id.,* at 30a–31a. The practice rose again in the last decades of the 20th century: President Carter made 17 intra-session recess appointments, Reagan 72, George H. W. Bush 37, Clinton 53, and George W. Bush 135. *Id.,* at 31a–61a. When the Solicitor General filed his brief, President Obama had made 26. *Id.,* at 62a–64a. Even excluding Truman's military appointments, roughly 90 percent of all the intra-session recess appointments in our history have been made since 1945.

_____

[7] I say Daugherty "arguably" embraced the majority's view because he may have been endorsing, not the majority's position, but the intermediate view that reads both "the Recess" and "the next Session" in functional terms, so that intra-session appointments would last only until the next intra-session break. See *supra,* at 10; Rappaport, Non-originalism 34–35.

Legal advisers in the Executive Branch during this period typically endorsed the President's authority to make intra-session recess appointments by citing Daugherty's opinion with little or no additional analysis. See, *e.g.,* 20 Opinions of Office of Legal Counsel (Op. OLC) 124, 161 (1996) (finding the question to have been "settled within the executive branch" by Daugherty's "often-cited opinion"). The majority's contention that "opinions of Presidential legal advisers . . . are nearly unanimous in determining that the Clause authorizes [intra-session recess] appointments," *ante,* at 12, is thus true but misleading: No Presidential legal adviser approved that practice before 1921, and subsequent approvals have rested more on precedent than on independent examination.

The majority is correct that during this period, the Senate "as a body" did not formally repudiate the emerging executive practice. *Ante,* at 14. And on one occasion, Comptroller General Lindsay Warren cited Daugherty's opinion as representing "the accepted view" on the question, 28 Comp. Gen. 30, 34 (1948), although there is no evidence he consulted any Senators or that his statement reflected their views. But the rise of intra-session recess appointments in the latter half of the 20th century drew sharp criticism from a number of Senators on both sides of the aisle. At first, their objections focused on the length of the intra-session breaks at issue. See, *e.g.,* 130 Cong. Rec. 22774–22776 (1984) (Sen. Sarbanes) (decrying recess appointment during a 3-week intra-session adjournment as "a circumvention of the Senate confirmation power"); *id.,* at 23235 (resolution offered by Sen. Byrd, with 39 cosponsors, urging that no recess appointments occur during intra-session breaks of fewer than 30 days).

Later, many Senators sought to end intra-session recess appointments altogether. In 1993, the Senate Legal Counsel prepared a brief to be filed on behalf of the Senate in *Mackie* v. *Clinton*, 827 F. Supp. 56 (DC 1993), vacated

in part as moot, 1994 WL 163761 (CADC 1994) (*per curiam*), but "Republican opposition" blocked the filing. 139 Cong. Rec. 15266–15267. The brief argued that "the recess[-appointment] power is limited to Congress' annual recess between sessions," that no contrary executive practice "of any appreciable magnitude" had existed before "the past fifty years," and that the Senate had not "acquiesced in this steady expansion of presidential power." *Id.,* at 15268, 15270. It explained that some Senators had limited their objections to shorter intra-session breaks out of a desire "to coexist with the Executive" but that "the Executive's subsequent, steady chipping away at the length of recess sufficient for making recess appointments ha[d] demonstrated the need to return to the Framers' original intent and limit the power to intersession adjournments." *Id.,* at 15267, 15272. Senator Kennedy reiterated that position in a brief to this Court in 2004. Brief for Sen. Edward M. Kennedy as *Amicus Curiae* in *Franklin* v. *United States*, O. T. 2004, No. 04–5858, p. 5. Today the partisan tables are turned, and that position is urged on us by the Senate's Republican Members. See Brief for Sen. McConnell et al. as *Amici Curiae* 26.

\*    \*    \*

What does all this amount to? In short: Intra-session recess appointments were virtually unheard of for the first 130 years of the Republic, were deemed unconstitutional by the first Attorney General to address them, were not openly defended by the Executive until 1921, were not made in significant numbers until after World War II, and have been repeatedly criticized as unconstitutional by Senators of both parties. It is astonishing for the majority to assert that this history lends "strong support," *ante,* at 11, to its interpretation of the Recess Appointments Clause. And the majority's contention that recent executive practice in this area merits deference because the

Senate has not done more to oppose it is utterly divorced from our precedent. "The structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic," *Freytag*, 501 U. S., at 880, and the Senate could not give away those protections even if it wanted to. See *Chadha*, 462 U. S., at 957–958; *Clinton*, 524 U. S., at 451–452 (KENNEDY, J., concurring).

Moreover, the majority's insistence that the Senate gainsay an executive practice "as a body" in order to prevent the Executive from acquiring power by adverse possession, *ante,* at 14, will systematically favor the expansion of executive power at the expense of Congress. In any controversy between the political branches over a separation-of-powers question, staking out a position and defending it over time is far easier for the Executive Branch than for the Legislative Branch. See generally Bradley and Morrison, Historical Gloss and the Separation of Powers, 126 Harv. L. Rev. 411, 439–447 (2012). All Presidents have a high interest in expanding the powers of their office, since the more power the President can wield, the more effectively he can implement his political agenda; whereas individual Senators may have little interest in opposing Presidential encroachment on legislative prerogatives, especially when the encroacher is a President who is the leader of their own party. (The majority would not be able to point to a lack of "formal action" by the Senate "as a body" challenging intra-session recess appointments, *ante,* at 15–16, had the appointing President's party in the Senate not blocked such action on multiple occasions.) And when the President wants to assert a power and establish a precedent, he faces neither the collective-action problems nor the procedural inertia inherent in the legislative process. The majority's methodology thus all but guarantees the continuing aggrandizement of the Executive Branch.

### III. Pre-Recess Vacancies

The second question presented is whether vacancies that "happen during the Recess of the Senate," which the President is empowered to fill with recess appointments, are (a) vacancies that *arise* during the recess, or (b) all vacancies that *exist* during the recess, regardless of when they arose. I would hold that the recess-appointment power is limited to vacancies that arise during the recess in which they are filled, and I would hold that the appointments at issue here—which undisputedly filled pre-recess vacancies—are invalid for that reason as well as for the reason that they were made during the session. The Court's contrary conclusion is inconsistent with the Constitution's text and structure, and it further undermines the balance the Framers struck between Presidential and Senatorial power. Historical practice also fails to support the majority's conclusion on this issue.

### A. Plain Meaning

As the majority concedes, "the most natural meaning of 'happens' as applied to a 'vacancy' . . . is that the vacancy 'happens' when it initially occurs." *Ante,* at 22. The majority adds that this meaning is most natural "to a modern ear," *ibid.,* but it fails to show that founding-era ears heard it differently. "Happen" meant then, as it does now, "[t]o fall out; to chance; to come to pass." 1 Johnson, Dictionary of the English Language 913. Thus, a vacancy that *happened* during the Recess was most reasonably understood as one that *arose* during the recess. It was, of course, possible in certain contexts for the word "happen" to mean "happen to be" rather than "happen to occur," as in the idiom "it so happens." But that meaning is not at all natural when the subject is a vacancy, a state of affairs that comes into existence at a particular moment in time.[8]

---

[8] Despite initially admitting that the text "does not naturally favor"

In any event, no reasonable reader would have understood the Recess Appointments Clause to use the word "happen" in the majority's "happen to be" sense, and thus to empower the President to fill all vacancies that might *exist* during a recess, regardless of when they arose. For one thing, the Clause's language would have been a surpassingly odd way of giving the President that power. The Clause easily could have been written to convey that meaning clearly: It could have referred to "all Vacancies that may exist during the Recess," or it could have omitted the qualifying phrase entirely and simply authorized the President to "fill up all Vacancies during the Recess." Given those readily available alternative phrasings, the reasonable reader might have wondered, why would any intelligent drafter intending the majority's reading have inserted the words "that may happen"—words that, as the majority admits, make the majority's desired reading awkward and unnatural, and that must be effectively read out of the Clause to achieve that reading?

For another thing, the majority's reading not only strains the Clause's language but distorts its constitutional role, which was meant to be subordinate. As Hamilton explained, appointment with the advice and consent of the Senate was to be "the general mode of appointing officers of the United States." The Federalist No. 67, at 455. The Senate's check on the President's appointment power was seen as vital because "'manipulation of official appointments' had long been one of the American revolutionary

––––––––––

its interpretation, the majority halfheartedly suggests that the "'happen to be'" reading may be admissible when the subject, like "vacancy," denotes a "continuing state." *Ante,* at 22–23. That suggestion distorts ordinary English usage. It is indeed natural to say that an ongoing activity or event, like a war, a parade, or a financial crisis, is "happening" for as long as it continues. But the same is not true when the subject is a settled state of affairs, like death, marriage, or vacancy, all of which "happen" when they come into being.

generation's greatest grievances against executive power." *Freytag*, 501 U. S., at 883. The unilateral power conferred on the President by the Recess Appointments Clause was therefore understood to be "nothing more than a supplement" to the "general method" of advice and consent. The Federalist No. 67, at 455.

If, however, the Clause had allowed the President to fill *all* pre-existing vacancies during the recess by granting commissions that would last throughout the following session, it would have been impossible to regard it—as the Framers plainly did—as a mere codicil to the Constitution's principal, power-sharing scheme for filling federal offices. On the majority's reading, the President would have had no need *ever* to seek the Senate's advice and consent for his appointments: Whenever there was a fair prospect of the Senate's rejecting his preferred nominee, the President could have appointed that individual unilaterally during the recess, allowed the appointment to expire at the end of the next session, renewed the appointment the following day, and so on *ad infinitum*. (Circumvention would have been especially easy if, as the majority also concludes, the President was authorized to make such appointments during any intra-session break of more than a few days.) It is unthinkable that such an obvious means for the Executive to expand its power would have been overlooked during the ratification debates.[9]

———————

[9] The majority insists that "character and politics" will ordinarily prevent the President from circumventing the Senate, and that the Senate has "political resources" to respond to attempts at circumvention. *Ante,* at 25. Neither character nor politics prevented Theodore Roosevelt from proclaiming a fictitious recess lasting an "infinitesimal fraction of a second." In any event, the Constitution does not entrust the Senate's role in the appointments process to the vagaries of character and politics. See, *e.g., Freytag* v. *Commissioner*, 501 U. S. 868, 879–880 (1991).

The original understanding of the Clause was consistent with what the majority concedes is the text's "most natural meaning." *Ante,* at 22. In 1792, Attorney General Edmund Randolph, who had been a leading member of the Constitutional Convention, provided the Executive Branch's first formal interpretation of the Clause. He advised President Washington that the Constitution did not authorize a recess appointment to fill the office of Chief Coiner of the United States Mint, which had been created by Congress on April 2, 1792, during the Senate's session. Randolph wrote: "[I]s it a vacancy which has *happened* during the recess of the Senate? It is now the same and no other vacancy, than that, which existed on the 2nd. of April 1792. It commenced therefore on that day or may be said to have *happened* on that day." Opinion on Recess Appointments (July 7, 1792), in 24 Papers of Thomas Jefferson 165–166 (J. Catanzariti ed. 1990). Randolph added that his interpretation was the most congruent with the Constitution's structure, which made the recess-appointment power "an exception to the general participation of the Senate." *Ibid.* (footnote omitted).

President John Adams' Attorney General, Charles Lee, was in agreement. See Letter to George Washington (July 7, 1796) (the President may "fill for a limited time an old office *become vacant* during [the] recess" (emphasis added)), online at http://founders.archives.gov/documents/ Washington/99-01-02-00702; Letter from James McHenry to John Adams (May 7, 1799) (hereinafter 1799 McHenry Letter) (conveying Lee's advice that certain offices were "'vacanc[ies] happening during the session, which the President cannot fill, during the recess, by the powers vested in him by the constitution'"), online at http:// wardepartmentpapers.org/document.php?id=31766.[10] One

---

[10] The majority does not deny that Lee took those positions, but it claims he also "later informed [Thomas] Jefferson that, in the Adams

of the most prominent early academic commenters on the Constitution read the Clause the same way. See 1 St. George Tucker, Blackstone's Commentaries, App. 342–343 (1803) (assuming the President could appoint during the recess only if "the office became vacant during the recess").

Early Congresses seem to have shared Randolph's and Lee's view. A statute passed by the First Congress authorized the President to appoint customs inspectors "with the advice and consent of the Senate" and provided that "if the appointment . . . shall not be made during the present session of Congress, the President . . . is hereby empowered to make such appointments during the recess of the Senate, by granting commissions which shall expire at the end of their next session." Act of Mar. 3, 1791, §4, 1 Stat. 200. That authorization would have been superfluous if the Recess Appointments Clause had been understood to apply to pre-existing vacancies. We have recognized that an action taken by the First Congress "provides 'contemporaneous and weighty evidence' of the Constitution's meaning." *Bowsher*, 478 U. S., at 723–724. And other statutes passed in the early years of the Republic contained similar authorizations. See App. to Brief for Re-

---

administration, 'whenever an office became vacant, so short a time before Congress rose, as not to give an opportunity of enquiring for a proper character, they let it lie always till recess.'" *Ante,* at 27 (quoting Letter from Jefferson to Wilson Cary Nicholas (Jan. 26, 1802), in 36 Papers of Thomas Jefferson 433 (B. Oberg ed. 2009) (hereinafter 1802 Jefferson Letter)). Assuming Lee in fact made the statement attributed to him by Jefferson, and further assuming that Lee endorsed the constitutionality of the practice described in that statement (which Jefferson does not say), that practice could only have been regarded as a pragmatic exception to the general view of the Clause that Lee, like Randolph, espoused. And the practice must not have been extensive, since the Solicitor General has been unable to identify even a single appointment made by Adams that filled a pre-recess vacancy. See *infra,* at 36.

spondent Noel Canning 1a–17a.[11]

Also illuminating is the way the Third Congress interpreted the Constitution's Senate Vacancies Clause, which uses language similar to that of the Recess Appointments Clause. Before the passage of the Seventeenth Amendment, the Constitution provided that "if Vacancies [in the Senate] happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature." Art. I, §3, cl. 2. Senator George Read of Delaware resigned in December 1793; the state legislature met in January and February 1794; and the Governor appointed Kensey Johns to fill the seat in March 1794. The Senate refused to seat Johns, resolving that he was "not entitled to a seat in the Senate of the United States; a session of the Legislature of the said State having intervened, between the resignation . . . and

--------

[11] The majority suggests that these statutes may have reflected, not a belief that the recess-appointment power was limited to vacancies arising during the recess, but a "separate" belief that the power could not be used for "new offices" created by Congress and not previously filled. *Ante,* at 30. But the latter view (which the majority does not endorse) was inseparably linked with the former (which the majority rejects), as is made clear by the very source the majority cites. See Letter from Alexander Hamilton to James McHenry (May 3, 1799), in 23 Papers of Alexander Hamilton 94 (H. Syrett ed. 1976) ("[T]he power to fill the vacancy is not the power to make an original appointment. The phrase 'Which may have happened' serves to confirm this construction. . . . [I]ndependent of the authority of a special law, the President cannot fill a vacancy which happens during a session of the Senate"); see also 2 Op. Atty. Gen., at 334 ("If the vacancy exist during the session of the Senate, as in the first creation of an office by law, it has been held that the President cannot appoint during the recess, unless he is specially authorized so to do by law"); W. Rawle, A View of the Constitution of the United States of America 163 (2d ed. 1829) (reprint 2009) ("It has been held by [the Senate], that if new offices are created by congress, the president cannot, after the adjournment of the senate, make appointments to fill them. The vacancies do not *happen* during the recess of the senate").

the appointment." 4 Annals of Cong. 77–78 (1794). It is thus clear that the phrase "happen . . . during the Recess" in the Senate Vacancies Clause was understood to refer to vacancies that *arose*, not merely existed, during the recess in which the appointment was made. It is not apparent why the nearly identical language of the Recess Appointments Clause would have been understood differently.

The majority, however, relies heavily on a contrary account of the Clause given by Attorney General William Wirt in 1823. See 1 Op. Atty. Gen 631. Wirt notably began—as does the majority—by acknowledging that his predecessors' reading was "most accordant with the letter of the constitution." *Id.,* at 632. But he thought the "most natural" reading had to be rejected because it would interfere with the "substantial purpose of the constitution," namely, "keep[ing] . . . offices filled." *Id.,* at 631–632. He was chiefly concerned that giving the Clause its plain meaning would produce "embarrassing inconveniences" if a distant office were to become vacant during the Senate's session, but news of the vacancy were not to reach the President until the recess. *Id.,* at 632, 634. The majority fully embraces Wirt's reasoning. *Ante,* at 22–25.

Wirt's argument is doubly flawed. To begin, the Constitution provides ample means, short of rewriting its text, for dealing with the hypothetical dilemma Wirt posed. Congress can authorize "acting" officers to perform the duties associated with a temporarily vacant office—and has done that, in one form or another, since 1792. See 5 U. S. C. §3345; Act of May 8, 1792, ch. 37, §8, 1 Stat. 281; 705 F. 3d, at 511; Rappaport, Original Meaning 1514–1517. And on "extraordinary Occasions" the President can call the Senate back into session to consider a nomination. Art. II, §3. If the Framers had thought those options insufficient and preferred to authorize the President to make recess appointments to fill vacancies arising late in the session, they would have known how to do so. Massa-

chusetts, for example, had authorized its Governor to make certain recess appointments "in case a vacancy shall happen . . . in the recess of the General Court [*i.e.,* the state legislature], *or at so late a period in any session of the same Court, that the vacancy . . . shall not be supplied in the same session thereof.*"  1783 Mass. Acts ch. 12, in Acts and Laws of the Commonwealth of Massachusetts 523 (1890) (emphasis added).

The majority protests that acting appointments, unlike recess appointments, are an "inadequate" solution to Wirt's hypothetical dilemma because acting officers "may have less authority than Presidential appointments." *Ante,* at 24–25.  It cites an OLC opinion which states that "an acting officer . . . is frequently considered merely a caretaker without a mandate to take far-reaching measures."  6 Op. OLC 119, 121 (1982).  But just a few lines later, the majority says that "the lack of Senate approval . . . may diminish the recess appointee's ability, as a practical matter, to get a controversial job done." *Ante,* at 25.  The majority does not explain why an acting officer would have less authority "as a practical matter" than a recess appointee.  The majority also objects that requiring the President to rely on acting officers would "lessen the President's ability to staff the Executive Branch with people of his own choosing," *ante,* at 24—a surprising charge, since that is the very purpose of the Constitution's advice-and-consent requirement.  As for special sessions, the majority thinks it a sufficient answer to say that they are "burdensome," *ibid.*, an observation that fails to distinguish them from many procedures required by our structural Constitution.

More fundamentally, Wirt and the majority are mistaken to say that the Constitution's "'substantial purpose'" is to "'keep . . . offices filled.'"  *Ibid.* (quoting 1 Op. Atty. Gen., at 632).  The Constitution is not a road map for maximally efficient government, but a system of "carefully

crafted restraints" designed to "protect the people from the improvident exercise of power." *Chadha*, 462 U. S., at 957, 959. Wirt's and the majority's *argumentum ab inconvenienti* thus proves far too much. There are many circumstances other than a vacancy that can produce similar inconveniences if they arise late in the session: For example, a natural disaster might occur to which the Executive cannot respond effectively without a supplemental appropriation. But in those circumstances, the Constitution would not permit the President to appropriate funds himself. See Art. I, §9, cl. 7. Congress must either anticipate such eventualities or be prepared to be haled back into session. The troublesome need to do so is not a bug to be fixed by this Court, but a calculated feature of the constitutional framework. As we have recognized, while the Constitution's government-structuring provisions can seem "clumsy" and "inefficient," they reflect "hard choices . . . consciously made by men who had lived under a form of government that permitted arbitrary governmental acts to go unchecked." *Chadha, supra,* at 959.

## B. Historical Practice

For the reasons just given, it is clear that the Constitution authorizes the President to fill unilaterally only those vacancies that arise during a recess, not every vacancy that happens to exist during a recess. Again, however, the majority says "[h]istorical practice" requires the broader interpretation. *Ante,* at 26. And again the majority is mistaken. Even if the Constitution were wrongly thought to be ambiguous on this point, a fair recounting of the relevant history does not support the majority's interpretation.

### 1. 1789 to 1822

The majority correctly admits that there is "no undisputed record of Presidents George Washington, John

Adams, or Thomas Jefferson" using a recess appointment to fill a pre-recess vacancy. *Ibid.* That is not surprising in light of Randolph's early conclusion that doing so would be unconstitutional. Adams on one occasion contemplated filling pre-recess vacancies but was dissuaded by, among others, Attorney General Lee, who said the Constitution did not permit him to do so. See 1799 McHenry Letter.[12] And the Solicitor General does not allege that even a single appointment made by Adams filled a pre-recess vacancy. Jefferson, too, at one point thought the Clause "susceptible of" the majority's reading, 1802 Jefferson Letter, but his administration, like Adams', appears never to have adopted that reading.

James Madison's administration seems to have rejected the majority's reading as well. In 1814, Madison wanted to appoint Andrew Jackson to a vacant major-generalship in the Army during the Senate's recess, but he accepted, without contradiction or reservation, his Secretary of War's advice that he lacked the power to do so because the post's previous occupant had resigned before the recess. He therefore ordered that Jackson be given a "brevet of Major General," *i.e.,* a warrant conferring the nominal rank without the salary thereof. Letter from John Armstrong to Madison (May 14, 1814); Letter from Madison to

—————

[12] See also Letter from Adams to James McHenry (April 16, 1799), in 8 Works of John Adams 632 (C. Adams ed. 1853) (proposing the appointments); Letter from Adams to McHenry (May 16, 1799), in *id.,* at 647 (agreeing to "suspend [the appointments] for the present, perhaps till the meeting of the Senate"). Before advising Adams, McHenry also consulted Alexander Hamilton, who agreed that the appointments would be unlawful. See Letter from McHenry to Hamilton (Apr. 26, 1799), in 23 Papers of Alexander Hamilton, at 69, 70 ("It would seem that, under this Constitutional power, the President cannot alone . . . fill up vacancies that may happen during a session of the senate"); Letter from Hamilton to McHenry (May 3, 1799), in *id.,* at 94 ("It is clear, that independent of the authority of a special law, the President cannot fill a vacancy which happens during a session of the Senate").

Armstrong (May 17, 1814).  In conveying the brevet, Madison's Secretary of War explained to Jackson that "'[t]he vacancy produced by General Hampton's resignation, not having been filled during the late session of the Senate, cannot be supplied constitutionally, during the recess.'" Letter from Armstrong to Jackson (May 22, 1814).  A week later, when Madison learned that a different major general had resigned *during* the recess, he thought that development would enable him to appoint Jackson "at once." Letter from Madison to Armstrong (May 24, 1814); see Letter from Armstrong to Madison (May 20, 1814) (reporting the resignation).[13]

The majority discounts that evidence of an occasion when Madison and his advisers actually considered the precise constitutional question presented here.  It does so apparently because Madison, in acting on the advice he was given without questioning the interpretation of the recess-appointment power that was offered as the reason for that advice, did not explicitly say "I agree."  The majority prefers to focus on five appointments by Madison, unremarked by anyone at the time, that "the evidence suggests" filled pre-recess vacancies. *Ante,* at 27.  Even if the majority is correct about those appointments, there is no indication that any thought was given to their constitutionality, either within or outside the Executive Branch.  A handful of appointments that appear to contravene the written opinions of Attorneys General Randolph and Lee and the written evidence of Madison's own beliefs about what the Constitution authorized, and that lack any contemporaneous explanation, are not convincing evidence of the Constitution's original meaning.[14]

―――――――

[13] All the letters cited in this paragraph are available online courtesy of the Library of Congress.  See James Madison Papers, http://memory.loc.gov/ammem/collections/madison_papers.

[14] The same can be said of the Solicitor General's claim to have found two recess appointments by Washington and four by Jefferson that

If Madison or his predecessors made any appointments in reliance on the broader reading, those appointments must have escaped general notice. In 1822, the Senate Committee on Military Affairs declared that the President had "no power to make [appointments] in the recess" where "the vacancies did not *happen* in the recess." 38 Annals of Cong. 500. The Committee believed its construction had been "heretofore observed" and that "no instance ha[d] before occurred . . . where the President ha[d] felt himself authorized to fill such vacancies, without special authority by law." *Ibid.*; see also T. Sergeant, Constitutional Law 373 (2d ed. 1830) ("[I]t seemed distinctly understood to be the sense of the senate, that [it] is only in offices that become vacant during the recess, that the president is authorised to exercise the right of appointing").

## 2. 1823 to 1862

The Executive Branch did not openly depart from Randolph and Lee's interpretation until 1823, when Wirt issued the opinion discussed earlier. Even within that branch, Wirt's view was hotly contested: William Crawford, Monroe's Treasury Secretary, argued "with great pertinacity" that the Clause authorized the President to fill only "vacancies which happen during the recess" and not those "which happen while Congress are in session." 5 Memoirs of John Quincy Adams 486–487 (C. Adams ed. 1875). Wirt's analysis nonetheless gained ground in the

filled pre-existing vacancies. Noel Canning disputes that claim, pointing out that Washington told the Senate the offices in question had "'fallen vacant during the recess'" and arguing that Jefferson may have removed the incumbent officers during the recess. Brief for Respondent Noel Canning 44. Suffice it to say that if either Washington or Jefferson had adopted the broader reading, against the written advice of Attorneys General Randolph and Lee, one would expect a good deal more evidence of that fact.

Executive Branch over the next four decades; but it did so slowly and fitfully.

In 1830, Attorney General Berrien disagreed with Wirt when he wrote that "[i]f the vacancy exist during the session of the Senate, . . . the President cannot appoint during the recess." 2 Op. Atty. Gen. 333, 334. Two years later, Attorney General Taney endorsed Wirt's view although doing so was, as he acknowledged, unnecessary to resolve the issue before him: whether the President could, during the recess, fill a vacancy resulting from the expiration of a prior recess appointment at the end of the Senate's session. 2 Op. Atty Gen. 525, 528 (1832). Addressing the same issue in 1841, Attorney General Legaré appeared to believe the dispositive question was whether the office could be said to have "becom[e] vacant" during the recess. 3 Op. Atty. Gen. 673, 674. And in 1845, Attorney General Mason thought it "well established" that "[i]f vacancies are known to exist during the session of the Senate, and nominations are not then made, they cannot be filled by executive appointments in the recess." 4 Op. Atty. Gen. 361, 363.[15]

The tide seemed to turn—as far as the Executive Branch was concerned—in the mid-19th century: Attorney General Cushing in 1855 and Attorney General Bates in 1862 both treated Wirt's position as settled without subjecting it to additional analysis. 7 Op. Atty. Gen. 186, 223; 10 Op. Atty. Gen. 356. Bates, however, entertained "seri-

_____

[15] A year later Mason, like Taney and Legaré before him, concluded that when a recess appointment expired at the end of the Senate's session, the President could fill the resulting vacancy during the ensuing recess. In reaching that conclusion, Mason reiterated that the recess-appointment power "depends on the happening of vacancies when the Senate is not in session" and said the vacancy at issue was "within the meaning of" the Clause because the happening of the vacancy and the termination of the session had "occurred *eo instanti*." 4 Op. Atty. Gen. 523, 526–527 (1846).

ous doubts" about its validity. *Ibid.* And as one 19th-century court shrewdly observed in rejecting Wirt's interpretation, the frequency with which Attorneys General during this period were called upon to opine on the question likely "indicate[s] that no settled administrative usage had been . . . established." *In re District Attorney of United States*, 7 F. Cas. 731, 738 (No. 3,924) (DC Pa. 1868). The Solicitor General identifies only 10 recess appointments made between 1823 and 1863 that filled pre-recess vacancies—about one every four years. App. to Brief for Petitioner 68a–71a. That is hardly an impressive number, and most of the appointments were to minor offices (like Deputy Postmaster for Janesville, Wisconsin, *id.,* at 70a) unlikely to have gotten the Senate's attention. But the Senate did notice when, in 1862, President Lincoln recess-appointed David Davis to fill a seat on this Court that had become vacant before the recess, *id.,* at 71a—and it reacted with vigor.

### 3. 1863 to 1939

Two months after Lincoln's recess appointment of Davis, the Senate directed the Judiciary Committee "to inquire whether the practice . . . of appointing officers to fill vacancies which have not occurred during the recess of Congress, but which existed at the preceding session of Congress, is in accordance with the Constitution; and if not, what remedy shall be applied." Cong. Globe, 37th Cong., 3d Sess., 100 (1862). The committee responded with a report denouncing Wirt's interpretation of the Clause as "artificial," "forced and unnatural," "unfounded," and a "perversion of language." S. Rep. No. 80, 37th Cong., 3d Sess., pp. 4–6 (1863). Because the majority all but ignores this evidence of the Senate's views, it is worth quoting the report at some length:

"When must the vacancy . . . accrue or spring into existence? May it begin during the session of the

SCALIA, J., concurring in judgment

Senate, or must it have its beginning during the recess?  We think the language too clear to admit of reasonable doubt, and that, upon principles of just construction, this period must have its inceptive point after one session has closed and before another session has begun. . . .

.          .          .          .          .

"We . . . dissent from the construction implied by the substituted reading, 'happened to exist,' for the word 'happen' in the clause. . . . [I]f a vacancy once exists, it has in law happened; for it is in itself an instantaneous event.  It implies no continuance of the act that produces it, but takes effect, and is complete and perfect at an indivisible point of time, like the beginning or end of a recess.  Once in existence, it has *happened*, and the mere continuance of the condition of things which the occurrence produces, cannot, without confounding the most obvious distinctions, be taken or treated as the occurrence itself, as Mr. Wirt seems to have done. . . .

"Again, we see no propriety in forcing the language from its popular meaning in order to meet and fulfill one confessedly great purpose, (the keeping the office filled,) while there is plainly another purpose of equal magnitude and importance (fitting qualifications) attached to and inseparable from the former." *Id.,* at 3–6.

The Committee acknowledged that the broad reading "ha[d] been, from time to time, sanctioned by Attorneys General . . . and that the Executive ha[d], from time to time, practiced upon it," but it said the Executive's practice was entitled to no weight because the Constitution's text was "too plain to admit of a doubt or to need interpretation." *Id.,* at 7.

On the same day the Committee published its scathing

report, its chairman, Senator Trumbull, proposed a law barring the payment of any officer appointed during the recess to fill a pre-recess vacancy. Cong. Globe, 37th Cong., 3d Sess., 564. Senator Fessenden spoke in support of the proposal:

> "It ought to be understood distinctly, that when an officer does not come within the rules of law, and is appointed in that way in defiance of the wishes of the Senate, he shall not be paid. It may not be in our power to prevent the appointment, but it is in our power to prevent the payment; and when payment is prevented, I think that will probably put an end to the habit of making such appointments." *Id.,* at 565.

The amendment was adopted by the Senate, *ibid.*, and after passing the House became the Pay Act, which provided that "no money shall be paid . . . out of the Treasury, as salary, to any person appointed during the recess of the Senate, to fill a vacancy . . . which . . . existed while the Senate was in session." Act of Feb. 9, 1863, §2, 12 Stat. 646 (codified at Rev. Stat. §1761; subsequently codified as amended at 5 U. S. C. §56 (1925–1926 ed.)).

The Pay Act would remain in force without significant modification for nearly eight decades. The Executive Branch, however, refused to acknowledge that the Act embodied the Senate's rejection of the broad reading of "happen." Several Attorneys General continued to treat Wirt's interpretation as settled without so much as mentioning the Act. See 12 Op. Atty. Gen. 32 (1866); 12 Op. Atty. Gen. 449 (1868); 14 Op. Atty. Gen. 562 (1875); 15 Op. Atty. Gen. 207 (1877). And when, 17 years after its passage, Attorney General Devens deigned to acknowledge the Act, he preposterously described it as "conced[ing]" the President's power to make the appointments for which the Act barred payment. 16 Op. Atty. Gen. 522, 531 (1880).

The majority is not that bold. Instead, it relegates the

1863 Judiciary Committee report to a pair of anodyne sentences in which it says only that the committee "disagreed with" Wirt's interpretation. *Ante,* at 30. (With like understatement, one could say that Shakespeare's Mark Antony "disagreed with" Caesar's detractors.) Even more remarkably, the majority goes on to claim that the Senate's passage of the Pay Act on the same day the committee issued its report was not a strong enough statement to impede the constitutionalization-by-adverse-possession of the power asserted by the Executive. Why not? Because, the majority says, some Senators may have disagreed with the report, and because the Senate did not go so far as to make acceptance of a recess appointment that filled a pre-recess vacancy "a federal crime." *Ante,* at 30–31. That reasoning starkly illustrates the excessive burden the majority places on the Legislative Branch in contests with the Executive over the separation of powers. See *supra,* at 26.

Despite its minimization by subsequent Attorneys General and by today's majority, there is no reason to doubt that the Pay Act had a deterrent effect. The Solicitor General has identified just 40 recess appointments that filled pre-recess vacancies during the nearly eight decades between the Act's passage in 1863 and its amendment in 1940. App. to Brief for Petitioner 71a–79a.[16]

––––––––––

[16] In the early 20th century, some Senators acceded to the majority's reading of the Clause, as the majority is eager to point out, *ante,* at 31. In 1904, Senator Tillman allowed that "the Senate ha[d] acquiesced" in the President's use of the recess-appointment power to fill pre-existing vacancies, 38 Cong. Rec. 1606, though he also quoted at length from the 1863 Judiciary Committee report and said he did "not see how anybody can find any argument to controvert the position [the report] takes," *id.,* at 1608. And in 1916, Senators Robinson and Sutherland accepted the majority's reading without analysis. 53 Cong. Rec. 4298. The reader can decide whether those statements by three Senators justify the assertion that the Senate "abandoned its hostility" to the broad reading, *ante,* at 31.

### 4. 1940 to the Present

The majority finds it highly significant that in 1940, Congress created a few carefully limited exceptions to the Pay Act's prohibition on paying recess appointees who filled pre-recess vacancies. See Act of July 11, 1940, ch. 580, 54 Stat. 751, now codified with nonsubstantive amendments at 5 U. S. C. §5503. Under the current version of the Act, "[p]ayment for services may not be made from the Treasury of the United States to an individual appointed during a recess of the Senate to fill a vacancy" that "existed while the Senate was in session" *unless* either the vacancy arose, or a different individual's nomination to fill the vacancy was rejected, "within 30 days before the end of the session"; or a nomination was pending before the Senate at the end of the session, and the individual nominated was not himself a recess appointee. §5503(a)(1)–(3). And if the President fills a pre-recess vacancy under one of the circumstances specified in the Act, the law requires that he submit a nomination for that office to the Senate "not later than 40 days after the beginning of the next session." §5503(b).

The majority says that by allowing salaries to be paid to recess appointees in these narrow circumstances, "the 1940 Senate (and later Senates) in effect supported" the majority's interpretation of the Clause. *Ante,* at 32. Nonsense. Even as amended, the Act strictly regulates payment to recess appointees who fill pre-recess vacancies, and it still forbids payment to many officers whose appointments are constitutional under the majority's interpretation. As *amici* Senators observe, the 1940 amendments "reflect at most a desire not to punish public servants caught in the crossfire" of interbranch conflict. Brief for Sen. McConnell et al. as *Amici Curiae* 30. Surely that inference is more reasonable than the majority's supposition that Congress, by permitting *some* of the appointees covered by the Act to be paid, meant to signal

that it now believed *all* of the covered appointments were valid.

Moreover, given the majority's interpretation of the Recess Appointments Clause, it is fairly debatable whether the current version of the Pay Act is constitutional (and *a fortiori*, whether the pre-1940 version was constitutional). Even as amended, the Act seeks to limit and channel the President's exercise of the recess-appointment power by prohibiting payment to officers whose appointments are (per the majority) within the President's sole constitutional authority if those appointments do not comply with conditions imposed by Congress, and by requiring the President to submit a nominee to the Senate in the first 40 days of the ensuing session. There is a colorable argument—which is routinely made by lawyers in the Executive Branch—that Congress "'cannot use the appropriations power to control a Presidential power that is beyond its direct control.'" 33 Op. OLC ___, ___ (2009), online at http://www.justice.gov/olc/opiniondocs/section7054.pdf (quoting 20 Op. OLC 253, 267 (1996)). Consistent with that view, the Office of Legal Counsel has maintained that Congress could not "condition . . . the funding of an officer's salary on being allowed to appoint the officer." 13 Op. OLC 258, 261 (1989).

If that is correct, then the Pay Act's attempt to control the President's exercise of the recess-appointment power at least raises a substantial constitutional question under the majority's reading of the Recess Appointments Clause. See Rappaport, Original Meaning 1544–1546. The Executive has not challenged the Act's constitutionality in this case, and I express no opinion on whether such a challenge would succeed. I simply point out that it is impossible to regard the amended Pay Act as evidence of Senatorial acquiescence in the majority's reading when that reading has the potential to invalidate the Act.

Since the Pay Act was amended, individual Senators

have continued to maintain that recess appointments may not constitutionally be used to fill pre-recess vacancies. See, *e.g.,* 130 Cong. Rec. 22780 (statement of seven Senators that a recess appointment to the Federal Reserve Board in 1984 was unconstitutional because the vacancy "did not happen during the recess"); Brief for Sen. McConnell et al. as *Amici Curiae* 26 (45 Senators taking that view of the Clause). And there is no evidence that the watering-down of the Pay Act produced an immediate flood of recess appointments filling pre-recess vacancies. The Solicitor General has pointed us to only 40 such appointments between 1940 and the present. App. to Brief for Petitioner 79a–89a.

The majority, however, finds it significant that in two small "random sample[s]" of contemporary recess appointments—24 since 1981 and 21 since 2000—the bulk of the appointments appear to have filled pre-existing vacancies. *Ante,* at 29. Based on that evidence, the majority thinks it "a fair inference that a large proportion of the recess appointments in the history of the Nation have filled pre-existing vacancies." *Ibid.* The extrapolation of that sweeping conclusion from a small set of recent data does not bear even the slightest scrutiny. The majority ignores two salient facts: First, from the founding until the mid-19th century, the President's authority to make such appointments was far from settled even within the Executive Branch. Second, from 1863 until 1940, it was *illegal* to pay *any* recess appointee who filled a pre-recess vacancy, which surely discouraged Presidents from making, and nominees from accepting, such appointments. Consequently, there is no reason to assume that the majority's sampling—even if it accurately reflects practices during the last three decades—is at all typical of practices that prevailed throughout "the history of the Nation."[17]

———————

[17] The majority also notes that many of the *intra-session* recess ap-

\*     \*     \*

In sum: Washington's and Adams' Attorneys General read the Constitution to restrict recess appointments to vacancies arising during the recess, and there is no evidence that any of the first four Presidents consciously departed from that reading. The contrary reading was first defended by an executive official in 1823, was vehemently rejected by the Senate in 1863, was vigorously resisted by legislation in place from 1863 until 1940, and is arguably inconsistent with legislation in place from 1940 to the present. The Solicitor General has identified only about 100 appointments that have ever been made under the broader reading, and while it seems likely that a good deal more have been made in the last few decades, there is good reason to doubt that many were made before 1940 (since the appointees could not have been compensated). I can conceive of no sane constitutional theory under which this evidence of "historical practice"—which is actually evidence of a long-simmering inter-branch conflict—would require us to defer to the views of the Executive Branch.

## IV. Conclusion

What the majority needs to sustain its judgment is an ambiguous text and a clear historical practice. What it

---

pointments identified by the Solicitor General were made "within two weeks of the beginning of the recess," which, according to the majority, "strongly suggests that many of the vacancies initially arose prior to the recess." *Ante,* at 29. The inference is unwarranted, since there are many circumstances other than random chance that could cause a vacancy to arise early in the recess: For example, the prior officeholder may have been another recess appointee whose commission expired at the end of the Senate's session, or he may have waited until the recess to resign so that his successor could be compensated without violating the Pay Act. In any event, the overwhelming majority of the intra-session recess appointments on the Solicitor General's list occurred after 1945 and do not shed light on earlier practices.

has is a clear text and an at-best-ambiguous historical practice. Even if the Executive could accumulate power through adverse possession by engaging in a *consistent* and *unchallenged* practice over a long period of time, the oft-disputed practices at issue here would not meet that standard. Nor have those practices created any justifiable expectations that could be disappointed by enforcing the Constitution's original meaning. There is thus no ground for the majority's deference to the unconstitutional recess-appointment practices of the Executive Branch.

The majority replaces the Constitution's text with a new set of judge-made rules to govern recess appointments. Henceforth, the Senate can avoid triggering the President's now-vast recess-appointment power by the odd contrivance of never adjourning for more than three days without holding a *pro forma* session at which it is understood that no business will be conducted. *Ante,* at 33–34. How this new regime will work in practice remains to be seen. Perhaps it will reduce the prevalence of recess appointments. But perhaps not: Members of the President's party in Congress may be able to prevent the Senate from holding *pro forma* sessions with the necessary frequency, and if the House and Senate disagree, the President may be able to adjourn both "to such Time as he shall think proper." U. S. Const., Art. II, §3. In any event, the limitation upon the President's appointment power is there not for the benefit of the Senate, but for the protection of the people; it should not be dependent on Senate action for its existence.

The real tragedy of today's decision is not simply the abolition of the Constitution's limits on the recess-appointment power and the substitution of a novel framework invented by this Court. It is the damage done to our separation-of-powers jurisprudence more generally. It is not every day that we encounter a proper case or controversy requiring interpretation of the Constitution's struc-

tural provisions. Most of the time, the interpretation of those provisions is left to the political branches—which, in deciding how much respect to afford the constitutional text, often take their cues from this Court. We should therefore take every opportunity to affirm the primacy of the Constitution's enduring principles over the politics of the moment. Our failure to do so today will resonate well beyond the particular dispute at hand. Sad, but true: The Court's embrace of the adverse-possession theory of executive power (a characterization the majority resists but does not refute) will be cited in diverse contexts, including those presently unimagined, and will have the effect of aggrandizing the Presidency beyond its constitutional bounds and undermining respect for the separation of powers.

I concur in the judgment only.